## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| LYNN B. KANIOS | : | Civil Action No.  303CV369 (DJS) |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| UST INC. and MARK ULIASZ, | : | |
| | : | |
| Defendants. | : | May 21, 2004 |

### DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF
### MOTION FOR SUMMARY JUDGMENT

Pursuant to Federal Rule of Civil Procedure 56 and Local Rules 7 and 56, the Defendants, UST

Inc. ("UST" or the "Company") and Mark Uliasz ("Uliasz") (or collectively "Defendants"), hereby

respectfully submit this Memorandum of Law in Support of their Motion for Summary Judgment.

### PRELIMINARY STATEMENT

This action was brought by Plaintiff, Lynn Kanios, a former employee of Defendant UST.  In

the Amended Complaint dated January 14, 2004 (the operative Complaint and hereinafter the

"Complaint"), Kanios alleges: (1) in the First Count against UST, discrimination based on gender in

violation of Title VII of the Civil Rights Act of 1964, as amended, 29 U.S.C. § 2000, *et seq*. ("Title

VII")[1]; (2) in the Second Count against UST, discrimination based on gender in violation of the

Connecticut Fair Employment Practices Act, Conn. Gen. Stat. § 46a-60(a)(1), *et seq*. ("CFEPA"); (3) in

the Third Count against UST, retaliation in violation of Title VII; (4) in the Fourth Count against UST,

retaliation in violation of the CFEPA; (5) in the Fifth Count against Defendant Uliasz, aiding and

abetting in violation of the CFEPA; (6) in the Sixth Count against both Defendants, negligent infliction

of emotional distress; (7) in the Seventh Count against UST, negligent misrepresentation; and (8) in the

---

[1] Although Kanios alleges "sexual harassment" in the Complaint, she has clarified that she is alleging only gender-based sexual harassment.  (Kanios Dep. pp. 99-104)

Eighth Count against UST, violation of the federal Family and Medical Leave Act, 29 U.S.C. § 2615(a)(1), *et seq.* ("FMLA").

As will be established herein, Defendants' Motion should be granted as to all causes of action based on the pleadings, deposition testimony and documents presented, because the record unequivocally establishes the absence of any genuine, disputed issues of material fact, warranting the entry of summary judgment as to the Complaint in its entirety.

## I.     <u>STATEMENT OF FACTS</u>

UST, headquartered in Greenwich, Connecticut, is in the primary business of manufacturing and distributing smokeless tobacco products.  Kanios began her employment with UST on March 6, 1995, as a Support Staff Secretary in the Employee Relations ("Human Resources") Department ("Complaint," ¶ 7, part of Ex. K hereto; Kanios Dep. pp. 49-50)[2]  Kanios performed some secretarial and data coordinator work for the Purchasing Department, filling in for a secretary in that department on maternity leave.  (Kanios Dep. pp. 54, 70, 73) Kanios describes her interaction at that time with Uliasz, Purchasing Manager, as limited; however, she claimed to have even then experienced problems with his "managerial style," including his "condescending tone."  She also claimed that Uliasz made comments about her weight, appearance, the amount of food she consumed during pregnancy, that he vaguely referred to her "mind being home with the kids," and remarked that "women belong in the home." (Kanios Dep. pp. 59-64)  Although Kanios knew that she could complain to Human Resources about Uliasz, she did not bring any complaint at that time. (Kanios Dep. pp. 67-69, 83-86, 120; Ex. M)

### <u>Kanios is Promoted Into Purchasing</u>

On or about July 21, 1997, Kanios was promoted into the Purchasing Department as an Associate Buyer by Tim Howard, the department Director.  (Ex. K ¶ 8; Kanios Dep. pp. 54-55; Howard Dep. p. 4)  As an Associate Buyer, Kanios' primary responsibilities were to assist the Buyers, Senior

---

[2] Kanios received an employee handbook and reviewed its contents when she commenced her employment with UST.  (Kanios Dep. p. 51; Ex. L)

Buyers and Managers by placing purchase orders with suppliers, managing inventory by ensuring that certain, designated plants and manufacturing facilities had the ingredients necessary to make the smokeless tobacco products, ensuring sufficient inventory of dry plant materials, developing spreadsheets for polypropylene and casing materials or flavoring fragrances, and placing purchase orders for casing materials, waxes and some of the labels for the dry snuff business.  (Kanios Dep. pp. 55-56, 71; Howard Dep. pp. 12-13, 110, 112, 114; Maguire Dep. pp. 6, 8-9, 27-28, 48, 50-51, 53)  Priscilla Maguire, a then Buyer, supervised some of Kanios' orders and inventory management.[3]  (Maguire Dep. p. 9)  Kanios was periodically also expected to pitch in, as were the other Associate Buyers, to absorb duties of employees who were on leave.  (Kanios Dep. pp. 69-70; Howard Dep. p. 118; Uliasz Dep. pp. 126-28, 131-32)[4]    Kanios initially reported to David Turner.  (Kanios Dep. pp. 57-59)  Shortly thereafter, however, Kanios began to report directly to Defendant Uliasz,[5] but her responsibilities did not change. (Id.)  At all times, Uliasz reported to Tim Howard.  (Howard Dep. pp. 5, 9)

### Kanios' Complaint to a Co-Worker Reaches Human Resources

In or about late January 2001, Kanios told a colleague, Christine Walsh, that she was upset by comments made to her by Uliasz.  (Kanios Dep. pp. 80, 116-17; Ex. K ¶ 16)  Walsh worked directly for Robert Rentz, Director of Customer Development and a UST Compliance Officer;[6] she told Rentz about her "friend" who was having problems with her supervisor.  (Rentz Dep. pp. 42; Kanios Dep. pp. 145-46)  Kanios then spoke directly with Rentz after Rentz contacted her.  (Kanios Dep. pp. 82, 117, 120; Rentz Dep. pp. 43-44)  Kanios alleged to Rentz: (a) that Uliasz made offensive comments about her size;

---

[3] While Kanios contends Uliasz harbored discriminatory bias against women in general, it is noteworthy that Uliasz promoted Maguire, a female, to Associate Buyer; then to Buyer; and then to Senior Buyer. (Maguire Dep. pp. 7, 37). This testimony is undisputed by Kanios. (Kanios Dep. pp. 94-95, 113-14, 156-57)

[4] (See also, e.g., Uliasz Dep. pp. 126-128, 138; Howard Dep. p. 118; Kanios Dep. pp. 69-71, 182-84)

[5] Uliasz participated in the decision to have Kanios transferred to him as her supervisor, as well as in the initial promotion to Associate Buyer.  (Uliasz Dep. pp. 40, 41, 157; Ex. N) This testimony is also undisputed by Kanios. (Kanios Dep. pp. 58-59 wherein she concedes lack of knowledge on this point)

[6] Compliance officers are identified individuals within UST charged with the responsibility of acting as additional receivers of employee complaints of violations of the Company's Code of Conduct.  Once received, these officers forward complaints received to the appropriate department, such as Human Resources, for investigation.  (Rentz Dep. pp. 16-18).

(b) that he often commented about the amount of food she was consuming, possibly having called her a "fat bitch" (although Rentz was admittedly unclear in his recollection on this remark); and (c) that, in general, he made repeated, condescending comments about her intelligence and performance.  (Kanios Dep. p. 120-21; Rentz Dep. pp. 43-44, 60; Viesta Dep. pp. 63-65 and Ex. P, DO667)  Kanios also told Rentz Uliasz "pushed" her.  (Kanios Dep. p. 121)  No mention of any gender-based comments was made by Kanios to Rentz.  (Id.)

Rentz advised Kanios that the matter had to be reported, and himself followed up with the Legal Department.  (Rentz Dep. pp. 44, 47-48)  This conversation with Rentz was the first on record in which Kanios ever complained about conduct by Uliasz to UST management.  (Kanios Dep. pp. 76-77, 83, 111, 286-87; Howard Dep. pp. 23-24)[7]  Kanios claimed she did not go to Human Resources earlier out of fear of retaliation, but she could not name even an single instance which she observed to support this fear.  (Kanios Dep. pp. 83, 84-87, 118)  In fact, she acknowledged that others had complained about the department, with other males having complained specifically about Uliasz's managerial style, yet she could not point to any retaliation against them.  (Kanios Dep. pp. 84-86, 157-59)  Rentz then followed up with Nella Viesta, Director of Employee Relations, to advise her that Kanios would be coming in to see her.  (Kanios Dep. p. 122; Rentz Dep. pp. 50-51; Viesta Dep. p. 8)  By that time, however, Viesta had already been made aware by the Legal Department that Kanios complained about Uliasz.  (Viesta Dep. pp. 62-63 and Ex. P DO667)  An investigation thereafter ensued.  (See *infra*)

On February 7, 2001, Viesta met with Kanios.  She complained to Viesta about Uliasz's managerial style, condescending tone, as well as his "comments" about her food consumption.  (Kanios Dep. pp. 148-49, 151-52)  During her deposition, Kanios elaborated that Uliasz made derogatory comments about her appearance, weight, eating habits and intelligence.  By way of example: (a) when

---

[7] Kanios claimed during deposition she previously complained to David Turner and to Tim Howard, yet she did not include this allegation either in her Complaint, or in her CHRO Charge.  Further, she could not remember the particulars of these purported conversations.  (Kanios Dep. pp. 68, 77-78 ; Ex. K; Ex. R, CHRO charge)

she returned from maternity leave, Uliasz told her he "needed to teach [her] Math 101 again," and that "her thoughts are still at home"; (b) he kept a small jar of pennies on a desk in the department which he labeled her "education fund"; (c) incident to her two pregnancies, Uliasz had commented repeatedly that she was "really packing it [weight] on…was eating for two…was strapping on a feed bag…."; "when you are done eating, make sure you wipe your chin off"; and (d) he would ask her if she "wanted a hefty bag," referring again to her food consumption.

When asked at her deposition if all comments were about "weight and eating habits," Kanios said "No, there was…he would make comments about my appearance, he would make comments that he had to deal with…he would talk condescending to me and it would be inferior comments and he would—you know, comments he wouldn't make to a man.  A lot of it is hard to say.  A lot of it was in his—he had a lot of mannerisms.  It's very hard to describe…"  When asked yet again what comments were <u>not</u> related to weight or food consumption, she answered:  "He's made comments about my hair, he's made comments about my glasses, he's made comments about my shoes.  He's made comments about—you know, living still in the 80's with the clothes I had on."  She also claimed he made negative comments about her attractiveness.  (Kanios Dep. pp. 97-104, 247, Viesta Dep. pp. 41-44 )  Kanios further asserted that Uliasz commented about her being "barefoot and pregnant," being a woman home with children, and about being emotional because she was a woman.  (Kanios Dep. pp. 89-93, 97-104, 150-152; <u>but</u> <u>see</u> Viesta Dep. pp. 37-38, 41-44, 55-56, 67-69, 72, 75-80 and Ex. P DO668-669-Viesta denies any record of Kanios alleging gender-derogatory remarks)  Kanios also told Viesta that Uliasz put his hands on her to get by her, expressing frustration, during a conversation in his office--"like she didn't matter."  (Kanios Dep. pp. 108-10, 169-170, 172; Viesta Dep. pp. 42-43, 72-73)[8]  Interestingly, Kanios' **allegations of comments which refer to "women" are conspicuously absent from both Kanios' Complaint in this action and her CHRO Charge, including the letter attached to her Charge**

---

[8] Viesta denied that Kanios alleged Ulisaz pushed or shoved her, but rather, visibly demonstrated and verbally described that he had placed his hands up to get by her—without touching, pushing or shoving.  (Viesta Dep. pp. 42-43, 72-73)

**authored by her then attorney, William Blake**.  (Ex. K; Ex. R)  Further, Kanios produced purported contemporaneous handwritten notes of what she described as pertinent events, yet not one comment reflected in those notes refers to such statements.  (Ex. T, Kanios Notes)

When asked at her deposition whether she had raised any claims of gender based discrimination or harassment to Viesta, Kanios responded ambiguously that she "believed" she told Viesta about comments "along those lines"; about the remark that Kanios was "barefoot and pregnant," about Kanios being emotional because she was a woman[9], and about _her_ mind being home with the children. (Kanios Dep. pp. 148-52; see also Kanios Dep. pp. 97-104, 273-75, 277, 280, 281-88; Ex. T)[10]  Kanios was assured she would not have to confront Uliasz unless she was comfortable.  (Kanios Dep. pp. 125-27; Ex. K ¶ 17)

Viesta promptly met with Uliasz on February 8, 2001, and informed him of Kanios' complaints which concerned his condescending management style and comments he made about the amount of food Kanios consumed.  (Uliasz Dep. pp. 90, 93-94, 171-73; Viesta Dep. pp. 83-88; Ex. P DO670, D0682-683)  Uliasz expressed surprise to Viesta that Kanios had not addressed this issue with him directly, yet conceded that, at times, he may have exhibited his frustration with Kanios' performance in a manner which could be too direct.  (Uliasz Dep. pp. 172-73; Viesta Dep. p. 85)  Uliasz agreed to try to be more sensitive to any condescending demeanor, and to better manage Kanios' performance by giving her specifics and coaching.  (Viesta Dep. pp. 87- 88; Ex. P D0670; Uliasz Dep. pp. 101-02)  Uliasz further admitted that he made the "Math 101" comment once (Uliasz Dep. pp. 84), and that he may have joked in the cafeteria about Kanios' food consumption.  (Uliasz Dep. p. 88)  However, during his deposition, Uliasz added that such teasing remarks were made in the department between and among males and

---

[9] Kanios conceded Uliasz could have been simply making a distinction between men and women and how sensitive women are to teasing remarks, as opposed to how men handle teasing.  (Kanios Dep. p. 151)

[10] Viesta denies that Kanios made any claims of gender-based derogatory comments by Uliasz, and indeed, Viesta's deposition testimony and contemporaneous investigatory notes reflect allegations by Kanios consistent with the Complaint and the CHRO Charge; i.e., that the comments were about the amount of food being consumed, weight, appearance, and intelligence. (Viesta Dep. pp. 172-175 and Ex. P)

females alike. (Uliasz Dep. pp. 158-159, 181)  Kanios, on the other hand, could not proffer evidence as to how Uliasz treated males, or anyone else, in the office.  Nor could she provide any evidence regarding Uliasz's pattern of hiring and firing of males and females, except to concede he promoted Maguire. (Kanios Dep. pp. 95, 113-14, 153-55 )

After hearing about Kanios' complaint, Uliasz met with Kanios, as pre-planned, to discuss her annual performance review. (Kanios Dep. pp. 124-25, 139-40; Uliasz Dep. pp. 68-71, 169-170)  Indeed, contrary to her own Complaint, Kanios admitted during deposition that Uliasz specifically referred to his conversation with Viesta during her review meeting.  (Kanios Dep. pp. 124-25)  Yet, despite his knowledge of the internal complaint, Uliasz still gave Kanios a positive overall performance review and commensurate raise.[11]  A bonus followed two weeks later.  (Ex. V; Ex. U D0398; Viesta Dep. pp. 165-166; Kanios Dep. pp. 124-125, 160)[12]

Viesta also advised Howard, that Kanios had complained about Uliasz's condescending and abrasive management style. (Viesta Dep. pp. 88-90; Howard Dep. pp. 30-35, 37, 63-66)  Howard agreed to a meeting with and to monitor Uliasz.  (Howard Dep. p. 35-40; Viesta Dep. pp. 89-90, 94, 176)  Howard then approached Kanios directly, who reiterated her claims to Howard.[13]  (Kanios Dep. pp. 130-31; Howard Dep. pp. 44-47, 50-52, 78-79; Viesta Dep. p. 94; Ex. EE DO384-388)  Howard met with Uliasz.  (Howard Dep. pp. 39-40, 64-67; Uliasz Dep. p. 99-101; Ex. EE DO385-388)   It is important to note that Kanios never stated to Howard that Uliasz had called her "fat," "ugly," or that she believed she was treated differently because of gender. (Howard Dep. pp. 144-145)

On February 16, 2001, Howard, in an attempt to facilitate a resolution, attempted to have a meeting with Kanios and Uliasz, but Kanios expressed discomfort at meeting with them alone.  (Kanios

---

[11] Historically, Kanios's reviews reflected a "meets" or "exceeds" expectations rating by Uliasz. (Kanios Dep. pp. 73-89)

[12] Howard and Uliasz could have taken the opportunity to change Kanios' performance review upon learning of her complaint about Uliasz, and before presenting it to Kanios.  However, neither took such action.  Again, even two weeks later, Kanios received a bonus on top of the raise granted with the positive review.  (Viesta Dep. pp. 168-169; Howard Dep. pp. 145-47)

[13] Kanios again ambiguously claimed she told Howard of Uliasz's comments by making it "obvious" they were made because she is a woman.  (Kanios Dep. p. 146-48)  No factual details were provided.

Dep. 130-31; Viesta Dep. pp. 98-100; Ex. P DO672)  On that same day, Kanios went to the Vice President of UST's Employee Assistance Program ("EAP"), Karen Thorman.  (Thorman Dep. pp. 12-17; Kanios Dep. p. 132)  Observing that Kanios was emotionally upset about attending a meeting her managers had scheduled, Thorman referred Kanios to Dr. Jane Hankin, a psychologist on UST's EAP referral list.  Thorman further recommended that Kanios go back to Viesta and talk to her about her discomfort, and herself contacted Viesta to advise that Kanios wanted Viesta present at the meeting. (Thorman Dep. pp. 12-17, 26; Viesta Dep. pp. 94-97; Ex. P DO671)  However, on February 20, before hearing from Viesta, Howard attempted to resolve the situation by having a meeting with Kanios and Uliasz, to find out how to "make it better".  (Kanios Dep. pp. 132-36; Howard Dep. pp. 81-83, 89-92; Ex. EE DO389; Viesta Dep. pp. 94-97, 102, 104-05; Ex. P DO671-674; Uliasz Dep. pp. 102, 105-06)

After the February 20th meeting with Uliasz and Howard, Kanios contacted an attorney, who wrote a letter to Senior Vice President, Richard Kohlberger.  (Kanios Dep. pp. 134-35)  This letter referenced only comments relating to Kanios' weight, appearance, and intelligence, yet asserted that such comments were the result of gender-bias, that they created a "hostile environment", and constituted "sexual harassment."  (Ex. W)  In the interim, on February 22, Viesta had a conversation with Kanios, during which Kanios informed her of the meeting with Howard and Uliasz two days earlier, and her discomfort with meeting them alone.  Kanios told Viesta she thought they were trying to "make it a performance issue", and therefore, Viesta suggested another meeting with her present for the following Monday.  Kanios agreed.  (Viesta Dep. pp. 103-07; Ex. P DO672-674)

After this conversation, but prior to the scheduled Monday meeting, Kohlberger passed the attorney letter along to Viesta.  Viesta contacted Kanios on February 23 to discuss the letter, and asked why Kanios had contacted an attorney.  (Kanios Dep. p. 136; Viesta Dep. pp. 104-106, 108-09, 112; Ex. P D0675-676)  Viesta claims Kanios told her that her "real estate attorney" had been premature in sending the letter, and she wanted to explore transfer opportunities, but agreed to proceed with the Monday meeting with Howard and Uliasz to continue to aim for resolution.  (Viesta Dep. pp. 109-12;

Ex. P DO675).  Kanios denies disavowing the letter, but agrees that she told Viesta she would meet again without her attorney present, responding to Viesta's expression that she wanted things to work about with Uliasz.  (Kanios Dep. pp. 137-38; Ex. P DO675-676)

On February 27, 2001, this meeting was conducted.  Kanios' allegations were reviewed, and the parties agreed that Uliasz would meet with Kanios once each week to discuss the status on projects to improve communications and to avoid problems when he might be frustrated with her performance.  It was also decided that Howard would be observing, monitoring and coaching Uliasz and attending his regular staff meetings as much as he could.  They reiterated that Kanios could come to Uliasz or Howard at any time with any continuing concerns. (Kanios Dep. pp. 138-144; Viesta Dep. pp. 113-16; Ex. P D0675-676; Howard Dep. pp. 90-93, 98-99; Ex. EE DO390)[14]

Viesta then told Howard and Uliasz that "a letter" had been received from an attorney representing Kanios, but she did not divulge to Uliasz, and could not recall divulging to Howard, the specific content thereof or that discrimination and sexual harassment were being alleged.  Howard and Uliasz specifically recalled not being told of these details (Howard Dep. pp. 101-104, 133, 150-151, 154; Uliasz Dep. pp. 173-175)  The testimony of Howard and Uliasz, which establish that Howard and Uliasz were never made privy to any of the contents of the attorney letters, <u>cannot be contraverted with evidence</u> by Kanios.

Viesta prepared a "purpose" memo dated February 26, 2001, confirming the topics of discussion at the February 27 meeting, noting specifically Viesta's continuing perception that Kanios' complaint was that Uliasz was condescending, and that he had made offensive remarks related to her eating habits and intelligence.  The memo also mentioned Uliasz's frustrations with Kanios' performance as a potential reason for his attitude. (Viesta Dep. pp. 113-117, 178; Ex. P, Ex. X; Kanios Dep. pp. 138-45)  Kanios admitted in deposition that some of these performance issues had, in fact, been addressed by

---

[14] Viesta testified that she decided what investigative steps to take based specifically on Kanios' allegations.  Thus, had Kanios suggested gender-based harassment, Viesta possibly would have conducted other interviews of women in the department.  (Viesta Dep. pp. 174-175)

Uliasz before her complaint.  (Kanios Dep. pp. 162-74; <u>see also</u> Viesta Dep. p. 178-79, where she confirms that Kanios never alleged performance concerns of Uliasz unjustified)  Viesta also  prepared a March 6, 2001, "recap" memo specifically noting the solutions discussed to improve communications between Kanios and Uliasz going forward.  (Ex. X DO677)   Significantly, the memo contained an invitation to the recipients, including Kanios, to alter or add to its content if the recipient thought it necessary---**Kanios neither changed nor added anything to this memo, despite the lack of any reference to gender-based remarks, or discrimination or harassment on the basis of gender or any other protected category.  (Kanios Dep. pp. 144-45; Ex. X; Viesta Dep. pp. 180-81)**  Kanios claimed that even after March 6**,** Uliasz made additional comments about her eating.  (Kanios Dep. pp. 140-41) However, subsequent to this last meeting, Viesta periodically checked with Kanios about the status of her situation and Kanios replied that the situation was "okay."  (Viesta Dep. pp. 118-119)   Viesta, Howard and Uliasz therefore believed the matter had progressed to Kanios' satisfaction.  (Viesta Dep. p. 119; Howard Dep. pp. 90-93; Uliasz Dep. pp. 114-15, 119)

### Kanios Takes a Two-Week Leave of Absence

On March 19, 2001, Kanios went to Viesta and to Thorman upset, without providing the reasons why she was upset. (Kanios Dep. p. 211; Viesta Dep. pp. 120-21)   Kanios mentioned she had a scheduled doctor's appointment and Thorman recommended she keep that appointment.  (Thorman Dep. p. 26) Kanios told Viesta she was having panic attacks and was going to see her doctor. (Viesta Dep. pp. 120-121, 177, 180; Ex. P D0678.)  Thorman was then contacted directly by Kanios' psychologist who expressed concern over Kanios' return to the department.   (Hankin Dep. pp. 91-92)   At the psychologist's request, Thorman agreed to approve Kanios for a two week leave of absence, commencing immediately on March 20, 2001.  (Thorman Dep. pp. 28-29, 36; Hankin Dep. pp. 91-92; Trencher Dep. pp. 19-20, 35-36; Kanios Dep. pp. 220-21, 310- 311)  Kanios followed up with Viesta on March 20, 2001, and informed her of the two-week medical leave.  (Viesta Dep. pp. 123-24)

On March 22, 2001, Viesta forwarded to Kanios the UST leave of absence forms, including the physician certification forms, for completion by her and by her treating psychologists so as to qualify for any remaining leave to which Kanios was entitled. (Kanios Dep. pp. 312-14; Ex. Y; Ex. Z; Ex. AA) Like the FMLA policy set forth in the employee handbook, these forms, which Kanios acknowledged receiving and completing, specifically provided that the federal leave entitlement was calculated by looking back at the prior 12 month period.  In this regard, it is critical to note that in 2000, and specifically between May 1 through July 12, Kanios had already taken 10.3 weeks of FMLA qualified leave incident to her pregnancy.  She then took an additional 2 weeks of medical leave from July 24, 2000, through August 7, 2000; thus, Kanios had taken more than 12 weeks of medical leave during the 12 months between March 20, 2000, and March 20, 2001.  (Kanios Dep. pp. 302-03, 306; Ex. Z; Ex. AA; Ex. BB; Ex. CC)  Critically important, the forms confirmed that her federally guaranteed FMLA rights had already been exhausted by that point, and that she may have additional eligibility for leave only under the **Connecticut state** FMLA.[15] (Ex. Z; Ex. AA; Ex. BB; Kanios Dep. pp. 314-15)

### Management Discovers Serious Performance Deficiencies

On March 21, 2001, immediately following the commencement of Kanios' leave, another letter had been received by Kohlberger from Attorney Blake.  (Ex. DD)  Kohlberger forwarded this letter to Viesta as well, but the contents of this letter were, like the first, not made known to Uliasz or Howard. (Howard Dep. pp. 101-104, 133, 150-151, 154; Ex. P D0682-683; Viesta Dep. p. 131-39; Uliasz Dep. 174)  Viesta told Howard a second letter had been received.  During this same conversation, Howard advised Viesta that after Kanios' leave of absence commenced, the plants began calling him and Maguire directly, complaining about the reducing inventory; the failure to receive critical supplies; and unprocessed orders for items for which Kanios was responsible.  (Howard Dep. pp. 107-22, 136-39; Uliasz Dep. pp. 5-6, 135-37, 159-160; Maguire Dep. pp. 20-21; Viesta Dep. pp. 131-36, 142, 149-57; Ex. S).  In fact, Maguire testified as to her direct knowledge that orders for supplies and ingredients had

[15] These forms were sent again to Kanios on April 6, 2001.  (Ex. Z DO366)

not been timely placed by Kanios, despite that she and Kanios had reviewed the inventory together prior to her leave and decided what items within Kanios' responsibility needed to be ordered for the manufacturing plants. Indeed, Maguire confirmed that representatives from the plants had called her directly, informing her that orders for critical ingredients and supplies were either not received or not placed at all. Maguire herself was frustrated since, based on Kanios' prior assurances and discussions, Kanios should have understood the tasks to be completed. It was Maguire who then informed both Uliasz and Howard about a number of problems related to the orders for plant materials/ingredients. (Maguire Dep. pp. 26-29, 44-55, 61-62) A series of e-mail communications and internal memoranda outlining the problems were presented to Maguire during her deposition; she confirmed that she knew personally and directly that Kanios had failed to order items as reflected in these communications. (Id.) Critically important, Maguire, a female and friend of Kanios, someone completely removed from the investigation and complaint process, and not a decision-maker with respect to Kanios' employment, presented testimony still unrefuted by Kanios that these failures constituted serious derelictions of duty by Kanios which could have potentially shut down plants and/or cost UST millions of dollars. (Maguire Dep. pp. 49-52; Ex. O, copy of Maguire Affidavit to CHRO) Kanios' proclaimed lack of any knowledge of these issues was, bluntly stated, patently "underwhelming," yet she admitted the seriousness of the consequences in not correctly and timely placing orders. (Kanios Dep. 56, 181-210)

After this initial conversation wherein Howard advised Viesta of these disturbing discoveries, serious additional problems were unearthed. As Howard testified and his contemporaneous handwritten notes confirm, once he was advised of the problems with the plants, both through Maguire and through calls placed directly to him, he asked the employees covering Kanios' desk to see what else might be lingering. This inquiry revealed that the problems were prevalent, yet Kanios had told Howard prior to her leave as well things were "under control."[16] (Howard Dep. pp. 106-22, 132-39; Ex. S) By this time,

---

[16] Howard initially told Viesta he wanted to place Kanios on probation, but after problems continued to be discovered, he agreed termination was warranted. (Viesta Dep. pp. 155-57)

it was clear that Kanios' deficiencies were egregious, especially in view of her repeated assurances to management. (Uliasz Dep. pp. 135-38) Obviously, Kanios had been sitting on a "powder keg," keeping everything hidden. Yet, while Kanios claims that Howard and Uliasz were driven by their desire to retaliate against her for lodging her complaint, she proffers no reason whatsoever for Maguire's undisputed and unequivocal testimony with respect to her performance deficiencies or to disprove the testimony by Howard regarding calls he received directly from the plants. Kanios' employment was ultimately terminated effective April 13 by way of letter to her. (Ex. Q, Termination Letter)

Kanios confirmed at her deposition that she was medically unable to return to work at the time she received the letter terminating her employment. (Kanios Dep. pp. 306-307, 310) Interestingly, Kanios stopped seeing her treating psychologist as soon as she received the termination letter, and has not sought continuing treatment with any medical professional since then. (Kanios Dep. pp. 217-19, 315-317)

### Kanios Files Administrative Charges

On or about August 21, 2001, Kanios filed an administrative charge with the Connecticut Commission on Human Rights and Opportunities ("CHRO") and the Equal Employment Opportunity Commission ("EEOC"). As previously established, in support of her Charge, Kanios submitted an affidavit, under oath, in which she set forth only allegations that Uliasz had made comments relating to her weight, appearance, and intelligence. The affidavit contains no reference whatsoever to comments by Uliasz that were sexual or gender-based; there were no allegations mentioning disparate treatment of "women," or of Kanios as a "woman"; or even any comments about pregnancy. (Ex. R, Kanios Affidavit to CHRO) Similarly, Kanios' Complaint and Amended Complaint in this action contain only allegations that Uliasz made comments regarding her "weight, appearance, eating habits and intelligence," and are likewise conspicuously devoid of any mention of comments regarding gender or pregnancy. (Ex. K ¶¶ 12, 13).

Based on the applicable judicial precedent and a review of the undisputed facts presented, the following becomes apparent:  (a) even if Kanios' allegations are taken as true, the purported conduct by Uliasz did not rise to the level of actionable discrimination or gender-based harassment within the scope of either Title VII or the CFEPA; (b) even if Kanios' allegations are taken as true, she did not engage in "protected activity" <u>known to Howard or Uliasz</u>, the primary decision-makers with respect to the termination of her employment, when that decision was made, and therefore, Kanios cannot sustain a claim of retaliation under either Title VII or the CFEPA; (c) Uliasz cannot be held to have "aided and abetted" a discriminatory practice as a matter of law; Uliasz is the accused "discriminator," and therefore, cannot be an "aider or abetter" under well established law; (d) Kanios cannot sustain a claim of negligent infliction of emotional distress, as the required showing that defendant should have realized its conduct during the termination process involved an unreasonable risk of causing severe distress, which might result in illness or bodily harm; (e) Kanios cannot establish that any representation made to her by anyone at UST was false when made, or which anyone should have known was false when made, in connection with her taking a leave of absence; and (f) Kanios cannot maintain a claim under the FMLA because: (i) by the time she commenced her last leave of absence, her rights had already been exhausted; (ii) in any event, the remainder of her leave entitlement was exhausted by the time of her termination; or (iii) in the alternative, she did not fulfill the requirement of continued certification of a serious illness, nor was she even able to return to her employment at the time of the undisputed expiration of her leave entitlement.

## II.   <u>ARGUMENT</u>

### A.   <u>THE STANDARD ON A MOTION FOR SUMMARY JUDGMENT</u>

A moving party is entitled to summary judgment if the "pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any," demonstrate the absence of a genuine issue of material fact.  Fed. R. Civ. P. 56(c); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986); <u>Beckman v. United States Postal Serv.</u>, 79 F. Supp.2d 394, 399 (S.D.N.Y. 2000). The

movant's burden is satisfied if it can point to an absence of evidence to support an essential element of the non-moving party's claim. Goenaga v. March of Dimes Birth Defects Found., 51 F.3d 14, 18 (2d Cir. 1995); Celotex, 477 U.S. at 322-23; Jancewicz v. Southern New England Tel. Co., 54 F. Supp. 2d 134, 135 (D. Conn. 1999). Defendant is entitled to judgment if a fair-minded jury could not return a verdict for the plaintiff on the evidence presented. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). The non-moving party must provide "concrete evidence" upon which a reasonable juror could return a verdict in his or his favor. Id. at 256. A summary judgment motion "will not be defeated merely…on the basis of conjecture or surmise." Bernard v. New York City Health & Hosps. Corp., No. 93 Civ. 8593 (LAP), 1996 WL 457284, at *4 (S.D.N.Y. Aug. 14, 1996)(quoting Goenaga, 51 F. 3d at 18)). Summary judgment is appropriate in employment discrimination cases, including Title VII-based discrimination or harassment cases, despite that the employer's intent may be at issue. See, e.g., Weinstock v. Columbia University, 224 F.3d 33, 41 (2d Cir. 2000), cert. denied, 124 S.Ct. 53 (2003); Coraggio v. Time, Inc., No. 94 Civ. 5429, 1996 WL 139786, at *6 (S.D.N.Y. Mar. 28, 1996), aff'd mem., 108 F.3d 329 (2d Cir. 1997); Abdu-Brisson v. Delta Air Lines, 239 F.3d 456, 466 (2d Cir. 2001), cert. denied, 534 U.S. 993 (2001).

## B.    COUNTS ONE AND TWO (DISCRIMINATION) FAIL AS A MATTER OF LAW

Kanios alleges in her first cause of action that UST violated Title VII, 42 U.S.C. § 2000e et seq., by treating her in a "manner unequal to other employees…on the basis of sex…". Kanios further claims that UST failed to "adequately investigate and remedy the treatment to which [she] was subjected," which also "discriminatorily denied plaintiff equal treatment on the basis of sex…" Plaintiff makes identical allegations under the CFEPA in Count Two.

Kanios confirmed during her deposition that her discrimination claim is one for gender-based harassment. (Kanios Dep. pp. 99-101) Moreover, she does not attribute, because she cannot, any particular tangible, adverse employment decision attributable to the purported gender bias; indeed, in response to questioning by her own attorney to clarify her claim regarding the adverse action about

which she complains (i.e., the termination of her employment), she responded that it was the fact of her internal complaint against Uliasz which motivated that termination decision.  In other words, as more fully outlined below, Kanios never asserts that a basis for the termination of her employment was her gender, and similarly fails to point to any other tangible, adverse action which she asserts was discriminatory based on her gender.[17]  (Kanios Dep. pp. 128-30 where she admits she was not disciplined in any way after her complaint; 210, 254)

    (i)      **Plaintiff Cannot Prove Actionable Hostile Environment Sexual Harassment**

In support of her claim of hostile environment as a result of gender-based harassment by her supervisor, Uliasz, in violation of the Title VII and CFEPA,[18] Kanios articulated alleged comments about her appearance, weight, intelligence, and about Uliasz's "condescending" attitude in general. While such comments, if made, were clearly in poor taste, they do not involve "categories" protected by Title VII or the CFEPA.  As to Kanios' allegations concerning comments which do arguably reference her gender, or women in general, it is undisputed that they were vague, sporadic, and did not even clearly evidence a gender bias.  Further, Kanios conceded she had no personal knowledge of how Uliasz treated her male counterparts, except to admit that <u>other males had complained</u> about his managerial style.  (Kanios Dep. pp. 84-85, 93-95, 153-54, 157-59, 258).  She had no evidence as to how he treated other females[19], nor his hiring and firing practices along gender lines, and thus, in sum, articulated nothing but inadmissible hearsay, conjecture, or surmise in support of her discrimination claims.  (Kanios Dep. pp 95, 113-14, 153-60)  At the same time, she admits that Uliasz promoted another female, Maguire, whom she claimed Uliasz had teased only about her

---

[17] Likewise, in her Complaint, she alleges that it was "through defendant Uliasz's behavior," which she portrays as harassment, that resulted in "unreasonable interference with her work performance" and unspecified "adverse employment decisions." (Ex. K)

[18] It bears noting that the same legal standards are to be applied to each of these claims.  Specifically, in interpreting the provisions of the CFEPA, the courts are to be guided by the federal courts' interpretation of Title VII's provisions.  <u>Levy v. Commission on Human Rights and Opportunities</u>, 236 Conn. 96, 103 (1996).

[19] With the exception of Priscilla Maguire.  However, even with Maguire, it bears repeated that Kanios alleged only that Uliasz made remarks about her "wrinkled clothing", her fingernails, weight, and needing an extra tray for her lunch.  Further, she acknowledged that Uliasz had promoted Maguire.  (Kanios Dep. pp. 93-95, 152, 288)

"wrinkled clothing" and the food on her lunch tray.   (Kanios Dep. pp. 95, 113-14, 153-55)

Nevertheless, Kanios leaps to the conclusion that Uliasz's abusive behavior was borne of his animus

toward females.  Despite these unrealistic and unsubstantiated conclusions, and even if all the above

allegations are deemed true, Kanios' claims of gender-based sexual harassment must fail as a matter

of law.

### Kanios Cannot Satisfy Her *Prima Facie* Burden

To establish a *prima facie* case of hostile work environment sexual harassment under either

the CFEPA or Title VII, Plaintiff must prove that she was subjected to unwelcome conduct because

of her gender that was <u>so extreme as to create an objective change in the terms and conditions of her</u>

<u>employment.</u>  <u>Oncale v. Sundowner Offshore Servs., Inc.,</u> 523 U.S. 75, 81 (1998).  More specifically,

she must demonstrate with competent evidence that her "workplace [was] permeated with

'discriminatory intimidation, ridicule, and insult' that [was] 'sufficiently severe or pervasive to alter

the conditions of [her] employment.'" <u>Harris v. Forklift Sys., Inc.,</u> 510 U.S. 17, 21 (1993) (citations

omitted).  <u>See also</u> <u>Oncale</u>, 523 U.S. at 78; <u>Rider v. Town of Farmington and Bangham</u>, 162 F.Supp.

2d 45 (D. Conn. 2001). For the workplace to be deemed a hostile work environment:

> it must be both objectively and subjectively offensive, one that a
> reasonable person would find hostile or abusive, and one that the
> victim in fact did perceive to be so…. [Courts must] look [] at all
> the circumstances, 'including the frequency of the discriminatory
> conduct; its severity; whether it is physically threatening or
> humiliating or a mere offensive utterance; and whether it
> unreasonably interferes with an employee's work performance.'

<u>Faragher v. City of Boca Raton</u>, 524 U.S. 775, 787-88 (1998) (citations omitted).  <u>See also</u> <u>Loiola</u>

<u>N.Y. A.G.</u>, 2002 U.S. Dist. LEXIS 11112, 00 CV 4907 (RCC)  (S.D.N.Y. Jun. 21, 2002)(totality of

the circumstances must indicate an environment ridden with discriminatory intimidation, ridicule and

insult  sufficiently severe or pervasive).

Thus, courts "filter out complaints attacking the ordinary tribulations of the workplace…." Faragher, 524 U.S. at 788 (citation omitted). "Title VII does not prohibit all verbal or physical harassment in the workplace; it is directed only at 'discriminat[ion]…because of…sex.'" Oncale, 523 U.S. at 102. Significantly, "workplace harassment, even harassment between men and women, is [not] automatically discrimination because of sex merely because the words used have sexual content or connotations. 'The critical issue…is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed.'" Id. (citing Harris, 510 U.S. at 25). Plaintiff's claims here must therefore be examined against these standards, and only evaluated with reference to the "social context in which [the] particular behavior occur[red] and [was] experienced by [plaintiff]." Oncale, 523 U.S. at 81. See Brennan v. Metropolitan Opera Ass'n, 192 F.3d 310, 319 (2d Cir. 1999) and Leson v. Ari of Connecticut, Inc., 51 F. Supp.2d 135 (D.Conn. 1999). Consequently, "isolated remarks or occasional episodes of harassment will not merit relief under Title VII; in order to be actionable, the incidents of harassment must occur in concert or with a regularity that can reasonably be termed pervasive," Tomka v. Seiler Corp., 66 F.3d 1295, 1305 n.5 (2d Cir. 1995) (overruled on other grounds by Faragher), and be deemed gender-based, rampant abuse; see Harris, 510 U.S. at 21; Tomka, 66 F.3d at 1305. As the Supreme Court has cautioned, Title VII is not a general civility code. Oncale, 523 U.S. at 102.

Instructive is the ruling in Figueroa v. City of New York, 2002 WL 31163880 (S.D.N.Y. Sept. 27, 2002). In Figueroa, the court reversed a denial of summary judgment as to plaintiff's gender based sexual harassment claims. Figueroa primarily alleged: (a) that a supervisor made comments about liking the way her pants fit; (b) that male coworkers made jokes about "snowplows" and "screws"; (c) that she was subjected to a prank where condoms were stuck into her glove; and (d) a coworker tried to strike her with his car. She also claimed that her supervisor consistently reprimanded her. In her deposition, she testified to a conclusion that the fact these incidents

occurred, and her supervisor's treatment of her, were based on her gender.  When pressed for reasons why she concluded gender was the motivating factor, she simply repeated it was because she was female, and could not point to discriminatory or disparate treatment of other females as opposed to the treatment of males.  In dismissing the claim, the court opined:  "Courts have repeatedly granted summary judgment where the evidence points, not to gender…animus, but rather to the fact that plaintiff's personality is the motivation for the harassment."  See, e.g., Alfano v. Costello, 294 F.3d 365, 378 (2d Cir. 2002); Kodengaga v. Int'l Bus. Mach. Corp., 88 F.Supp.2d 236, 243 (S.D.N.Y.), aff'd 242 F.3d 366 (2d Cir. 2000)(dismissing hostile work environment claim where, inter alia, evidence showed that the hostility plaintiff encountered largely reflected a clash of personalities rather than discriminatory animus).  Indeed, the Figueroa court focused on plaintiff's failure to proffer sufficient evidence that males were not treated in a hostile manner and that other females were so treated.  Id. At *3-4.

Equally instructive is the ruling in Samborski v. West Valley Nuclear Services Co., Inc., 2002 U.S. Dist. LEXIS 12745, 99 CV 0213E (F) (W.D.N.Y. Jun. 25, 2002).  In Samborski, the plaintiff alleged harassment in violation of Title VII and comparable state law by being subjected to continuous comments by co-workers derogatory toward women in the workplace.  While Samborski dealt with co-worker harassment, the court's analysis of hostile environment cases is persuasive.  In addressing the plaintiff's claim that male co-workers were not subjected to rumors regarding their sexual orientation and other gender-based derogatory remarks, the court rejected the perceived attempt to turn a "non-actionable allegation" into an actionable one simply by asserting that males were not subjected to the same behavior.  "Indeed, were such pleading proper, a plaintiff could turn a non-actionable allegation that she was harassed because she has purple hair into an actionable claim for sex-based discrimination by simply alleging that male co-workers were not harassed for having purple hair.  Plaintiffs asserting Title VII claims must show that they were discriminated against because of their sex, not because they were disliked or ridiculed for some other reason."  Id. at *2.

Thus, as these and other courts have emphasized, the subject conduct must be both objectively and subjectively offensive, such that a **reasonable** person would find the behavior hostile or abusive, not just that the plaintiff did, in fact, perceive it to be so.[20]  See Harris, 510 U.S. at 21-22.  The fact that a plaintiff is "female and that she did not always receive the respect and help she desired does not create the inference that the treatment was motivated by discriminatory animus."  Meckenberg v. New York City Off-Track Betting, 42 F.Supp.2d 359, 372 (S.D.N.Y. 1999).

Clearly, here, Kanios is attempting to transform comments about weight, the amount of food she consumed, and her level of intelligence into actionable behavior, merely by projecting that she did not observe male co-workers being treated in the same fashion.  As to any other comments where gender is even arguably referenced (e.g., "women belong at home"), it is imperative to note that the sporadic dispersing of gender-based comments does not salvage her cause of action, particularly when she cannot establish how any purported gender bias harbored by Uliasz affected her in terms of compensation or status.  Indeed, she admitted her performance never changed; she was promoted with input by Uliasz; given positive performance reviews; given commensurate raises; and paid bonuses, with one positive review, raise and bonus being given after her internal complaint.  (Kanios Dep. pp. 124-29, 160, 169-70. Ex. V; Ex. U)  Simply stated, given these undisputed facts, Kanios cannot sustain her burden of establishing that Uliasz made any comment or engaged in any teasing because of any discriminatory animus toward women.  See, e.g., Loiola, 2002 U.S. Dist. LEXIS 11112 at *17 (offensive conduct  violates the law only if it was engaged in for a prohibited reason—plaintiff's gender); Rizzo-Puccio v. College Auxiliary Servs., Inc., 2000 U.S. App. LEXIS 14116, No. 99-9272 (2d Cir. Jun. 14, 2000)(where isolated, gender specific remarks made among a host of gender-based insults or other remarks, plaintiff failed to prove existence of objectively hostile

---

[20] Thus, equally critical to note, comments such as "your mind is at home with the kids," do not, in themselves, connote gender bias as plaintiff contends. Rizzo-Puccio v. College Auxilliary Servs., Inc., 2000 U.S. App. 14116, No. 99-9272 (2d Cir. Jun. 2000); Tuggle v. Mangan, 348 F.3d 714 (8th Cir. 2003);Gleason v. Mesirow Financial, Inc., 118 F.3d 1134 (7th Cir. 1997).

environment; at best, plaintiff showed supervisor was a "rude person).  See also, Gleason v. Mesirow

Financial, Inc., 118 F.3d 1134 (7th Cir. 1997)(pregnancy related comments, such as commenting

about how plaintiff's breasts had become "larger" due to pregnancy; that he hoped the baby's father

would support the child; asking plaintiff about her dietary and alcohol restrictions; and continuing to

comment about plaintiff's pregnancy even after she requested he stop; not sufficient, even in the

aggregate, to establish gender bias or bias against pregnant women).

Although rendered in the Eighth Circuit, the decision in Tuggle v. Mangan, 348 F.3d 714 (8th

Cir. 2003) is equally persuasive.  Tuggle alleged her supervisor: (a) told her "women are better

secretaries"; (b) asked plaintiff why she did not do her hair, wear make-up or wear a dress to work;

(c) commented about plaintiff's fingernails; (d) told plaintiff "women are better at organizing

things"; (e) asked plaintiff once if she was pregnant after she vomited at work; and (f) told plaintiff

on one occasion she needed to "choose between [her] job and her family."  Plaintiff also alleged her

supervisor took a photograph of her leaning into a truck from behind and posted an unflattering photo

focusing on her rear end on the bulletin board in the shop.  After plaintiff complained about this

conduct, which she contended took place over a two year period, she was required to meet monthly

with her supervisor and others to discuss ways to allow her to be on the road and out of the office.

She believed these meetings were punitive.  She also claimed she was asked to perform different

responsibilities following her complaint.  The employee relations department, after an internal

investigation, told plaintiff she had not been subjected to discrimination or retaliation, and that they

had canvassed the supervisor and warned him about his comments and behavior.  In reversing the

lower court's denial of a motion for summary judgment as to plaintiff's hostile environment claim,

the court held: "[a]lthough Mangan's conduct was inappropriate, it did not rise to the level of

actionable hostile work environment sexual harassment.  Our conclusion is consistent with Duncan

and other recent circuit cases requiring hostile environment claims to satisfy the demanding standards

established by the Supreme Court in order to clear the high threshold for actionable harm." (citations omitted).  Id. at 721-23.

Based on the wealth of judicial precedent presented, Kanios clearly falls far short of sustaining her burden of proof herein.  She cannot demonstrate initially that most, if any, of the conduct by Uliasz, even if true, was motivated by her gender or otherwise was sufficiently severe or pervasive.  The best Kanios can do is to infer that, perhaps, Uliasz had a personal dislike for her, or displayed a stern, abrasive, or even rude and condescending management style.  Remarking about "math 101"; being verbally abusive toward her at work; joking about the amount of food she consumed, and even allegedly pushing her on one occasion, even if true, cannot, especially in view of the judicial precedent explored, be deemed tantamount to hostile environment sexual harassment covered by Title VII or the CFEPA.  Murphy v. Board of Education of the Rochester School District, 273 F.Supp.2d 292 (W.D.N.Y. 2003)

As demonstrated above, this inevitable conclusion does not change even with reference to alleged, sporadic remarks about "women in the workplace" or that her "mind was at home with the children".  Kanios' additional failure to establish similar conduct by Uliasz toward other female employees, except to state that she heard Uliasz comment about Maguire's wrinkled clothing, and that he had asked her if she "needed an extra tray for her lunch," underscores the deficiencies of her claims. (Kanios Dep. pp. 89-95, 150-52)[21]  Bolstering Defendants' assertions in this regard, Maguire, a then Buyer and admitted personal friend of Kanios, testified that Kanios herself made weight-related comments directed at Uliasz; examples include calling Uliasz "bones" because he was thin and general comments about the amount of food he ate at lunch time.  Maguire denied ever hearing any comments by Uliasz which revealed a gender bias towards Kanios or women in general.  Maguire further provided undisputed testimony that Uliasz also made comments to male employees about their shoes (looked "plastic") and clothes ("K-mart"), and could be condescending toward male

---

[21] Maguire testified she and Kanios teased Uliasz about his food consumption as well.  (Maguire Dep. pp. 35-37)

employees as well as female employees. (Maguire Dep. pp. 26, 35-37, 42-44, 58-61)    Maguire's critical testimony confirming Uliasz's gender neutral conduct toward her and others, and that Uliasz promoted her, remains undisputed by Kanios.  This unrefuted evidence, coupled with Kanios' failure to establish sufficiently severe and pervasive conduct reflecting gender bias, defeats her prima facie case, and therefore, this claim should be summarily dismissed.

**(ii)      Even If Uliasz's Actions Were Tantamount to Sexual Harassment, Liability Cannot Be Imputed to Defendant UST**

Even if this Court deems the conduct of which Kanios complains to constitute hostile environment sexual harassment, this claim must nevertheless be dismissed as no tangible employment action was taken against her <u>as derived from the alleged harassment</u>, and it is undisputed that: (a) the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior; and (b) Plaintiff was unreasonable in taking advantage of the corrective opportunities provided by UST.  <u>Faragher</u>, 524 U.S. at 807; <u>Burlington Indus., Inc. v. Ellerth</u>, 524 U.S. 742, 765 (1998); <u>Hill v. The Children's Village</u>, 196 F.Supp.2d 389 (S.D.N.Y. 2002).  In this regard, a "tangible employment action" is a <u>significant</u> change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.  <u>See</u>, <u>e.g.</u>, <u>Hill</u>, 196 F.Supp.2d at 396-97.

As previously established, while Kanios' employment was terminated, she herself attributes that action to her having filed an internal complaint against Uliasz, i.e., motivated by intent to retaliate, as opposed to gender bias or harassment.  (Kanios Dep. pp. 254: Q. by Attorney Lucas: "Why do you believe you were terminated.  A.: Because I complained.  I believe it was in total retaliation.")  Thus, Kanios fails to proffer evidence of any "tangible employment action" resulting from the discrimination itself.  <u>See</u>, <u>e.g.</u>, <u>Mack v. Otis Elevator Co.</u>, 326 F.3d 116 (2d Cir. 2003), <u>cert denied</u> 124 S.Ct. 562 (2003)(for purposes of this defense, the question is whether the supervisor's focus on the employee's protected attributes was the source of the hire, fire, demotion, promotion,

transfer or discipline); <u>Wilburn v. Fleet Financial Group, Inc.</u>, 170 F.Supp.2d 219 (D.Conn. 200(defense available where the hostile work environment does not culminate in the tangible action).

Indeed, it has already been established that even after the internal complaint by Kanios, Uliasz and Howard gave her a positive performance review, raises, and bonuses. (See, supra). Her compensation <u>increased as a result.</u> <u>See</u> also <u>Ellerth</u>, 524 U.S. at 761; <u>Arnold v. Yale New Haven Hosp.</u>, 213 F.Supp 2d 142, 148 (D. Conn. 2002); <u>Gibson v. Crucible Materials Corp.</u>, 290 F.Supp.2d 292 (N.D.N.Y. 2003); <u>Hill</u>, 196 F.Supp.2d at 399-400.

Moreover, any suggestion by Plaintiff that the manner in which the investigation was handled was based on gender bias, and thus constituted a "tangible employment action," does not pass muster under the "significant change" principles set forth by the courts in <u>Faragher</u> and <u>Hill v. The Children's</u> <u>Village</u>. Specifically, such action did not involve or result in a failure to hire, failure to promote, reassignment or transfer with significantly different responsibilities, nor in the termination of employment (which again Kanios attributes to retaliatory motive). See <u>Arnold</u>, 213 F.Supp.2d at 148-49; <u>Lee-Crespo v. Shering-Plough Del Caribe, Inc.</u>, 354 F.3d 34 (1st Cir. 2003). <u>See</u> also <u>Ellerth</u>, 524 U.S. at 761; <u>Gibson</u> 290 F.Supp.2d at 292; <u>Hill</u>, 196 F.Supp.2d at 399-400. In this regard, Kanios has no entitlement to demand a particular method to deal with Uliasz's "behavioral issues". <u>Gonzalez v. Beth Isr. Med. Ctr.</u>, 262 F.Supp.2d 342, 355 (S.D.N.Y. 2003).

Consequently, as previously stated, UST must further prove that: (a) it exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) Kanios unreasonably failed to take advantage of any preventive or corrective opportunities provided by UST. <u>Burlington</u>, 118 S.Ct. at 2270; <u>Faragher</u>, 118 S.C. at 2292-93. <u>See</u> also <u>Moore v. Sam's Club</u>, 55 F. Supp.2d 177 (S.D.N.Y. 1999). First, it is undisputed that UST publicized and maintained a harassment policy and internal complaint procedure of which Plaintiff was aware. (Kanios Dep. pp. 51, 67, 69; Ex. L; Ex. M) It is equally undisputed that Kanios, by her own testimony, waited "years" to raise any complaints about Uliasz. (Kanios Dep. pp. 68, 77, 111) It is further undisputed that after her

complaint to Rentz, and then to Viesta, the Company immediately implemented steps to have Uliasz counseled, to have the parties meet on a regular basis and to have Uliasz's superior, Howard, monitor the situation and keep an open door.  After these steps were taken and implemented, Kanios never complained again about subsequent events.  Instead, she just went out on leave. (see, e.g, Viesta Dep. pp. 88-90, 92-94, 98-102, 114; Kanios Dep. pp. 122, 130-36, 138, 140-45; Howard Dep. pp. 30, 34-35, 39-40, 44-46, 50-51, 55, 78, 81-83, 86, 89, 94, 98-99; Ex. P)

Thus, even if this Court deems the conduct of which Kanios complains to have created an actionable, hostile work environment, her claims should nevertheless be dismissed based on the absence of a tangible employment action, followed by Defendants' prompt, remedial action coupled with Plaintiff's failure to act on the corrective action by making additional complaints before going on leave commencing March 20, 2001.  As previously established, this principle applies even despite Kanios' claim that the remedial action taken was not to her satisfaction.   Therefore, this Court should hold that UST complied with its legal obligations, even if the subject conduct constituted hostile environment sexual harassment, obviating the Defendant's potential vicarious liability under the CFEPA or Title VII.  Accordingly, Counts One and Two should be dismissed.

C.    **KANIOS' CLAIMS OF RETALIATION SIMILARLY FAIL**

Retaliation claims are analyzed under the burden shifting rules applicable to discrimination claims established by the Supreme Court in McDonnell Douglas v. Green, 411 U.S. 792 (1973); see also Reeves v. Sanderson Plumbing Products Inc., 530 U.S. 133 (2000); Quinn v. Green Tree Credit Corp, 159 F.3d 759, 764.  The plaintiff must first demonstrate a *prima facie* case of retaliation, after which the defendant has the burden of articulating a legitimate, non-retaliatory reason for the subject action.  If the defendant meets its burden of proof, the plaintiff must then demonstrate by competent evidence that there is sufficient proof for a reasonable jury to find the proffered legitimate reason is merely a pretext for retaliation. See Spadola v. New York City Transit Authority, 242 F.Supp.2d 284 (S.D.N.Y. 2003); Gurry v. Merck, No. 01 Civ. 5659 (RLC), 2003 WL 1878414 (S.D.N.Y. Apr. 14,

2003).

Noteworthy, the Supreme Court has held that in order for a sexual harassment complaint to be the basis for a retaliation claim, the underlying sexual harassment must have been "objectively" perceived as covered conduct.  See Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 270-72 (2001). As in Breeden, Kanios cannot sustain her burden of proving that, notwithstanding her subjective, unreasonable conclusions, the conduct of which she complained actually violated Title VII or, in the alternative, that a reasonable person, in good faith, could believe the conduct of which she complained constituted actionable sexual harassment.  Under such circumstances, her retaliation claim must be rejected.  Nevertheless, even if the three-prong rule of shifting burdens is applied, Kanios' retaliation claims still fail.

### (i)    Plaintiff Cannot Establish A Prima Facie Case of Retaliation

To establish a prima facie case of retaliation, a plaintiff must prove: (1) participation in a protected activity known to the defendants; (2) adverse employment action; and (3) a causal connection between the protected activity and the adverse employment action.  See Reed v. A.W. Lawrence & Co., Inc., 95 F.3d 1170, 1178 (2d Cir. 1996); Leson, 51 F.Supp.2d at 145.  A causal connection can be established directly through evidence of retaliatory animus directed against the plaintiff by defendants, indirectly by showing that the protected activity was followed closely by discriminatory treatment or through other evidence such as disparate treatment of fellow employees who engaged in similar conduct.  Van Zant v. KLM Royal Dutch Airlines, 80 F.3d 708, 713 (2d Cir. 1996); Johnson v. Palma, 931 F. 2d 203, 207 (2d Cir. 1991); DeCintio v. Westchester County Med. Ctr., 821 F. 2d 111, 115 (2d Cir. 1987), cert. denied, 484 U.S. 825 (1987).  While Defendants concede, for purposes of this Motion, that Kanios arguably participated in protected activity at least as of the date her attorney wrote to UST and that she can establish alleged adverse action (i.e., the termination of her employment) close to the time of her internal complaint, for those reasons set forth below, Defendants contend that Kanios cannot satisfy the remaining element necessary to prove a

*prima facie* case of retaliation—a causal connection between such protected activity and the termination decision.

### Kanios Fails to Establish the Requisite Causal Connection

Kanios conceded that Uliasz knew about her complaint to Human Resources before presenting her with a "meets expectations" performance appraisal and commensurate raise in salary, contrary to the allegation in her Complaint that such appraisal was issued without that knowledge. (Kanios Dep. pp. 124-25, 139-40)  She further conceded that after her internal complaint, Uliasz did not impose any discipline against her.  (Kanios Dep. pp. 124-25, 128-30, 160)  However, what she does allege is that while she was out on FMLA leave, the Company deliberately conjured up performance based reasons to terminate her employment.

Nonetheless, Kanios cannot proffer sufficient, actual evidence that the primary decision-makers, Uliasz and Howard, knew that she had engaged in "protected activity", or that they were motivated by it. To the contrary, Uliasz's and Howard's testimony in this regard remains undisputed; they believed Kanios' complaint was about Uliasz's managerial style and about comments he made about food, weight, and intelligence.  (Howard Dep. pp 30-35, 101-04, 133, 144-45, 150-51, 154; Uliasz Dep. pp. 90, 93-94, 171-75; also Kohlberger Dep. pp. 44-45, confirming he did not discuss letters with Howard or Uliasz)  Thus, they had no reason to surmise that Kanios had claimed gender discrimination or harassment, and had no knowledge that any attorney on her behalf had made any such assertions prior to the termination decision.  Thus, proof of the requisite causal connection between the alleged adverse actions and her engagement in protected activity is blatantly absent.  Philippeaux v. Fashion Institute of Technology, 1996 U.S. Dist. LEXIS 4397, 93 CV 4438 (SAS) (S.D.N.Y. Apr. 8, 1996), aff'd 1996 U.S. App. LEXIS 33507 (2d Cir. Dec. 23, 1996) (plaintiff must prove not only that entity knew of protected activity, but also the actual decision-makers).

Indeed, in Philippeaux, plaintiff contended that he personally advised supervisors of his federal complaints, but did not provide them with a copy and did not discuss the contents with them.

Plaintiff's supervisors testified to a lack of any knowledge of the contents of the complaints prior to taking the purported adverse action, and plaintiff proffered only his speculation to contradict that testimony.  The court granted summary judgment as to the plaintiff's retaliation claim, finding plaintiff failed to sustain his burden of proof as to a necessary element—knowledge of protected activity by the actual decision-makers.  Id. at pp. 12-33[22]

Likewise, the record in this case lacks any direct evidence to allow a reasonable trier of fact to determine that retaliatory animus was aimed at the Plaintiff, and equally void of any indirect evidence of disparate treatment, or that similarly situated employees who engaged in similar conduct were treated in a dissimilar manner than Plaintiff.  See Van Zant, 80 F.3d at 713; Johnson, 931 F.2d at 207; DeCintio, 821 F.2d at 115.   See also Spadola, 242 F. Supp.2d 284 (summary judgment granted on claim of retaliation under Title VII for plaintiff's threat to file a sexual harassment charge against a female supervisor, since, among other reasons, plaintiff failed to establish the requisite causal connection between the protected activity and the adverse employment action); Bottge v. Suburban Propane, 77 F.Supp.2d 310 (N.D.N.Y. 1999)(decision-makers must reasonably know activity engaged in by employee constituted protected activity); Mendoza v. SSC&B Lintas, 1997 U.S. App. LEXIS 27259 (2d Cir. Oct. 3, 1997)(unpublished--actual decision-makers must have knowledge and plaintiff has burden to prove such knowledge); Morales v. Human Rights Div., 878 F. Supp. 653, 659 (S.D.N.Y. 1995) ("an employer's knowledge of the filing of a prior complaint of discrimination, without more, is insufficient to prove a retaliatory motive").

### (ii)    Defendants Have Articulated Legitimate, Non-Retaliatory Reasons

Even assuming that Plaintiff could satisfy the burden of establishing the elements of a *prima facie* case of retaliation, Defendants can nevertheless establish non-retaliatory reasons for their decision.   Specifically, extensive testimony has been gleaned from defense witnesses that

---

[22] While this case dealt with a retaliation claim under Title VI, the court confirmed the analysis used was identical to that which would be used for a Title VII retaliation claim.  Philippeaux, 1996 U.S. Dist. LEXIS at *15-16 & n.2.

management discovered serious and substantial neglect by Kanios with respect to her job duties while others were covering her desk, and this discovery was the sole basis for the termination decision. (Ex. S; Howard Dep. pp. 105-18, 132-33, 136-40; Maguire Dep. pp. 20-21, 27-29, 44-55, 61-62; Uliasz Dep. pp. 135, 159-60; Viesta Dep. pp. 134, 137-38, 149-53, 155)  Kanios proffers no evidence to contradict sworn testimony that is was management's discovery of the egregious nature of her performance deficiencies, coupled with what they perceived to be intentional and misleading representations on Kanios' part about the status of orders and other work she was covering, which motivated them to terminate her employment. (Howard Dep. pp. 107-22; Uliasz Dep. pp. 5-6, 135-37, 159-60; Viesta Dep. pp. 131-36, 142, 149-57; Ex. S; Maguire Dep. pp. 20-21, 26-29, 44-55, 61-62)  As Defendants need only articulate, and not prove, these reasons are true at this procedural stage, they should be deemed to have met their burden.  See, e.g., Demars v. O'Flynn, 287 F. Supp.2d 230 (W.D.N.Y. 2003)(citing, McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) and its progeny)).

### (iii)    Plaintiff is Unable to Prove Pretext For Retaliation

At this procedural juncture, to defeat this Motion, Kanios must, but cannot, produce concrete evidence from which a reasonable juror could conclude that retaliatory animus motivated Defendants' decision to terminate her employment.  Indeed, as the Defendants' have articulated legitimate, nondiscriminatory reasons for the termination decision, "the presumption of discrimination created by the prima facie case drops out of the analysis, and the defendant 'will be entitled to summary judgment…unless the plaintiff can point to evidence that reasonably supports a finding of prohibited discrimination.'"    Alphonse v. State of Connecticut Department of Administrative Services, 2004 U.S. Dist. LEXIS 7239, No. 3:02 CV 1195 (MRK) (D. Conn. Apr. 21, 2004)(quoting James v. New York Racing Assn'n, 233 F.3d 149, 154 (2d Cir. 2000)).  As this Court established in Alphonse, even presenting evidence that the employer's justification may have been false is insufficient to meet plaintiff's returning burden; the "Court must not rely solely on plaintiff's

rebuttal of the employer's explanation but must 'examin[e] the entire record to determine whether the plaintiff could satisfy [her] ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff.'" Id. At *5 (quoting Reeves v. Sanderson Plumbing Prods, Inc., 530 U.S. 133, 143 (2000).

As previously established, UST based all decisions on legitimate, non-retaliatory business considerations. Kanios has not proffered any evidence to contradict those reasons, and she admitted to a total lack of evidence to contradict the sworn testimony of defense witnesses. Rather, in purely conclusory fashion, and contradictory to her own admissions concerning the completely speculative nature of her "evidence," she asserts an unsubstantiated and unsupportable belief that the decision was retaliatory merely due to its temporal proximity to her internal complaint. (**Kanios Dep. p. 210: "Q.: Do you have any evidence, meaning facts or documents…that the reason given you for termination is inaccurate?  That it was really some other reasoning they terminated you? A.: No, I don't—no."**)  Such a lack of evidence underscores the justification for the entry of summary judgment on her retaliation claims.

As the court held in Ghirardelli v. McAvey Sales & Service, Inc., 287 F.Supp.2d 379 (S.D.N.Y. 2003), the fact of temporal proximity in itself in insufficient to meet a plaintiff's burden at the pretext stage.  Indeed, in Ghirardelli, the plaintiff's focus on the temporal proximity between the claimed protected activity and her termination was deemed sufficient to get her through her prima facie burden.  However, when plaintiff was unable to proffer additional evidence that the employer's articulated reasons for her discharge—i.e., insufficient technical skills and her admission she had exaggerated her actual qualifications upon hire—were pretext, her claims were summarily dismissed. In this regard, the court emphasized that Ghirardelli's conclusory and unsupported conjecture that a connection did exist, simply because the events were close in time, was held to be blatantly insufficient to sustain her burden.  See also,  Spadola, 242 F.Supp.2d at 296; Gurry v. Merck & Co., No. 1 CV 5659 (RLC), 2003 WL 1878414 (S.D.N.Y. April 14, 2003); Cruz v. Coach Stores, Inc.,

202 F.3d 560 (2d Cir. 2000); Gonzalez v. Beth Isr. Med. Ctr., 262 F.Supp.2d 342 (S.D.N.Y. 2003);

Hanna v. Infotech Contract Services, Inc. and Pfizer, Inc., 2003 U.S. Dist. LEXIS 7056, No. 3:01 CV

680 (SRU) (D. Conn. 2003), aff'd 2004 U.S. App. LEXIS 4692 (2d Cir. Mar. 11, 2004).

In sum, then, despite ample opportunity to do so, Kanios could not offer any evidence whatsoever that the claimed reason for termination was not the real reason motivating Howard and/or Uliasz.  Thus, even if they were "unfair" or mistaken in assuming she was responsible for the subject tasks, she cannot sustain her burden of proving such misunderstanding or unfairness was borne of intent to retaliate.  Again, at this time, Howard and Uliasz had no reason to think the prior complaint had not been resolved, or that her current leave was connected to that complaint.  (Howard Dep. pp. 93, 149-50; Uliasz Dep. pp. 133, 175)  Critically important, Kanios offers nothing more than her speculative testimony that the reasons articulated by them for her termination, bolstered by the testimony of Maguire, were not the real reason; however, as the court emphasized in Ghirardelli, "such a conflict does not raise a genuine issue of material fact; rather, it pits sworn testimony against speculation, conjecture and self-serving conclusions".  Ghirardelli, 287 F.Supp.2d at 391.

For these reasons, and for those reasons already explored, Kanios' retaliation claims set forth in Counts Three and Four must be dismissed.

### D.    DISMISSAL OF AIDING AND ABETTING CLAIM AGAINST ULIASZ

Count Five of Kanios' Complaint alleges Uliasz "aided and abetted" discriminatory practices by UST in violation of the CFEPA, ¶¶ 46a-60(a)(1).  In this regard, Kanios vaguely refers to "discrimination practices in violation of C.G.S. § 46a-60(a)(5)."  However, with respect to the claim that Uliasz "aided and abetted" discriminatory practices, such a claim must be dismissed, even if any claims survive this Motion.  Uliasz was clearly alleged to be the sole perpetrator of the "harassment." As such, any claim that he aided and abetted gender-based harassment fails as a matter of law as Uliasz cannot have aided and abetted himself.  Bolick v. Alea Group Holdings, Ltd., 278 F.Supp.2d 278 (D.Conn. 2003) (citing Wasik v. Stevens Lincoln-Mercury, Inc., No. 3:98 CV1083, 2000 WL

306048 (D.Conn. Mar. 20, 2000)(where aiding and abetting claim dismissed against individual defendant who called plaintiff names and was the sole perpetrator of the claimed active harassment). Accordingly, in that Kanios has failed to state a legally cognizable claim, Count Five must be dismissed.

**E.      PLAINTIFF'S CLAIM OF NEGLIGENT MISREPRESENTATION
MUST ALSO BE DISMISSED**

In order to establish a claim for negligent misrepresentation, Plaintiff must show that Defendants: (1) made a misrepresentation of a present fact to Plaintiff; (2) they knew or should have known it was false at the time the statement was made; and (3) the Plaintiff reasonably relied on the statement to her detriment.   Johnson v. Chesebrough-Ponds USA Co., 918 F.Supp.543, 548 (D. Conn. 1996), aff'd mem., 104 F.3d 355 (2d Cir. 1996).  Each element must be shown by clear and satisfactory evidence. Id. Courts have consistently held that in order to constitute a misrepresentation, the purported information must constitute more than a mere possibility. Id.

Here, Kanios' claim is predicated on the following factual allegations: (i) that she was "required" to meet with EAP listed doctors to discuss her condition; (ii) that the doctors recommended she take a leave of absence for her proclaimed "severe psychological distress"; (iii) that UST "encouraged" her to take such leave which she was assured was "for her own good"; and (iv) that she was also assured she would be "allowed to return to work."   She claims such representations were made "by defendant UST without exercise of reasonable care and competence in obtaining or communicating the information contained therein."  (Ex. K ¶¶ 23, 58-60)

These allegations were simply not borne out by Kanios' deposition testimony.  Kanios failed to prove that the individuals who allegedly caused such leave to be taken; i.e.; her psychologists, made such representations at the behest or on behalf of UST.  On the contrary, even if made, they were recommendations made by private psychologists who were simply on the UST EAP referral

list.[23] (Hankin Dep. pp. 14-16, 35)  Moreover, Kanios failed to recognize that it was not the fact of her taking leave that led to her termination, but rather, it was the intervening event of UST management discovering serious deficiencies with her work while she was on that leave.  In this regard, a critical element necessary to maintain her claim of negligent misrepresentation is missing; that a "false" <u>statement</u> was made by <u>Defendants</u> which they allegedly <u>knew was false when made</u>. <u>CLE Telecommunications Corp. v. Colonial Data Technologies, Corp.</u>, 1999 U.S. Dist. LEXIS 4921, No. 3:96 CV 2490 (D. Conn. Mar. 23, 1999).  Moreover, the deposition testimony of the subject doctors, which testimony cannot be controverted with evidence, belies the allegation that they were employees or authorized agents of UST; that they made such affirmative representations; or that such representations were false and known to be false when made.  (Hankin Dep. pp. 8-9, 11, 14, 89, 91-92; Trencher Dep. pp. 9, 19-20; Kanios Dep. p. 310: e.g., "I told Nella that <u>*the doctor*</u> suggested that I go out for at least two weeks, yes" (emphasis added))

During deposition as well, Kanios failed to proffer any testimony in support of her allegation that these doctors misrepresented her need to take a leave of any duration; on the contrary, she agreed that such leave was necessary and warranted.  Rather, she focused on a claim that at the time she commenced this leave, March 20, 2001, she was told she would "be allowed to return to work."  Yet, she did not identify who from UST made such alleged, affirmative statement, nor could she explain how it was false and known to be false when made.  Moreover, Kanios could not establish reasonable reliance on these representations to her detriment.  Again, it bears repeating that the uncontroverted record establishes that Kanios' mental condition purportedly warranted the leave, not anything UST did or said to her.  (Kanios Dep. pp. 215, 220-21, and Ex. Y)  Therefore, not only does Kanios fail to establish a misrepresentation of fact by UST known to be false when made with respect to her return

---

[23] See Kanios Dep. p. 212: "Q.: These doctors do not work for UST, do they? These are private doctors, right? A: Yes they are—yes, I don't know if they are retained by UST.  They were who they told me to go to see and that EAP was paying for it, so I'm assuming they work for UST…I don't know how that works."  At pages 211-12, Kanios claims she *"thought"* she would be fired if she did not see the referred doctors.

to work, she also fails to establish any reasonable reliance to her detriment.[24]  For these reasons, Kanios' claim for misrepresentation fails as a matter of law, and accordingly, Count Six must be dismissed.

### F.    DISMISSAL OF NEGLIGENT INFLICTION CLAIM

Kanios' claim for negligent infliction of emotional distress fails for two reasons.  First, it is barred by the exclusivity provisions of the Connecticut Workers' Compensation Act, Conn. Gen. Stat. § 31-284(a), to the extent Kanios is seeking damages for physical symptoms of her emotional distress.  Perdeau v. City of Hartford, 259 Conn. 729 (2002).  Second, even if the Court finds that Plaintiff's claim for negligent infliction of emotional distress is not barred by the exclusivity provisions of the Workers' Compensation Act, it is nevertheless barred as otherwise legally deficient.

In order to assert a cause of action for negligent infliction of emotional distress, "a plaintiff must show that the 'defendant should have realized that its conduct involved an unreasonable risk of causing the distress, and from the facts known to it, should have realized that the distress, if it were caused, might result in illness or bodily harm.'"  Gomez-Gil v. University of Hartford, 63 F.Supp. 2d 191, 194 (D.Conn. 1999); Perdeau v. City of Hartford, 259 Conn. 729 (2002); Parsons v. United Technologies Corp., 243 Conn. 66, 89, (1997).  In the employment context, Connecticut courts have required that in order to be actionable the conduct must involve the termination process itself and not events that may have occurred while the employee was still employed.  Hanna, 2003 U.S. Dist. Lexis 7056; Gomez-Gil, 63 F.Supp. 2d at 194; Parsons, 243 Conn. at 89; Perez v. Faria Corp., No. CV 980116017, 1999 WL 61684, *2-3 (Conn. Super. Ct. Jan. 29, 1999).   Even where the plaintiff claims that the defendant engaged in an actionable course of conduct leading up to his or her termination, the prior course of conduct is not actionable as a negligent infliction claim.  Perez, 1999

---

[24] It appears that Kanios' claim is actually that she relied on the statutory guarantee of reinstatement under the FMLA, not on any affirmative representation by a UST representative.  Such a claim would be more properly covered by FMLA, and not by this common law claim.

WL 61684, at *2-3[25].  The mere termination of an employee, even if wrongfully motivated, does not transgress the bounds of socially tolerable behavior.  Hanna, 2003 U.S. Dist. Lexis 7056 *30; Parsons, 243 Conn. at 88-89.

Here, Kanios' claim for negligent infliction of emotional distress does not include any allegations reflecting unreasonable conduct, let alone extreme and outrageous conduct, in connection with the *actual* termination of her employment.  Kanios was not even present in the workplace when the decision was made or communicated to her; instead, she was advised of the decision by way of letter.  Based on these facts alone, Kanios clearly cannot the necessary elements of this claim as a matter of law.  Moreover, Kanios has failed to allege or prove that she suffered illness or physical injury resulting from unreasonable conduct in the termination process.  Rather, Kanios testified that upon receiving the termination letter, she stopped treatment. (Kanios Dep. pp. 217-218, 315-316)  Lopez-Salerno v. Hartford Fire Ins. Co., No. 3:97CV273 AHN, 1997 WL 766890, at *6 (D. Conn. Dec. 8, 1997) (citations omitted).   See also Sacco v. George Schmitt & Co., No. 3:97CV02180 (AWT), 1998 WL 823039, at *4 (D. Conn. Sept. 14, 1998); Lark v. Post Newsweek Stations Conn. Inc., No. CV 940705326, 1995 WL 491290 at *4, (J. D. Hartford, Aug. 9, 1995).

In short, Plaintiff has not alleged sufficient facts to show either that Defendant engaged in any conduct which would result in harm to her or that Defendant created an unreasonable risk of causing her harm.  Instead, the evidence dispositively and undisputedly shows Plaintiff's allegations portray no more than the ordinary feelings which accompany a "surprise" termination decision.  Accordingly, Count Seven must be dismissed.

---

[25] In Perez, 1999 WL 61684, at *2-3, the court held that even though plaintiff alleged that the defendant employer retaliated against her for filing a worker's compensation claim and ultimately discharged her, the only potentially actionable conduct was that taken on the actual day she was fired.  Id.  Analyzing several Connecticut Supreme and Appellate Court decisions, the Perez court held:  "the conduct upon which a valid claim for negligent infliction of emotional distress is based must be close temporally to the actual termination.  It must occur during or immediately before or after the actual delivery of the notification of the termination to the employee.  Usually it would take place within minutes or hours of [the] time when the employee is told of the termination…." Id. at *7.

G.         **PLAINTIFF CANNOT ESTABLISH A VIOLATION OF THE FMLA**

In Count Eight, Plaintiff alleges that Defendants "interfered with and restrained" the exercise of her rights under the FMLA by failing to permit her to return to her former position at the end of her FMLA leave.  This Count fails as a matter of law for three primary reasons; first, and critically important, it is undisputed that that at the time that UST terminated Plaintiff's employment, Plaintiff had already exhausted the full twelve (12) weeks of leave to which she arguably was entitled under the statute.  Second, Kanios herself testified that even after her employment was terminated, she was unable to return to her prior, full time employment at UST, thus obviating her FMLA entitlement to reinstatement.  Third, it is likewise undisputed that Plaintiff failed to properly certify that she suffered from a "serious health condition" within the purview of the FMLA, at least beyond the initial two (2) week certification.

(i)         **Any FMLA Rights Were Exhausted**

The record unequivocally establishes that Plaintiff received her full twelve (12) weeks of statutorily-guaranteed leave prior to the termination of her employment with UST, and therefore, she cannot maintain this cause of action as a matter of law.  29 U.S.C. § 2612(a)(1).  In the instant case, Plaintiff <u>admitted</u> during her deposition that even before she commenced the final, two-week leave of absence, she had already taken a minimum of 10.3 weeks of leave.  (Kanios Dep. pp. 305-06.)  She further admitted that her entitlement to leave -- if any – had thereby already expired on April 1, 2001.  (Kanios Dep., p. 306.)  Noteworthy again, however, Kanios had taken an additional two weeks between July 24, 2000, and March 20, 2000, meaning her leave entitlement had already been exhausted by the time she commenced the last leave.  (Ex. Z; Ex. CC)[26]   As of the date her employment was terminated then, she had already enjoyed the full benefit of her statutory entitlement

---

[26] In this regard, Kanios admitted to knowledge of the method used by UST to calculate federal FMLA leave entitlement; specifically, all UST materials she admitted receiving, by virtue of inclusion in the employee handbook, and during the certification process, established that she was to look back at the twelve (12) month period prior to commencement of the current leave.  (Ex. Z; Ex. AA; Ex. BB; Kanios Dep. pp. 303-06, 313-15)  Under this scenario, by March 20, Kanios had already exhausted her twelve (12) week federal FMLA entitlement.  (Ex. Z)

warranting outright dismissal of her FMLA claim.  See, e.g., Thompson v. Federal Reserve Bank of New York, No. 01 Civ. 11640(DC), 2004 WL 330243 (S.D.N.Y. Feb. 23, 2004) (granting summary judgment motion as to plaintiff's FMLA claim because court found plaintiff "received all the leave and benefits to which she was entitled under the FMLA, if not more. . . "); Fulham v. HSBC Bank USA, No. 99 Civ. 11054(JGK), 2001 WL 1029051, *7-8 (S.D.N.Y. Sept. 6, 2001) (granting summary judgment in favor of defendant on plaintiff's FMLA claim where plaintiff had received all the substantive benefits to which he was entitled).

**(ii)    Plaintiff Was Unable to Return to Work at Date of Termination**

It is also undisputed that Plaintiff, by her own admission, was not qualified to return to her then job at UST on the date her employment had been terminated.  (Kanios Dep. pp. 306-09)  Therefore, as her leave rights were already exhausted by April 1, and she was not able to return even as of April 13, she cannot here claim any right to reinstatement.  29 C.F.R. § 825.216(d).  Cases interpreting these regulations similarly have held that the right to reinstatement only comes into play where the plaintiff is able to return to her position at the conclusion of the FMLA leave period.  See, e.g., Donnellan v. New York City Transit Authority, No. 98 Civ. 1096(BSJ), 1999 WL 527901, *4 (S.D.N.Y. Jul. 22, 1999).

The case of Sarno v. Douglas Elliman-Gibbons & Ives, Inc., is directly on point. 183 F.3d 155 (2d Cir. 1999).  Following the expiration of his twelve (12) week FMLA leave, Sarno was unable to return to work and was discharged.  He subsequently alleged a violation of the FMLA.  The Second Circuit affirmed the district court's grant of summary judgment, finding that discharging Sarno at the end of the twelve (12) week period "did not infringe his FMLA rights because it [was] also undisputed that at the end of that period he remained unable to perform the essential functions of his . . . position."  Id. at 161-62.  See also Thompson v. Diocese of Saginaw, No. 02-10267-BC, 2004 WL 45519, *8 (E.D. Mich. Jan. 6, 2004).  Like Sarno, Kanios was not, by her own admission, able to perform the essential functions of the job at the expiration of her leave.  (Kanios Dep. at p. 306)

Consequently, Plaintiff had no right to reinstatement, nor does she have a right to any other remedies under the FMLA.

### (iii)  Plaintiff Did Not Certify She Was Suffering from a "Serious Health Condition"

The FMLA entitles an eligible employee to twelve (12) weeks of unpaid leave for a "serious health condition."  29 U.S.C. § 2612(a)(1).  See also, Miller v. Venator Group, Inc., No. 00 Civ. 0454(HB), 2000 WL 648186, *2 (S.D.N.Y. May 18, 2000).  Whether an employee suffers from a "serious health condition" under the FMLA is a question of law.  See, e.g., Haefling v. United Parcel Service, 169 F.3d 494, 499 (7th Cir. 1999).  See also Roberts v. Human Development Assoc., 4 F. Supp. 2d 154 (E.D.N.Y. 1998).  Plaintiff here alleges "difficulty sleeping," "shortness of breath," "panic attacks," and "heart palpitations."  (Kanios Dep. pp. 317, 323-24)  Kanios did not provide certification of such serious illness beyond the initial two-week leave period requested by her treating psychologist.  (Ex. Y)  In fact, the Certification of Health Care Provider form that Plaintiff's own doctor completed provides to the contrary that Plaintiff was not suffering from a chronic condition that required protracted treatment.  (Ex. Y)  Thus, at least beyond that initial two week period, could not be deemed "serious" within the purview of the FMLA.  See, e.g., Boyce v. New York City Mission Society, 963 F.Supp. 290, 298-300 (S.D.N.Y. 1997)(temporary ailments do not qualify). See also Bailey v. Augustine Medical, Inc., No. Civ. 01-695 ADMAJB, 2003 WL 288470, *11 (D. Minn. Feb. 7, 2003) ("[s]tress does not rise to the level of a serious health condition . . .employee must identify a 'serious medical condition' necessitating the leave"); Wemmitt-Pauk v. The Beech Mountain Club, 140 F.Supp.2d 571, 580 (W.D.N.C. 2001) (employee's "panic attacks" not a "serious health condition").  The lack of proof of a "serious health condition" in the present case is underscored by Plaintiff's own testimony as well-- Plaintiff testified herself that she did not seek any medical treatment after she was discharged from employment on April 13,  2001, yet could not have returned to work until well after her termination.  (Kanios Dep. pp. 306-08, 315-17)  See, e.g., Bauer v. Varity Dayton-Walther Corp., 118 F.3d 1109 (6th Cir. 1997) (the fact that plaintiff had not sought

medical treatment after discharge refuted claim of "serious health condition").  Therefore,

Defendants are entitled to summary judgment as a matter of law.

**CONCLUSION**

For the foregoing reasons, and for those reasons set forth in the annexed Motion, Statement

of Undisputed Facts and the Exhibits hereto, the Defendants respectfully request that this Court grant

its Motion for Summary Judgment as to the Plaintiff's Amended Complaint in its entirety.


**EPSTEIN BECKER & GREEN, P.C.**
Attorneys for Defendants


By:_____
    Mary A. Gambardella, Esq.
    Federal Bar No. ct05386
    One Landmark Square, Suite 1800
    Stamford, CT  06901-2681
    (203) 348-3737

             - and –

    Steven J. Younes, Esq.
    Federal Bar No. ct12408
    One Landmark Square, Suite 1800
    Stamford, CT  06901-2681
    (203) 348-3737

## **CERTIFICATION**

The undersigned hereby certifies that a copy of the foregoing *Memorandum of Law in Support of Defendants' Motion for Summary Judgment* was served, regular mail, postage prepaid, this 21st day of May 2004 to:

> Scott Lucas, Esq.
> Martin, Lucas & Chioffi, LLP
> 177 Broad Street
> Stamford, CT  06901

_____
Mary A. Gambardella