IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **LYNN B. KANIOS** | : | Civil Action No. 303CV369 (DJS) |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| v. | : | |
| | : | |
| **UST INC. and MARK ULIASZ,** | : | |
| | : | |
| **Defendants.** | : | May 21, 2004 |

**DEFENDANTS' STATEMENT OF UNDISPUTED FACTS
PURSUANT TO FEDERAL RULE 56(A)(1)**

Pursuant to Federal Rule of Civil Procedure 56 (a)(1), the Defendants, UST Inc. ("UST" or the "Company") and Mark Uliasz ("Uliasz") (or collectively "Defendants"), hereby respectfully submit this Statement of Undisputed Facts.

1. This action was brought by Plaintiff, Lynn Kanios, a former employee of Defendant UST. The operative Complaint is the Amended Complaint dated January 14, 2004 (Ex. K to the Memorandum of Law).

2. In her Complaint, Kanios alleges: (1) in the First Count against UST, discrimination based on gender in violation of Title VII of the Civil Rights Act of 1964, as amended, 29 U.S.C. § 2000, *et seq.* ("Title VII")[1]; (2) in the Second Count against UST, discrimination based on gender in violation of the Connecticut Fair Employment Practices Act, Conn. Gen. Stat. § 46a-60(a)(1), *et seq.* ("CFEPA"); (3) in the Third Count against UST, retaliation in violation of Title VII; (4) in the Fourth Count against UST, retaliation in violation of the CFEPA; (5) in the Fifth Count against Defendant Uliasz, aiding and abetting in violation of the CFEPA; (6) in the Sixth Count against both Defendants, negligent infliction

---

[1] Although Kanios alleges "sexual harassment" in the Complaint, she has clarified that she is alleging only gender-based sexual harassment. (Kanios Dep. pp. 99-104)

ST:28787v1

of emotional distress; (7) in the Seventh Count against UST, negligent misrepresentation; and (8) in the Eighth Count against UST, violation of the federal Family and Medical Leave Act, 29 U.S.C. § 2615(a)(1), *et seq*. ("FMLA").

3. UST, headquartered in Greenwich, Connecticut, is in the primary business of manufacturing and distributing smokeless tobacco products.

4. Kanios began her employment with UST on March 6, 1995, as a Support Staff Secretary in the Employee Relations ("Human Resources") Department ("Complaint," ¶ 7, part of Ex. K to the Memo of Law; Kanios Dep. pp. 49-50). Kanios received an employee handbook and reviewed its contents when she commenced her employment with UST. (Kanios Dep. p. 51; Ex. L)

5. Kanios performed some secretarial and data coordinator work for the Purchasing Department, filling in for a secretary in that department on maternity leave. (Kanios Dep. pp. 54, 70, 73)

6. Kanios describes her interaction at that time with Uliasz, Purchasing Manager, as limited; however, she claimed to have even then experienced problems with his "managerial style," including his "condescending tone." She also claimed that Uliasz made comments about her weight, appearance, the amount of food she consumed during pregnancy, that he vaguely referred to her "mind being home with the kids," and remarked that "women belong in the home." (Kanios Dep. pp. 59-64)

7. Although Kanios knew that she could complain to Human Resources about Uliasz, she did not bring any complaint at that time. (Kanios Dep. pp. 67-69, 83-86, 120; Ex. M)

8. On or about July 21, 1997, Kanios was promoted into the Purchasing Department as an Associate Buyer by Tim Howard, the department Director. (Ex. K ¶ 8; Kanios Dep. pp. 54-55; Howard Dep. p. 4)

9. Uliasz participated in the decision to have Kanios transferred to him as her supervisor, as well as in the initial promotion to Associate Buyer. (Uliasz Dep. pp. 40, 41, 157; Ex. N) This testimony is also undisputed by Kanios. (Kanios Dep. pp. 58-59 wherein she concedes lack of knowledge on this point)

10.     As an Associate Buyer, Kanios' primary responsibilities were to assist the Buyers, Senior Buyers and Managers by placing purchase orders with suppliers, managing inventory by ensuring that certain, designated plants and manufacturing facilities had the ingredients necessary to make the smokeless tobacco products, ensuring sufficient inventory of dry plant materials, developing spreadsheets for polypropylene and casing materials or flavoring fragrances, and placing purchase orders for casing materials, waxes and some of the labels for the dry snuff business.  (Kanios Dep. pp. 55-56, 71; Howard Dep. pp. 12-13, 110, 112, 114; Maguire Dep. pp. 6, 8-9, 27-28, 48, 50-51, 53)

11.     Priscilla Maguire, a then Buyer, supervised some of Kanios' orders and inventory management.  (Maguire Dep. p. 9)

12.     Kanios was periodically also expected to pitch in, as were the other Associate Buyers, to absorb duties of employees who were on leave.  (Kanios Dep. pp. 69-70; Howard Dep. p. 118; Uliasz Dep. pp. 126-28, 131-32; See also, e.g., Uliasz Dep. pp. 126-128, 138; Howard Dep. p. 118; Kanios Dep. pp. 69-71, 182-84)

13.     Kanios initially reported to David Turner.  (Kanios Dep. pp. 57-59)  Shortly thereafter, however, Kanios began to report directly to Defendant Uliasz, but her responsibilities did not change.  (Id.)

14.     At all times, Uliasz reported to Tim Howard.  (Howard Dep. pp. 5, 9)

15.     In or about late January 2001, Kanios told a colleague, Christine Walsh, that she was upset by comments made to her by Uliasz.  (Kanios Dep. pp. 80, 116-17; Ex. K ¶ 16)

16.     Walsh worked directly for Robert Rentz, Director of Customer Development and a UST Compliance Officer;[2] she told Rentz about her "friend" who was having problems with her supervisor.  (Rentz Dep. pp. 42; Kanios Dep. pp. 145-46)

---

[2] Compliance officers are identified individuals within UST charged with the responsibility of acting as additional receivers of employee complaints of violations of the Company's Code of Conduct.  Once received, these officers forward complaints received to the appropriate department, such as Human Resources, for investigation.  (Rentz Dep. pp. 16-18).

17.  Kanios then spoke directly with Rentz after Rentz contacted her.  (Kanios Dep. pp. 82, 117, 120; Rentz Dep. pp. 43-44)

18.  Kanios alleged to Rentz: (a) that Uliasz made offensive comments about her size; (b) that he often commented about the amount of food she was consuming, possibly having called her a "fat bitch" (although Rentz was admittedly unclear in his recollection on this remark); and (c) that, in general, he made repeated, condescending comments about her intelligence and performance.  (Kanios Dep. p. 120-21; Rentz Dep. pp. 43-44, 60; Viesta Dep. pp. 63-65 and Ex. P, DO667)

19.  Kanios also told Rentz Uliasz "pushed" her.  (Kanios Dep. p. 121)

20.  No mention of any gender-based comments was made by Kanios to Rentz.  (Id.)

21.  Rentz advised Kanios that the matter had to be reported, and himself followed up with the Legal Department.  (Rentz Dep. pp. 44, 47-48)

22.  This conversation with Rentz was the first on record in which Kanios ever complained about conduct by Uliasz to UST management.  (Kanios Dep. pp. 76-77, 83, 111, 286-87; Howard Dep. pp. 23-24)

23.  Kanios claimed during deposition she previously complained to David Turner and to Tim Howard, yet she did not include this allegation either in her Complaint, or in her CHRO Charge.  Further, she could not remember the particulars of these purported conversations.  (Kanios Dep. pp. 68, 77-78 ; Ex. K; Ex. R, CHRO charge)

24.  Kanios claimed she did not go to Human Resources earlier out of fear of retaliation, but she could not name any single instance which she observed to support this fear.  (Kanios Dep. pp. 83, 84-87, 118)

25.  She acknowledged that others had complained about the department, with other males having complained specifically about Uliasz's managerial style, yet she could not point to any retaliation against them.  (Kanios Dep. pp. 84-86, 157-59)

26. Rentz then followed up with Nella Viesta, Director of Employee Relations, to advise her that Kanios would be coming in to see her. (Kanios Dep. p. 122; Rentz Dep. pp. 50-51; Viesta Dep. p. 8)

27. By that time, however, Viesta had already been made aware by the Legal Department that Kanios complained about Uliasz. (Viesta Dep. pp. 62-63 and Ex. P DO667) An investigation thereafter ensued. (See *infra*)

28. On February 7, 2001, Viesta met with Kanios. She complained to Viesta about Uliasz's managerial style, condescending tone, as well as his "comments" about her food consumption. (Kanios Dep. pp. 148-49, 151-52)

29. During her deposition, Kanios elaborated that Uliasz made derogatory comments about her appearance, weight, eating habits and intelligence. By way of example: (a) when she returned from maternity leave, Uliasz told her he "needed to teach [her] Math 101 again," and that "her thoughts are still at home"; (b) he kept a small jar of pennies on a desk in the department which he labeled her "education fund"; (c) incident to her two pregnancies, Uliasz had commented repeatedly that she was "really packing it [weight] on…was eating for two…was strapping on a feed bag…."; "when you are done eating, make sure you wipe your chin off"; and (d) he would ask her if she "wanted a hefty bag," referring again to her food consumption. (Kanios Dep. pp. 97-104, 148-49, 150-52)

30. When asked at her deposition if all comments were about "weight and eating habits," Kanios said "No, there was…he would make comments about my appearance, he would make comments that he had to deal with…he would talk condescending to me and it would be inferior comments and he would—you know, comments he wouldn't make to a man. A lot of it is hard to say. A lot of it was in his—he had a lot of mannerisms. It's very hard to describe…" When asked yet again what comments <u>were not</u> related to weight or food consumption, she answered: "He's made comments about my hair, he's made comments about my glasses, he's made comments about my shoes. He's made comments about—you know, living still in the 80's with the clothes I had on." She also claimed

he made negative comments about her attractiveness. (Kanios Dep. pp. 97-104, 247, Viesta Dep. pp. 41-44)

31. Kanios further asserted that Uliasz commented about her being "barefoot and pregnant," being a woman home with children, and about being emotional because she was a woman. (Kanios Dep. pp. 89-93, 97-104, 150-152)

32. Viesta denies any record of Kanios alleging gender-derogatory remarks. (Viesta Dep. pp. 37-38, 41-44, 55-56, 67-69, 72, 75-80 and Ex. P DO668-669)

33. Kanios also told Viesta that Uliasz put his hands on her to get by her, expressing frustration, during a conversation in his office--"like she didn't matter." (Kanios Dep. pp. 108-10, 169-170, 172; Viesta Dep. pp. 42-43, 72-73)

34. Viesta denied that Kanios alleged Ulisaz pushed or shoved her, but rather, visibly demonstrated and verbally described that he had placed his hands up to get by her—without touching, pushing or shoving. (Viesta Dep. pp. 42-43, 72-73)

35. Kanios' allegations of comments which refer to "women" are absent from both Kanios' Complaint in this action and her CHRO Charge, including the letter attached to her Charge authored by her then attorney, William Blake. (Ex. K; Ex. R)

36. Further, Kanios produced purported contemporaneous handwritten notes of what she described as pertinent events; not one comment reflected in those notes refers to such statements. (Ex. T, Kanios Notes)

37. When asked at her deposition whether she had raised any claims of gender based discrimination or harassment to Viesta, Kanios responded ambiguously that she "believed" she told Viesta about comments "along those lines"; about the remark that Kanios was "barefoot and pregnant," about Kanios being emotional because she was a woman, and about <u>her</u> mind being home with the children. (Kanios Dep. pp. 148-52; see also Kanios Dep. pp. 97-104, 273-75, 277, 280, 281-88; Ex. T)

38.     Kanios was assured she would not have to confront Uliasz unless she was comfortable. (Kanios Dep. pp. 125-27; Ex. K ¶ 17)

39.     Viesta promptly met with Uliasz on February 8, 2001, and informed him of Kanios' complaints which concerned his condescending management style and comments he made about the amount of food Kanios consumed. (Uliasz Dep. pp. 90, 93-94, 171-73; Viesta Dep. pp. 83-88; Ex. P DO670, D0682-683)

40.     Uliasz expressed surprise to Viesta that Kanios had not addressed this issue with him directly, yet conceded that, at times, he may have exhibited his frustration with Kanios' performance in a manner which could be too direct. (Uliasz Dep. pp. 172-73; Viesta Dep. p. 85)

41.     Uliasz agreed to try to be more sensitive to any condescending demeanor, and to better manage Kanios' performance by giving her specifics and coaching. (Viesta Dep. pp. 87- 88; Ex. P D0670; Uliasz Dep. pp. 101-02)

42.     Uliasz further admitted that he made the "Math 101" comment once (Uliasz Dep. pp. 84), and that he may have joked in the cafeteria about Kanios' food consumption. (Uliasz Dep. p. 88)

43.     However, during his deposition, Uliasz added that such teasing remarks were made in the department between and among males and females alike. (Uliasz Dep. pp. 158-159, 181)

44.     Kanios conceded Uliasz could have been simply making a distinction between men and women and how sensitive women are to teasing remarks, as opposed to how men handle teasing. (Kanios Dep. p. 151)

45.     Viesta denies that Kanios made any claims of gender-based derogatory comments by Uliasz, and indeed, Viesta's deposition testimony and contemporaneous investigatory notes reflect allegations by Kanios consistent with the Complaint and the CHRO Charge; i.e., that the comments were about the amount of food being consumed, weight, appearance, and intelligence. (Viesta Dep. pp. 172-175 and Ex. P)

46. Kanios could not proffer evidence as to how Uliasz treated males, or anyone else, in the office. Nor could she provide any evidence regarding Uliasz's pattern of hiring and firing of males and females, except to concede he promoted Maguire. (Kanios Dep. pp. 95, 113-14, 153-55 )

47. After hearing about Kanios' complaint, Uliasz met with Kanios, as pre-planned, to discuss her annual performance review. (Kanios Dep. pp. 124-25, 139-40; Uliasz Dep. pp. 68-71, 169-170)

48. Contrary to the Complaint, Kanios admitted during deposition that Uliasz specifically referred to his conversation with Viesta during her review meeting. (Kanios Dep. pp. 124-25)

49. Uliasz still gave Kanios a positive overall performance review and commensurate raise. (Ex. V) Historically, Kanios's reviews reflected a "meets" or "exceeds" expectations rating by Uliasz. (Kanios Dep. pp. 73-89)

50. A bonus followed two weeks later. **(**Ex. V; Ex. U D0398; Viesta Dep. pp. 165-166; Kanios Dep. pp. 124-125, 160)

51. Howard and Uliasz could have taken the opportunity to change Kanios' performance review upon learning of her complaint about Uliasz, and before presenting it to Kanios. However, neither took such action. Again, two weeks later, Kanios received a bonus on top of the raise granted with the positive review. (Viesta Dep. pp. 168-169; Howard Dep. pp. 145-47)

52. Viesta also advised Howard that Kanios had complained about Uliasz's condescending and abrasive management style. (Viesta Dep. pp. 88-90; Howard Dep. pp. 30-35, 37, 63-66)

53. Howard agreed to a meeting with and to monitor Uliasz. (Howard Dep. p. 35-40; Viesta Dep. pp. 89-90, 94, 176)

54. Howard then approached Kanios directly, who reiterated her claims to Howard. (Kanios Dep. pp. 130-31; Howard Dep. pp. 44-47, 50-52, 78-79; Viesta Dep. p. 94; Ex. EE DO384-388) Howard met with Uliasz. (Howard Dep. pp. 39-40, 64-67; Uliasz Dep. p. 99-101; Ex. EE DO385-388)

55. Howard testified Kanios never alleged to him that Uliasz had called her "fat," "ugly," or that she believed she was treated differently because of gender. (Howard Dep. pp. 144- 145)

56. Kanios ambiguously claimed she told Howard of Uliasz's comments by making it "obvious" they were made because she is a woman. (Kanios Dep. p. 146-48) No factual details were provided.

57. On February 16, 2001, Howard, in an attempt to facilitate a resolution, attempted to have a meeting with Kanios and Uliasz, but Kanios expressed discomfort at meeting with them alone. (Kanios Dep. 130-31; Viesta Dep. pp. 98-100; Ex. P DO672)

58. On that same day, Kanios went to the Vice President of UST's Employee Assistance Program ("EAP"), Karen Thorman. (Thorman Dep. pp. 12-17; Kanios Dep. p. 132)

59. Observing that Kanios was emotionally upset about attending a meeting her managers had scheduled, Thorman referred Kanios to Dr. Jane Hankin, a psychologist on UST's EAP referral list. Thorman further recommended that Kanios go back to Viesta and talk to her about her discomfort, and herself contacted Viesta to advise that Kanios wanted Viesta present at the meeting. (Thorman Dep. pp. 12-17, 26; Viesta Dep. pp. 94-97; Ex. P DO671)

60. However, on February 20, before hearing from Viesta, Howard attempted to resolve the situation by having a meeting with Kanios and Uliasz, to find out how to "make it better". (Kanios Dep. pp. 132-36; Howard Dep. pp. 81-83, 89-92; Ex. EE DO389; Viesta Dep. pp. 94-97, 102, 104-05; Ex. P DO671-674; Uliasz Dep. pp. 102, 105-06)

61. After the February 20th meeting with Uliasz and Howard, Kanios contacted an attorney, who wrote a letter to Senior Vice President, Richard Kohlberger. (Kanios Dep. pp. 134-35)

62. This letter referenced only comments relating to Kanios' weight, appearance, and intelligence, yet asserted that such comments were the result of gender-bias, that they created a "hostile environment", and constituted "sexual harassment." (Ex. W)

63.     In the interim, on February 22, Viesta had a conversation with Kanios, during which Kanios informed her of the meeting with Howard and Uliasz two days earlier, and her discomfort with meeting them alone. Kanios told Viesta she thought they were trying to "make it a performance issue", and therefore, Viesta suggested another meeting with her present for the following Monday. Kanios agreed. (Viesta Dep. pp. 103-07; Ex. P DO672-674)

64.     After this conversation, but prior to the scheduled Monday meeting, Kohlberger passed the attorney letter along to Viesta. Viesta contacted Kanios on February 23 to discuss the letter, and asked why Kanios had contacted an attorney. (Kanios Dep. p. 136; Viesta Dep. pp. 104-106, 108-09, 112; Ex. P D0675-676)

65.     Viesta claims Kanios told her that her "real estate attorney" had been premature in sending the letter, and she wanted to explore transfer opportunities, but agreed to proceed with the Monday meeting with Howard and Uliasz to continue to aim for resolution. (Viesta Dep. pp. 109-12; Ex. P DO675).

66.     Kanios denies disavowing the letter, but agrees that she told Viesta she would meet again without her attorney present, responding to Viesta's expression that she wanted things to work about with Uliasz. (Kanios Dep. pp. 137-38; Ex. P DO675-676)

67.     On February 27, 2001, this meeting was conducted. Kanios' allegations were reviewed, and the parties agreed that Uliasz would meet with Kanios once each week to discuss the status on projects to improve communications and to avoid problems when he might be frustrated with her performance. It was also decided that Howard would be observing, monitoring and coaching Uliasz and attending his regular staff meetings as much as he could. They reiterated that Kanios could come to Uliasz or Howard at any time with any continuing concerns. (Kanios Dep. pp. 138-144; Viesta Dep. pp. 113-16; Ex. P D0675-676; Howard Dep. pp. 90-93, 98-99; Ex. EE DO390)

68. Viesta testified that she decided what investigative steps to take based specifically on Kanios' allegations. Thus, had Kanios suggested gender-based harassment, Viesta possibly would have conducted other interviews of women in the department. (Viesta Dep. pp. 174-175)

69. Viesta then told Howard and Uliasz that "a letter" had been received from an attorney representing Kanios, but she did not divulge to Uliasz, and could not recall divulging to Howard, the specific content thereof or that discrimination and sexual harassment were being alleged. Howard and Uliasz specifically recalled not being told of these details (Howard Dep. pp. 101-104, 133 150-151, 154; Uliasz Dep. pp. 173-175)

70. The testimony of Howard and Uliasz, which establish that Howard and Uliasz were never made privy to any of the contents of the attorney letters, cannot be contraverted with evidence by Kanios.

71. Viesta prepared a "purpose" memo dated February 26, 2001, confirming the topics of discussion at the February 27 meeting, noting specifically Viesta's continuing perception that Kanios' complaint was that Uliasz was condescending, and that he had made offensive remarks related to her eating habits and intelligence. The memo also mentioned Uliasz's frustrations with Kanios' performance as a potential reason for his attitude. (Viesta Dep. pp. 113-117, 178; Ex. P D0677; Kanios Dep. pp. 138-45)

72. Kanios admitted in deposition that some of these performance issues had, in fact, been addressed by Uliasz before her complaint. (Kanios Dep. pp. 162-74; see also Viesta Dep. p. 178-79, where she confirms that Kanios never alleged performance concerns of Uliasz unjustified)

73. Viesta also prepared a March 6, 2001, "recap" memo specifically noting the solutions discussed to improve communications between Kanios and Uliasz going forward. (Ex. X)

74. Significantly, the recap memo contained an invitation to the recipients, including Kanios, to alter or add to its content if the recipient thought it necessary---Kanios neither changed nor added anything to this memo, despite the lack of any reference to gender-based remarks, or

discrimination or harassment on the basis of gender or any other protected category. (Kanios Dep. pp. 144-45; Ex. X; Viesta Dep. pp. 180-81)

75. Kanios claimed that even after March 6, Uliasz made additional comments about her eating. (Kanios Dep. pp. 140-41)

76. However, subsequent to this last meeting, Viesta periodically checked with Kanios about the status of her situation and Kanios replied that the situation was "okay." (Viesta Dep. pp. 118-119)

77. Viesta, Howard and Uliasz therefore believed the matter had progressed to Kanios' satisfaction. (Viesta Dep. p. 119; Howard Dep. pp. 90-93; Uliasz Dep. pp. 114-15, 119)

78. On March 19, 2001, Kanios went to Viesta and to Thorman upset, without providing the reasons why she was upset. (Kanios Dep. p. 211; Viesta Dep. pp. 120-21)

79. Kanios mentioned she had a scheduled doctor's appointment and Thorman recommended she keep that appointment. (Thorman Dep. p. 26) Kanios told Viesta she was having panic attacks and was going to see her doctor. (Viesta Dep. pp. 120-121, 177, 180; Ex. P D0678.)

80. Thorman was then contacted directly by Kanios' psychologist who expressed concern over Kanios' return to the department. (Hankin Dep. pp. 91-92)

81. At the psychologist's request, Thorman agreed to approve Kanios for a two week leave of absence, commencing immediately on March 20, 2001. (Thorman Dep. pp. 28, 29, 36; Hankin Dep. pp. 91-92; Trencher Dep. pp. 19-20, 35-36; Kanios Dep. pp. 220-21, 310- 311)

82. Kanios followed up with Viesta on March 20, 2001, and informed her of the two-week medical leave. (Viesta Dep. pp. 123-24)

83. On March 22, 2001, Viesta forwarded to Kanios the UST leave of absence forms, including the physician certification forms, for completion by her and by her treating psychologists so as to qualify for any remaining leave to which Kanios was entitled. (Kanios Dep. pp. 312-14; Ex. Y; Ex. Z; Ex. AA)

84. Like the FMLA policy set forth in the employee handbook, these forms, which Kanios acknowledged receiving and completing, specifically provided that the federal leave entitlement was calculated by looking back at the prior 12 month period. In this regard, it is critical to note that in 2000, and specifically between May 1 through July 12, Kanios had already taken 10.3 weeks of FMLA qualified leave incident to her pregnancy. She then took an additional 2 weeks of medical leave from July 24, 2000, through August 7, 2000; thus, Kanios had taken more than 12 weeks of medical leave during the 12 months between March 20, 2000, and March 20, 2001. (Kanios Dep. pp. 302-03, 306; Ex. Z; Ex. AA; Ex. BB; Ex. CC)

85. The forms confirmed that her federally guaranteed FMLA rights had already been exhausted by that point, and that she may have additional eligibility for leave only under the Connecticut state FMLA.[3] (Ex. Z; Ex. AA; Ex. BB; Kanios Dep. pp. 314-15)

86. On March 21, 2001, immediately following the commencement of Kanios' leave, another letter had been received by Kohlberger from Attorney Blake. (Ex. DD)

87. Kohlberger forwarded this letter to Viesta as well, but the contents of this letter were, like the first, not made known to Uliasz or Howard. (Howard Dep. pp. 101-104, 133, 150-151, 154; Ex. P D0682-683; Viesta Dep. p. 131-39; Uliasz Dep. 174)

88. Viesta told Howard a second letter had been received. During this same conversation, Howard advised Viesta that after Kanios' leave of absence commenced, the plants began calling him and Maguire directly, complaining about the reducing inventory; the failure to receive critical supplies; and unprocessed orders for items for which Kanios was responsible. (Howard Dep. pp. 107-22, 136-39; Uliasz Dep. pp. 5-6, 135-37, 159-160; Maguire Dep. pp. 20-21; Viesta Dep. pp. 131-36, 142, 149-57; Ex. S).

89. Maguire testified as to her direct knowledge that orders for supplies and ingredients had not been timely placed by Kanios, despite that she and Kanios had reviewed the inventory together prior

---

[3] These forms were sent again to Kanios on April 6, 2001. (Ex. Z D0366)

to her leave and decided what items within Kanios' responsibility needed to be ordered for the manufacturing plants. Maguire confirmed that representatives from the plants had called her directly, informing her that orders for critical ingredients and supplies were either not received or not placed at all. Maguire herself was frustrated since, based on Kanios' prior assurances and discussions, Kanios should have understood the tasks to be completed. It was Maguire who then informed both Uliasz and Howard about a number of problems related to the orders for plant materials/ingredients. (Maguire Dep. pp. 26-29, 44-55, 61-62)

90. A series of e-mail communications and internal memoranda outlining the problems were presented to Maguire during her deposition; she confirmed that <u>she</u> knew personally and directly that Kanios had failed to order items as reflected in these communications. (Id.; Ex. S)

91. Maguire, a female and friend of Kanios, someone completely removed from the investigation and complaint process, and not a decision-maker with respect to Kanios' employment, presented testimony unrefuted by Kanios that these failures constituted serious derelictions of duty by Kanios which could have potentially shut down plants and/or cost UST millions of dollars. (Maguire Dep. pp. 49-52; Ex. O, Maguire Affidavit to CHRO)

92. Kanios offered no specific facts regarding the reason for the e-mails; did not allege the e-mails were concocted, altered, or fabricated; and proclaimed a lack of any knowledge of these issues. However, she admitted the seriousness of the consequences in not correctly and timely placing orders. (Kanios Dep. 56, 181-210)

93. After this initial conversation wherein Howard advised Viesta of these discoveries, serious additional problems were unearthed. As Howard testified and his contemporaneous handwritten notes confirm, once he was advised of the problems with the plants, both through Maguire and through calls placed directly to him, he asked the employees covering Kanios' desk to see what else might be

lingering. This inquiry revealed that the problems were prevalent, yet Kanios had told Howard prior to her leave as well things were "under control."[4] (Howard Dep. pp. 106-22, 132-39; Ex. S)

94.    By this time, it was clear that Kanios' deficiencies were egregious in UST's opinion, especially in view of her repeated assurances to management. (Uliasz Dep. pp. 135-38)

95.    While Kanios claims that Howard and Uliasz were driven by their desire to retaliate against her for lodging her complaint, she proffers no reason whatsoever for Maguire's undisputed and unequivocal testimony with respect to her performance deficiencies or to disprove the testimony by Howard regarding calls he received directly from the plants. (Kanios Dep. pp. 181-210)

96.    Kanios' employment was ultimately terminated effective April 13 by way of letter to her. (Ex. Q, Termination Letter)

97.    Kanios confirmed at her deposition that she was medically unable to return to work at the time she received the letter terminating her employment. (Kanios Dep. pp. 306-307, 310)

98.    Kanios stopped seeing her treating psychologist as soon as she received the termination letter, and has not sought continuing treatment with any medical professional since then. (Kanios Dep. pp. 217-19, 315-317)

99.    On or about August 21, 2001, Kanios filed an administrative charge with the Connecticut Commission on Human Rights and Opportunities and the Equal Employment Opportunity Commission. As previously established, in support of her Charge, Kanios submitted an affidavit, under oath, in which she set forth only allegations that Uliasz had made comments relating to her weight, appearance, and intelligence. The affidavit contains no reference whatsoever to comments by Uliasz that were sexual or gender-based; there were no allegations mentioning disparate treatment of "women," or of Kanios as a "woman"; or even any comments about pregnancy. (Ex. R, Kanios Affidavit to CHRO)

---

[4] Howard initially told Viesta he wanted to place Kanios on probation, but after problems continued to be discovered, he agreed termination was warranted. (Viesta Dep. pp. 155-57)

100. Similarly, Kanios' Complaint and Amended Complaint in this action contain only allegations that Uliasz made comments regarding her "weight, appearance, eating habits and intelligence," and are likewise conspicuously devoid of any mention of comments regarding gender or pregnancy. (Ex. K ¶¶ 12, 13).

101. Based on these undisputed facts and the applicable judicial precedent the following becomes apparent:

(a) In support of her discrimination/harassment claims, Kanios failed to proffer sufficient evidence that Uliasz's conduct, even if true, was based on her gender. Kanios is attempting to transform comments about weight, the amount of food she consumed, and her level of intelligence into actionable behavior, merely by projecting that she did not observe male co-workers being treated in the same fashion. As to any other comments where gender is even arguably referenced (e.g., "women belong at home"), the sporadic dispersing of gender-based comments does not salvage her cause of action, particularly when she cannot establish how any purported gender bias harbored by Uliasz affected her in terms of compensation or status. Indeed, she admitted her performance never changed; she was promoted with input by Uliasz; given positive performance reviews; given commensurate raises; and paid bonuses, with one positive review, raise and bonus being given <u>after</u> her internal complaint. (Kanios Dep. pp. 89-95, 124-29, 150-52, 160, 169-70; Maguire Dep. pp. 26, 35-37, 42-44, 58-61; Ex. V; Ex. U);

(b) In any event, liability cannot be imputed to UST as no Kanios does not allege adverse action attributable to gender based harassment or discrimination (Kanios Dep. p. 254); UST took preventive measures to prevent such harassment (Kanios Dep. 51, 67, 69; Ex. L; Ex. M); and Kanios failed to reasonably take advantage of those measures by waiting to file a complaint, failing to file a subsequent complaint even though his conduct allegedly continued, and by not following up with the remedial measures taken. (Kanios Dep. pp. 68, 77, 111, 122, 130-36, 138, 140-45; <u>see</u>, <u>e.g</u> Viesta

Dep. pp. 88-90, 92-94, 98-102, 114; Howard Dep. pp. 30, 34-35, 39-40, 44-46, 50-51, 55, 78, 81-83, 86, 89, 94, 98-99; Ex. P);

(c) As to her retaliation claims, even if Kanios' allegations are taken as true, she did not engage in "protected activity" <u>known to Howard or Uliasz</u>, the primary decision-makers with respect to the termination of her employment, when that decision was made, and therefore, Kanios cannot sustain a claim of retaliation under either Title VII or the CFEPA (Howard Dep. pp. 30-35, 101-04, 133, 144-45, 150-51, 154; Uliasz Dep. pp. 90, 93-94, 171-75). Moreover, she cannot prove a causal connection between the claimed protected activity and the termination decision, nor can she proffer sufficient evidence of pretext for Defendants' articulated reasons for the subject decision---its discovery of serious neglect of her job duties. (Howard Dep. pp. 107-22; Uliasz Dep. pp. 5-6, 135-37, 159-60; Viesta Dep. pp. 131-36, 142, 149-57; Ex. S; Maguire Dep. pp. 20-21, 26-29, 44-55, 61-62; Kanios Dep. p. 210: "Q.: Do you have any evidence, meaning facts or documents…that the reason given you for termination is inaccurate? That it was really some other reasoning they terminated you? A.: No, I don't—no.");

(d) Uliasz cannot be held to have "aided and abetted" a discriminatory practice as a matter of law; Uliasz is the accused "discriminator," and therefore, cannot be an "aider or abetter" under well established law;

(e) Kanios cannot sustain a claim of negligent infliction of emotional distress, as the required showing that defendant should have realized its conduct during the termination process involved an unreasonable risk of causing severe distress, which might result in illness or bodily harm;

(f) Kanios cannot establish that any representation made to her by anyone at UST was false when made, or which anyone should have known was false when made, in connection with her taking a leave of absence; and

(g) Kanios cannot maintain a claim under the FMLA because: (i) by the time she commenced her last leave of absence, her rights had already been exhausted; (ii) in any event, the remainder of her

leave entitlement was exhausted by the time of her termination; or (iii) in the alternative, she did not fulfill the requirement of continued certification of a serious illness, nor was she even able to return to her employment at the time of the undisputed expiration of her leave entitlement.

102.    Accordingly, summary judgment is warranted as to the Amended Complaint in its entirety.


**EPSTEIN BECKER & GREEN, P.C.**
Attorneys for Defendants


By:_____
   Mary A. Gambardella, Esq.
   Federal Bar No. ct05386
   One Landmark Square, Suite 1800
   Stamford, CT  06901-2681
   (203) 348-3737

              - and –

   Steven J. Younes, Esq.
   Federal Bar No. ct12408
   One Landmark Square, Suite 1800
   Stamford, CT  06901-2681
   (203) 348-3737

## **CERTIFICATION**

The undersigned hereby certifies that a copy of the foregoing Defendant's Statement of Undisputed Facts Pursuant To Rule 56(a)(1) was served, regular mail, postage prepaid, this 21st day of May 2004 to:

> Scott Lucas, Esq.
> Martin, Lucas & Chioffi, LLP
> 177 Broad Street
> Stamford, CT  06901

_____
Mary A. Gambardella