# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **LYNN B. KANIOS** | : | |
| | : | **CIVIL ACTION NO.:** |
| **Plaintiff,** | : | **303 CV 369 (DJS)** |
| | : | |
| **V.** | : | |
| | : | |
| **UST, INC. and MARK ULIASZ** | : | |
| | : | **JULY 12, 2004** |
| **Defendants.** | : | |

## PLAINTIFF'S OPPOSITION TO
## <u>DEFENDANT'S MOTION FOR SUMMARY JUDGMENT</u>

### *PRELIMINARY STATEMENT*

Plaintiff Lynn B. Kanios submits this brief in opposition to defendants' Motion for Summary Judgment dated May 21, 2004 (hereinafter "Defendants' Motion"). As more fully set forth below, defendants' have misstated and skewed both the facts and, in many instances, the applicable law in an effort to wrongly deprive plaintiff of her day in court. For example, in its memorandum in support of its Motion (hereinafter "Defendants' Memo"), defendants inconsistently address the topic of plaintiff's complaints of discrimination. Not only are defendants inconsistent in their own recitation of operative facts, their versions lie in stark contrast to plaintiff's sworn testimony and defendants' own documents, resulting in a myriad of disputed issues of material fact, any one of which provides an adequate basis to deny defendants' Motion for Summary Judgment.

### *STATEMENT OF FACTS*

Defendant UST is a company headquartered in Greenwich, Connecticut and is in the primary business of manufacturing smokeless tobacco products. (Defendants' Memo at 2; D.Ex.[1] K ¶2; Def. Ex. EE.) Plaintiff began her employment with UST on March 6, 1995 as a Support Staff Secretary in the Employee Relations Department ("Human Resources") reporting to Rose Wilder and David

---

[1] "D.Ex. ___" shall refer to defendants' appendix of exhibits filed with their Motion for Summary Judgment; "P.Ex. ___" shall refer to plaintiff's appendix of exhibits filed herewith.

Turner, a supervisor with defendant UST's Human Resources department and a manager in UST's purchasing department, respectively. (D.Ex. K ¶7; Deposition of Lynn B. Kanios taken August 28, 2003 (hereinafter "Kanios Depo.") at 49-50, 57-58, 72-73 (P.Ex. 1); P.Ex. 2.) On or around August 21, 1995, plaintiff received a promotion incident to which she received approximately a 6% pay raise. (P.Ex. 2.) Again on August 5, 1996, plaintiff received a merit increase in salary of approximately 4%. (P.Ex. 2.) On or around April 29, 1997, plaintiff was again promoted, this time into the Purchasing Department where she became the Senior Data Coordinator reporting to Mr. Turner. (P.Ex. 3; P.Ex. 2; Kanios Depo. At 49-50, 57-58 (P.Ex. 1).) Incident to this promotion, plaintiff received a 10.6% percent increase in salary. (P.Ex. 2.) Soon thereafter, on or about July 21, 1997, at the behest of Mr. Turner, plaintiff again received a pay raise and was promoted within the purchasing department into the position of Associate Buyer.[2] (P.Ex. 3; P.Ex. 2.) By the admission of Nella Viesta, defendant UST's Director of Human Resources, plaintiff rose quickly through the ranks and was very successful. (Deposition of Nella Viesta taken January 7, 2004 (hereinafter "Viesta Depo.") at 14-21 (P.Ex. 4).)

After her July 1997 promotion, plaintiff began reporting to defendant Mark Uliasz, another of UST's purchasing managers. (P.Ex. 2; Kanios Depo at 49-50, 56-59, 72-73 (P.Ex. 1); deposition of Mark Uliasz taken March 15, 2004 (hereinafter "Uliasz Depo.") at 74 (P.Ex. 5).) Uliasz engaged in unremitting harassment of plaintiff up to the date of her termination on or around April 13, 2001. (Kanios Depo. At 59-64, 97-98, 102-103, 109, 140-141, 246-247, 253-254 (P.Ex. 1); D.Ex. T; D.Ex. W; D.Ex. K ¶27.) Examples of Uliasz's behavior include, *inter alia*, the following: (1) calling plaintiff a "fat bitch"; (2) telling plaintiff that "it was a good thing [she] wasn't married, because nobody would want [her] the way [she] was looking"; (3) telling plaintiff that "women should be barefoot and pregnant"; (4) stating that plaintiff wasn't "nice looking enough"; (5) stating that

---

[2] The "main objective" of plaintiff's position as an Associate Buyer was to support the administrative needs of the buying group. (D.Ex. V; Kanios Depo. At 187-201 (P.Ex. 1).)

plaintiff wasn't "sexy enough to be back out on the market"; (6) that plaintiff "hadn't seen the inside of a gym ever"; (7) that "women belong in the home"; (8) that women were too "emotional," referring to his animus toward women in the workplace; (9) telling plaintiff she couldn't "fit through the door," referring to her size despite his knowledge of her two recent pregnancies; (10) telling plaintiff she should use "a feed bag," referring to plaintiff as an animal when she eats; and (11) keeping a jar of pennies in the office labeled plaintiff's "education fund." Uliasz's unlawful conduct reached its nadir when he pushed plaintiff scoffing "get out of my way." (Kanios Depo. at 59-64, 121 140-141, 246-247, 253-254; D.Ex. T; D.Ex. W; Ex. K ¶27; deposition of Robert G. Rentz taken December 18, 2003 (hereinafter "Rentz Depo.") at 43-45 (P.Ex. 6).)

In late January 2001, Christine Walsh, plaintiff's coworker, realizing the gravity of the harassment befalling plaintiff, complained about Uliasz's unlawful conduct to Robert Rentz, a Compliance Representative[3] charged with, *inter alia*, receiving complaints of unlawful conduct and assisting the Compliance Committee[4] with the implementation of UST's Code of Corporate Responsibility, a mandatory code controlling conduct in defendants' workplace. (Deposition of Richard Kohlberger taken March 24, 2004 (hereinafter "Kohlberger Depo.") at 16-17 (P.Ex. 8); Rentz Depo. at 21-22, 42-43 (P.Ex. 6); Kanios Depo. at 78-80, 116-17 (P.Ex. 1); D.Ex. K ¶16; Pl. Ex. 7). Soon thereafter, Rentz met with plaintiff in order to discuss all her complaints of harassment, including being called a "fat bitch," as well her fears of retaliation. (Rentz Depo. at 42-45 (P.Ex. 6); Kanios Depo. at 82, 117, 120-121 (P.Ex. 1).) Rentz immediately deemed Uliasz's conduct to "define harassment in the workplace" and reported these complaints to Viesta as well as UST's Legal Department. (Rentz Depo. at 44-45, 47-48, 50-51 (P.Ex. 6).)

---

[3] Compliance Representatives, among other things, assist the Compliance Committee in its oversight and implementation of UST's compliance program, including compliance with the Code of Corporate Responsibility and Code Policy Statements. Compliance representatives also serve as an individual to whom employees and other agents can report violations by others within the organization without fear or retribution, and to take action on such reports as directed by the Compliance Committee. (P.Ex. 7.)

[4] The Compliance Committee is charged with, among other things, the duty to detect and ensure that all reasonable steps are taken in response to an offense and to prevent further similar offenses. (P.Ex. 7.)

Despite plaintiff's complaints of unlawful harassment, UST made no attempt to investigate, let alone apply corrective measures. (Rentz Depo. at 44-45, 47-48, 50-51 (P.Ex. 7); Viesta Depo. at 36-37, 44-45 (P.Ex.4).) While Rentz testified he brought directly toViesta's attention *all* of plaintiff's complaints of discrimination and sexual harassment, Viesta, inconsistent with her own notes, testified at her deposition and submitted in a sworn affidavit to the CHRO that Rentz told her of but <u>one</u> complaint regarding Uliasz's "managerial style." (P.Ex. 9 ¶6; Defendants' statement of undisputed facts No. 26.) Rentz testified, contrary to Viesta's affidavit, that the complaints were "serious" and that he informed Viesta and the Legal Department of these facts. Viesta made no investigation into these claims. (Rentz Depo. at 44-45, 47-48, 50-51 (P.Ex. 6); Viesta Depo. at 36-37, 44-45 (P.Ex. 4).) In fact, despite Rentz's testimony and her own notes regarding plaintiff's complaints, Viesta justifies her inaction by claiming that she had absolutely no knowledge of plaintiff's complaints of harassment. (Viesta Depo. at 36-38, 44-45 (P.Ex. 4); P.Ex. 9.)

In addition, Viesta's statements regarding plaintiff's complaints and her response to those complaints are inconsistent. For example, Viesta on one hand states that she did investigate plaintiff's complaint yet "determined it was not harassment" while on the other hand claims she "did not investigate harassment" because "there was no need to." (Viesta Depo. at 36-37, 44-45 (P.Ex. 4); P.Ex. 9.) In addition, Viesta admits that she was aware that plaintiff herself complained to Rentz, yet states that plaintiff "never formally lodged" a complaint. (Viesta Depo. at 53-54 (P.Ex. 4); P.Ex. 9.) Furthermore, Viesta states that she <u>never</u> personally spoke to Rentz regarding the complaints plaintiff reported to him; yet she then admits that Rentz, after meeting with plaintiff, followed up with her to advise her that plaintiff would be coming in to see her. (Rentz Depo. at 50-51 (P.Ex. 6); Viesta Depo. at 64-65 (P.Ex. 4); Defendants' statement of undisputed facts No. 26.) In fact, she later testified that she directed Rentz to stop speaking with plaintiff entirely so as to prevent him from providing plaintiff with "counsel" and "suggestions." (Viesta Depo. at 95-96 (P.Ex. 4).) Ironically, despite her admitted failure to enforce UST's policies geared at curing unlawful conduct, Viesta claims in her

4

sworn statement: "UST maintains and strongly enforces strict and clear written policies prohibiting discrimination on the basis of, inter alia, an individual's sex and prohibiting any form of unlawful harassment, including sexual harassment." (P.Ex. 9 ¶4.)

Despite her professed lack of knowledge, on February 7, 2001, soon after plaintiff's meeting with Rentz, Viesta met with plaintiff to discuss plaintiff's complaints. (Kanios Depo. at 97-98, 103-104, 108-110, 148-152, 169-170 247 (P.Ex. 1); Viesta Depo. at 62-63, 72-73, 78,79,80,81, 83,84 (P.Ex. 4).) By that time, Viesta had clearly been made aware by Rentz and the Legal Department that plaintiff had lodged a "formal" complaint. (Rentz Depo. at 50-51 (P.Ex. 6); Viesta Depo. at 41-44, 62-63 (P.Ex. 4).) Plaintiff stated to Viesta during this meeting that she feared retaliation and that she did not want to meet with Uliasz. (Kanios Depo. at 102-103, 122-123 (P.Ex. 1); D.Ex. P at DO668-669.) Viesta promised plaintiff that she would not have to meet Uliasz alone, but at some point she would have to meet the person she was accusing of harassment as that was "company policy." (Kanios Depo. at 123 (P.Ex. 1); D.Ex. at DO668-669.)

Despite Viesta's claim of lack of knowledge, plaintiff testified she reiterated her complaints to Viesta of Uliasz's harassing comments and detailed how Uliasz pushed her scoffing "out of my way." (Viesta Depo. at 62-63, 72-73 (P.Ex. 4); D.Ex. P at DO668-669; Kanios Depo. at 148-152 (P.Ex. 1).) Plaintiff testified she told Viesta, *inter alia*, that Uliasz: (1) discriminated against her because of her sex; (2) made comments about plaintiff "being barefoot and pregnant," referring to his animus towards women in the workplace and his sex based harassment of plaintiff; (3) made comments about plaintiff being a woman needing to be at home with her kids, again referring to his animus towards women in the workplace and his sex based harassment of plaintiff; and (4) comments that plaintiff, because she was a woman, was too emotional. (Kanios Depo. at 97-98, 103-104, 108-110, 148-152, 169-170, 247 (P.Ex. 1); Viesta Depo. at 62-63, 72-73, 79 (P.Ex. 4); D.Ex. P at DO668-669.) Plaintiff made it clear to Viesta that these comments toward plaintiff were made repeatedly. (Kanios Depo. at 148-152 (P.Ex. 1); D.Ex. P at DO668-669.) Viesta's own notes which reflect her

meeting with plaintiff regarding plaintiff's complaints of sex discrimination recorded, *inter alia*, that plaintiff complained that Uliasz made inappropriate comments about her weight, intelligence, and appearance. (D.Ex. P at DO668-669; Viesta Depo. at 62-63, 72-73, 79 (P.Ex. 4).) Viesta also recorded some of these comments made while plaintiff was pregnant. (D.Ex. P at DO668-669; Viesta Depo. at 62-63, 72-73, 79 (P.Ex. 4).)

Again, Viesta, inconsistent with her own notes and plaintiff's testimony, submitted a sworn affidavit to the CHRO stating plaintiff "at no time during her employment…complain[ed] or otherwise suggest[ed] to [Viesta] or any member of management that [Plaintiff] was being sexually harassed or otherwise being treated differently on account of her sex." (D.Ex. P at DO668-669; Viesta Depo. 62-63, 72-73, 79 (P.Ex. 4); Kanios Depo. at 97-98, 103-104, 108-110, 148-152, 169-170, 247 (P.Ex. 1); P.Ex. 9 ¶4.) Moreover, Viesta's notes reflect that plaintiff was physically moved as if "she didn't matter," with Uliasz stating "out my way." (D.Ex. P D0668-669; Viesta Depo. at 72-73, 79 (P.Ex. 4).) Nevertheless, despite all she had learned thus far, Viesta maintains and defendants assert in their brief that there is no evidence nor complaint of sexual "harassment." (Viesta Depo. at 90 (P.Ex. 4); P.Ex. 9 ¶4; Defendants' Memo at 4.)

As of February 7, 2001, the date of the meeting between Viesta and plaintiff, plaintiff's supervisor, Uliasz, had created a positive performance review which had been shared with his supervisor Tim Howard. (Deposition of Timothy G. Howard taken March 29, 2004 (hereinafter "Howard Depo.") at 26-29 (P.Ex. 10); D.Ex. V.) The next morning, on February 8, 2001, Viesta met with Uliasz and informed him of plaintiff's complaints. (Rentz Depo. at 43-45, 50-51 (P.Ex. 6); D.Ex. P at. DO667, DO670; Viesta depo. at 83, 84 (P.Ex. 4).) At this meeting, Uliasz admitted to being "condescending" toward plaintiff. (D.Ex. P at DO670; Viesta Depo. at 83, 84 (P.Ex. 4).) Uliasz then met with plaintiff and tendered to her the review. (Kanios Depo. at 124 (P.Ex. 1).) Uliasz did not change the review at this time, as plaintiff's performance had already been discussed between Howard and he, and they both on February 7, 2001 authorized her salary increase incident to

approving her positive review. (Howard Depo. at 26-29 (P.Ex. 10); P.Ex. 2); Kanios Depo. at 127-128 (P.Ex. 1).) Moreover, plaintiff testified that during this meeting, Uliasz informed her that he "just" had a meeting with Viesta and that "he was very upset" that she went to human resources. (Kanios Depo. at 124 (P.Ex. 1); Uliasz Depo. at 70 (P.Ex. 5).) Soon after, Viesta met with Howard to inform him of plaintiff's complaints. (Viesta Depo. at 88-89 (P.Ex. 4); Howard Depo. at 30-37 (P.Ex. 10).)

Then on February 16, 2001, Howard having been instructed by Human Resources to "put this to bed," referring to plaintiff's complaints, met with plaintiff and attempted to set up a meeting between Uliasz, plaintiff and himself. (Kanios Depo. at 130-131 (P.Ex. 1); D.Ex. W; D.Ex. P at DO671-DO672; Viesta Depo. at 98, 102-103 (P.Ex. 4); P.Ex. 11; Howard Depo. at 46-48 (P.Ex. 10).) Within a few minutes of this meeting, plaintiff became visibly "upset" and ended the meeting crying, making it clear to Howard that she "was not emotionally ready" and did not want to meet with Uliasz. (Howard Depo. at 46-48 (P.Ex. 10); Kanios Depo. at 130-131 (P.Ex. 1).) Still visibly upset, plaintiff went to the Vice President of UST's Employee Assistance Program ("EAP"), Karen Thorman, and complained to her and Mary Ann Morelli, defendant UST's manager of the Employee Assistance Program, that Uliasz had made sexist and derogatory remarks about her weight and appearance. (P.Ex. 11; Deposition of Karen Thorman taken March 29, 2004 (hereinafter "Thorman Depo.") at 12-17 (P.Ex. 12); Kanios Depo. at 132 (P.Ex. 1).) Moreover, plaintiff explained that Howard told her that she must meet with Uliasz however she was uncomfortable in doing so. (P.Ex. 11; Thorman Depo. at 12-17 (P.Ex. 12); Kanios Depo. at 132 (P.Ex. 1).) Thorman, recognizing the urgency of the situation, interrupted Viesta from a meeting and made it clear to Viesta that plaintiff was extremely agitated and did not want to meet with Uliasz or Howard. (Viesta Depo. at 94-96 (P.Ex. 4); D.Ex. P at D0671.) Viesta at that point told Thorman that she was "aware of it." (Thorman Depo. at 17 (P.Ex. 12).) Thorman then sent plaintiff home from work. (Viesta Depo. at 94-96 (P.Ex.

12); D.Ex. P at D0671.) Plaintiff was assured by EAP that she did not have to confront Uliasz alone. (Kanios Depo. at 126 (P.Ex. 1).)

Nevertheless, on February 20,, 2001, Howard and Uliasz, both aware that plaintiff did not want to meet, duped plaintiff into meeting. (D.Ex. P at DO671-DO672; Viesta Depo. at 98-99, 102-103 (P.Ex. 4); D.Ex. W.) Although, Viesta was well aware that plaintiff did not wish to meet with Uliasz and Howard, she nevertheless did absolutely nothing to prevent Uliasz and Howard from pressuring plaintiff. (Viesta Depo. at 98-100, 102-103 (P.Ex. 4); Complaint ¶17 (D.Ex. K); D.Ex. P at DO671.) At this meeting, plaintiff was extremely uncomfortable and did not speak. (D.Ex. P at DO671-DO672, DO6724; Viesta Depo. at 102-103 (P.Ex. 4); D.Ex. W.) After the meeting, plaintiff complained to Viesta that Howard and Uliasz had created a "two against one" atmosphere and were trying to undermine her complaints of discrimination by creating false performance issues. (D.Ex. P at DO674; Viesta Depo. at 104-105 (P.Ex. 4).)

After the February 20, 2001 meeting with Uliasz and Howard, plaintiff contacted an attorney who wrote a letter to the Senior Vice President of UST, Richard Kolhberger (Kanios Depo. at 134-135 (P.Ex. 1); D.Ex. W.) On February 21, 2001, Kohlberger received the letter from plaintiff's attorney specifically claiming, among other things, sexual harassment. (D.Ex. W.[5])

Kohlberger, although the person responsible for overseeing all complaints of discrimination, decided not to take any action himself and passed plaintiff's attorney's letter to Viesta, the same person who still maintains that plaintiff at no time complained of sex harassment. (P.Ex. 9; D.Ex. P at DO675-676; Viesta Depo. at 106 (P.Ex. 4); Kohlberger Depo. at 13-16, 37-43 (P.Ex. 8).) Plaintiff's attorney makes it clear in his letter that he is to be present if UST meets with plaintiff to discuss her complaints regarding Uliasz. (D.Ex. W.) Despite plaintiff's attorney's request, a

---

[5] This letter explicitly claims sexual harassment in violation of both the Connecticut Fair Employment Practices Act and Title VII of the Civil Rights Act of 1964. (D.Ex. W.)

subsequent meeting involving only plaintiff, Viesta, Howard and Uliasz was scheduled. (D.Ex. W; D.Ex. P at DO677; D.Ex. X.)

On February 27, 2001, this meeting was conducted. (D.Ex. EE at DO390; D.Ex. X.) A written synopsis of this meeting reflects a discussion not about plaintiff's complaints of discrimination, but instead of her theretofore undisclosed "performance issues" despite plaintiff's receipt, approximately 20 days prior to this meeting, of a positive performance review with no reference of these issues. (D.Ex. X; D.Ex. V; D.Ex. P. at DO674.) Moreover, Viesta, although having written in her notes that plaintiff complained that Howard and Uliasz were trying to use this meeting to convert her complaints into performance issues, denies even discussing this point with plaintiff. (Viesta Depo. at 178-179 (P.Ex. 4); D.Ex. P at DO674.) Plaintiff then called her attorney and informed him of what had occurred, specifically stating that she disagreed with the outcome of this meeting. (Kanios Depo. at 144-145 (P.Ex. 1).)

Despite plaintiff's numerous complaints reported to various members of UST's management, Uliasz's harassment continued unabated. (D.Ex. W; D.Ex. DD; Kanios Depo. at 59-64, 121, 140-141, 246-247, 253-254 (P.Ex. 1); D.Ex. T; D.Ex. W; D.Ex. K ¶27; Rentz Depo. at 43-45 (P.Ex. 6); Kohlberger Depo. at 37-43 (P.Ex. 8).) Plaintiff testified that Uliasz continued to make comments about her appearance and eating. (Kanios Depo. at 140-141 (P.Ex. 1).)

Although plaintiff had been receiving treatment[6] for the emotional distress she suffered at the hands of Uliasz, on March 19, 2001 plaintiff could withstand no more. (Kanios Depo. at 338 (P.Ex. 1); D.Ex. P at DO678; Viesta Depo. at 120-121 (P.Ex. 4).) Plaintiff, visibly shaking and suffering from a panic attack related to Uliasz's abuse, was sent by Viesta to plaintiff's doctor for immediate treatment. (D.Ex. P at DO678; Viesta Depo. at 120-121 (P.Ex. 4); Hankin Notes (P.Ex. 26);

---

[6] Plaintiff met with Drs. Hankin and Trencher, physicians EAP refers UST employees to for treatment of mental issues, regarding her physical and emotional difficulties related to Uliasz's abuse. (Kanios Depo. at 338 (P.Ex. 1); Hankin Notes (P.Ex. 26); Thorman Depo. at 3, 14 (P.Ex. 12); Deposition of Lisa Trencher taken March 22, 2004 (hereinafter "Trencher Depo.") at 16 (P.Ex. 13).)

deposition of Jane Hankin, M.D. taken March 30, 2004 (hereinafter "Hankin Depo.") at 83 (P.Ex. 14).) More importantly, due to plaintiff's "suicidal ideation," "serious distress," and her doctor's concern over plaintiff remaining in Uliasz's department, plaintiff was placed on Family Medical Leave on March 20, 2001. (Hankin Depo. at 74-76, 83, 86, 91 (P.Ex. 14); Trencher Depo. at 17-18 (P.Ex. 13); Thorman Depo. at 29 (P.Ex. 12); Kanios Depo. at 220-221 (P.Ex. 1); Viesta at 128-129 (P.Ex. 4); P.Ex. 15.) In fact, Viesta informed plaintiff that she had "three and a half weeks left of FMLA."[7] (Viesta Depo. at 128-129 (P.Ex. 4); D.Ex. P at DO679.) Plaintiff was tendered documents specifically stating she was eligible for the federal leave. (P.Ex. 16.)

On March 21, 2001, immediately following the commencement of plaintiff's Family Medical Leave, plaintiff's attorney sent a second letter to Kohlberger again reiterating plaintiff's claims of sexual harassment and addressing UST's deliberate attempts to stifle plaintiff's rights.[8] (D.Ex. DD; Kohlberger Depo. at 37-43 (P.Ex. 8); D.Ex. P at DO679, DO682-DO683.) Again, despite this second letter from plaintiff's attorney, Kohlberger did no investigation of his own and again passed the letter to Viesta. (Kohlberger Depo. at 37-43 (P.Ex. 8).) Viesta, upon receipt of this letter on March 21,

---

[7] Note also that one day prior to the date of plaintiff's termination letter, her family medical leave documents were being processed. (P.Ex. W.)

[8] This letter in pertinent part read:

"The meeting that was held with [Plaintiff] occurred on February 27, 2001. I am not certain if the meeting was simply conducted by a representative who did not understand the issues, and their importance, or if the meeting reflected a deliberate corporate decision to attempt to deny and cover up the claims made by [plaintiff]. In either event, if you review the draft memorandum describing the meeting…you will see the clear attempt to characterize the claims made by [plaintiff] as performance issues. Nothing could be further from the case. What was at issue was long term, mean-spirited, *sexual harassment* of [plaintiff] by her supervisor, Mr. Uliasz. What was also at issue was the manger's (Mr. Howard) effort to cover up the abuse, and to coerce [plaintiff] into silence. Yet those issues are never mentioned in the memorandum.

…severe emotional reactions have developed since Mr. Uliasz's battery of [plaintiff]. Incredibly, in the middle of a panic attack on Monday, UST's human resource representative, Nella Viesta, badgered [plaintiff] about what she was going to do when she returned from her leave, telling her that she would have to return to purchasing, because there was no other positions available. I cannot conceive of a better way to make a difficult situation worse."

2001, again did no investigation of her own. (D.Ex. P at DO683; P.Ex. 9; Viesta Depo. at 131, 146 (P.Ex. 4).) In fact, despite plaintiff's attorney's second letter, Viesta still found "no reason" to investigate the complaints. (Viesta Depo. at 148, 149 (P.Ex. 4).)

On March 22, 2001, the day after receipt of plaintiff's attorney's second letter, Viesta alerted Howard and Uliasz that plaintiff had retained an attorney to represent her in opposition to UST. (D.Ex. P at DO683l; P.Ex. 9; Viesta Depo. at 131, 132, 146 (P.Ex. 4).) Viesta testified that Howard, upon learning of the contents of plaintiff's attorney's second letter, became "very upset." (Viesta Depo. at 131, 132, 133, 146 (P.Ex. 4).) Howard's anger was followed by an immediate report a few hours later to Viesta of alleged performance failures he and Uliasz "discovered" during plaintiff's absence. (Viesta Depo. at 131-133, 142 (P.Ex. 4); D.Ex. P at DO682-DO683; D.Ex. Q). Note that at this point, plaintiff had only been out on Family Medical Leave for approximately **two days**. (D.Ex. P at DO678-DO679; D.Ex. DD; Viesta Depo. at 134-135 (P.Ex. 4).) Plaintiff adamantly denies responsibility for any of these alleged performance failures. (Kanios Depo. at 187-201 (P.Ex. 1).) At the time she went on leave, Viesta admitted that based on plaintiff's review, plaintiff would have had no indication her job was in jeopardy. (Viesta Depo. at 115-116 (P.Ex. 4).) Nevertheless, plaintiff was terminated while on FMLA leave, after her attorney's second letter, ostensibly for performance reasons never even discussed with nor mentioned to her. (Viesta Depo. at 115-116 (P.Ex. 4); D.Ex. P at DO682-DO683; D.Ex. Q.) Nevertheless, on April 11, 2001, Viesta mailed plaintiff her termination letter effectively terminating her employment as of April 13, 2001 for these supposed "performance failures." (D.Ex. Q.)

In an attempt to justify its termination decision, defendant UST identified in the CHRO proceedings a male Buyer formerly employed in its purchasing department who was terminated due to performance issues. Defendants claim that this male employee, Mr. Lou Mauro, was "similarly situated" to plaintiff. (Viesta Depo. at 161 (P.Ex. 4).) However, even a perfunctory review of his personnel file demonstrates he was treated radically different than plaintiff. Mr. Mauro was given

several warnings of his performance failures, as well as ample opportunities to improve. (Viesta Depo. at 161 (P.Ex. 4); Uliasz Depo. at 33-34, 145 (P.Ex. 5).) His performance issues, which included abuse of other employees and use of UST's resources to further his own personal construction project, were tolerated and documented for years. (Uliasz Depo. at 33-34, 145 (P.Ex. 5); P.Ex. 17 at D0689 and D0713.) Only after numerous warnings and personal confrontations and discussions was he actually terminated. In contrast, discovery has revealed that the only other *female* who claimed sex discrimination was terminated for performance reasons within three months of doing so. In that case, as here, defendant claimed it did a "thorough investigation," supervised by Viesta, yet "found no evidence" of discrimination. (P.Ex. 18; Viesta Depo. at 11-12, 159-160 (P.Ex. 4).)

## *ARGUMENT*

### I.    *THE STANDARD FOR GRANTING SUMMARY JUDGMENT.*

Summary judgment is proper only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). "The burden of demonstrating the absence of a genuine dispute as to a material fact rests with the party seeking summary judgment." Rose v. James River Paper Co., 2 F.Supp.2d 245 (D.Conn. 1998) (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970). In determining whether summary judgment is appropriate, the court resolves all ambiguities and draws all reasonable inferences against the moving party. Id. (citing McLee v. Chrysler Corp., 109 F.3d 130, 134 (2d Cir. 1997); see also Cifarelli v. Village of Babylon, 93 F.3d 47, 51 (2d Cir. 1996).

> In determining whether the plaintiff has met the de minimis initial burden of showing "circumstances giving rise to an inference of discrimination," the function of the court on a summary judgment motion is to determine whether the "proffered admissible evidence shows circumstances that would be sufficient to permit a rational finder of fact to infer a discriminatory motive. It is not the province of the summary judgment court itself to decide what inferences should be drawn." Chambers v. TRM Copy Centers Corp., 43 F.3d at 38;

> see also Ramseur v. Chase Manhattan Bank, 865 F.2d at 465; Donahue v. Windsor Locks Board of Fire Commissioners, 834 F.2d at 58.

Cronin v. Aetna Life Ins. Co., 46 F.3d 196, 203-04 (2d Cir. 1995).

In an employment discrimination context where the employer's intent is at issue, special caution should be employed when deciding a motion for summary judgment. See Gallo v. Prudential Residential Servs., Ltd. Partnership, 22 F.3d 1219, 1224 (2d Cir. 1994).

> Although the Second Circuit has approved the use of summary judgment in employment discrimination cases, Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir.), cert. denied, 474 U.S. 829, 106 S.Ct. 91, 88 L.Ed.2d 74 (1985), it has cautioned against granting summary judgment in an employer's favor because intent is often an issue. Gallo v. Prudential Residential Servs., Ltd., 22 F.3d 1219, 1224 (2d Cir. 1994). The Second Circuit has since reaffirmed its limited approach to summary judgment in discrimination cases. See Kerzer v. Kingly Mfg., 156 F.3d 396, 400 (2d Cir. 1998); McLee v. Chrysler Corp., 109 F.3d 130, 135-37 (2d Cir. 1997).

Zarzycki v. United Technologies Corp., 30 F.Supp.2d, 283, 286 (D. Conn. 1998).

## II.    GENUINE ISSUES OF MATERIAL FACT EXIST SUFFICIENT TO DEFEAT DEFENDANTS MOTION FOR SUMMARY JUDGMENT AS TO PLAINTIFF'S DISCRIMINATION CLAIMS.

Plaintiff has properly stated a claim for sex discrimination in violation of Title VII and CFEPA.[9] Plaintiff alleges in her first cause of action that UST violated Title VII, 42 U.S.C. §2000e *et seq.*, by treating her in a "manner unequal to other employees…on the basis of sex…discriminatorily denied plaintiff equal treatment on the basis of sex…. Moreover, UST unreasonably interfered with plaintiff's work performance, and plaintiff's complaints of discrimination were used by defendant UST as a basis for adverse employment decisions affecting plaintiff." (D.Ex. K ¶¶27, 31, 32.) Plaintiff further alleges in her complaint that "Plaintiff's **termination** and **unfavorable treatment by her superiors** were not based on plaintiff's work performance, but rather were **consistent with** her supervisor's sexist views and harassing conduct.…" (D.Ex. K ¶¶27, 31, 32 (emphasis added).)

---

[9] Note that the same legal standards are to be applied to plaintiff's claim under Title VII and CFEPA. Specifically, in interpreting the provisions of the CFEPA, the courts are to be guided by the federal courts' interpretation of Title VII's provisions. Board of Education of the City of Norwalk v. Commission On Human Rights and Opportunities, 266 Conn. 492, 832 A.2d 660 (2003); Craine v. Trinity College, 259 Conn. 625 (2002); Levy v. Commission on Human Rights and Opportunities, 236 Conn. 96, 103 (1996).

A.    *Claim Of Hostile Environment.*

Defendants inappropriately attempt to limit plaintiff's sex discrimination claim to that of "hostile environment" ostensibly on the basis that her claim for wrongful treatment on the basis of sex fails due to a lack of an adverse employment action. Plaintiff bases her Title VII claim on her wrongful treatment on the basis of sex and adverse action (i.e., termination) as discussed in the next section, as well as the fact she has suffered harm in the workplace amounting to hostile environment.

Title VII prohibits employers from "discriminat[ing] against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's ... sex." 42 U.S.C. §2000e-2(a)(1). The phrase "terms, conditions, or privileges of employment" is broad enough to encompass, and render actionable, an employer's requirement that an employee "work in a discriminatorily hostile or abusive environment," so long as the discriminatory conduct at issue is "severe or pervasive enough to create an objectively hostile or abusive work environment." Harris v. Forklift Systems, 510 U.S. 17, 21, 114 S.Ct. 367 (1993). This is so notwithstanding the fact that the employer takes no "tangible employment action ... [that] itself constitutes a change in the terms and conditions of employment" by formally altering a worker's employment status. Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 753-54, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998); see also id. at 761-63, 118 S.Ct. 2257 (discussing tangible employment actions).

"To prevail on a hostile work environment claim, a plaintiff must demonstrate: (1) that her workplace was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of her work environment, and (2) that a specific basis exists for imputing the conduct that created the hostile environment to the employer." Schwapp v. Town of Avon, 118 F.3d 106, 110 (2d Cir.1997). To be actionable, a "sexually objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim did in fact perceive to be so." Faragher v. City of Boca Raton, 524 U.S. 775, 118 S.Ct. 2275, 2283, 141 L.Ed.2d 662 (1998). The employer will avoid liability if it can plead and

prove, as an affirmative defense, that (1) the employer exercised reasonable care to prevent and promptly correct any sexual harassment by such a supervisor, and (2) the employee unreasonably failed to avail herself of any corrective or preventative opportunities provided by the employer or to avoid harm otherwise. Id. If plaintiff suffers a tangible employment action no defense is available. Leopold v. Baccarat, Inc., 239 F.3d 243 (2nd Cir. 2001).

### 1.    *Plaintiff Experienced A Hostile Work Environment.*

Plaintiff has presented sufficient evidence to allow a trier of fact to conclude that she subjectively experienced a hostile environment. Burford v. McDonald's Corporation, 2004 WL 1392426 (D.Conn. 2004) (Genuine issues of material fact existed as to whether employee subjectively experienced work environment as hostile precluding summary judgment where plaintiff testified at her deposition that the sexual harassment she claims to have been subjected to made it difficult for her to work, that she wanted to leave work, and that the experience made her physically ill) (P.Ex. 19); Feingold v. State of New York, 366 F.3d 138 (2nd Cir. 2004) (evidence consists of daily harassing comments, finding a rational fact-finder could conclude that plaintiff subjectively experienced a hostile work environment).

In the instant case, plaintiff has provided evidence that Uliasz's conduct not only made it difficult for her to work but also that his conduct was so egregious that she did not think she could continue working in his department. (Kanios Depo. at 121, 130-131 (P.Ex. 1); D.Ex. P at DO671-72, DO668-669, DO678.) Indeed, while at work, plaintiff, in connection with Uliasz's unwelcome physical contact. suffered panic attacks and after reporting this to Viesta was placed on leave. (D.Ex. P at DO678; P.Ex. 16.)

Accordingly, plaintiff has satisfied the subjective prong of the hostile environment test. Defendants' principal position in their motion for summary judgment is that plaintiff has not satisfied the objective portion of the test, that is, even taking her subjective allegations as true, they do not rise to the level of hostile environment. (Defendants' Memo at 17.) However, the conduct plaintiff was

made to suffer was objectively pervasive and severe. <u>Burford</u>, <u>supra</u> (Genuine issues of material fact existed as to whether employee's workplace, in which supervisor allegedly made comments about employee's body as well as unwanted physical contact was objectively hostile, precluding summary judgment) (P.Ex. 19); <u>Pascal v. Storage Technology Corp.</u>, 152 F.Supp.2d 191 (D. Conn. 2001) (Genuine issues of material fact regarding whether alleged conduct by female employee's male coworkers, including making disparaging remarks, jokes and comments about women were severe and pervasive precluding summary judgment).

In <u>Newtown v. Shell Oil Co.</u>, 52 F.Supp.2d 366, 372 (D.Conn.1999), the plaintiff's hostile environment claim was based on her allegations that she was subjected to two incidents of offensive name-calling based on her sex and a co-worker frequently called her "woman" in a derogatory fashion. The court denied summary judgment, noting that whether "the use of offensive epithets focusing on plaintiff's sex ... occurred frequently enough in the workplace to be deemed pervasive is a question of fact best left to a jury. Drawing all reasonable inferences in plaintiff's favor and looking at the totality of the circumstances, a reasonable jury could find that the discriminatory conduct was sufficiently pervasive to create a hostile or abusive work environment." <u>Id</u>.

In <u>Badlam v. Reynolds Metals Co.</u>, 46 F.Supp.2d 187, 196 (N.D.N.Y.1999), the court rejected the employer's argument that because the work environment was offensive to both men and women, it was not based on sex. The court noted that "[w]hile it is true that male and female employees alike were exposed to pornographic materials and offensive conduct and language, there is evidence that certain harassment was directed only at the female plaintiffs," including numerous pornographic drawings specifically referencing plaintiffs and the fact that plaintiffs were constantly referred to by offensive terms "usually associated with females." <u>Id</u>.

Here, plaintiff was repeatedly subjected to harassment by Uliasz and such harassment was clearly related to her gender. Examples of Uliasz's behavior include, *inter alia*, the following: (1) calling plaintiff a "fat bitch"; (2) telling plaintiff that "it was a good thing [she] wasn't married,

because nobody would want [her] the way [she] was looking"; (3) telling plaintiff that "women should be barefoot and pregnant"; (4) stating that plaintiff wasn't "nice looking enough"; (5) stating that plaintiff wasn't "sexy enough to be back out on the market"; (6) that plaintiff "hadn't seen the inside of a gym ever" (7) that "women belong in the home"; (8) that women were too "emotional" referring to his animus toward women in the workplace; (9) telling plaintiff she couldn't "fit through the door" referring to her size despite his knowledge of her two recent pregnancies; (10) telling plaintiff she should use "a feed bag" referring to plaintiff as an animal when she eats; and (11) keeping a jar of pennies in the office labeled plaintiff's "education fund." Uliasz's unlawful conduct reached its nadir when he pushed plaintiff, scoffing "get out of my way." (Kanios Depo. at 59-64, 121, 140-141, 246-247, 253-254 (P.Ex. 1); D.Ex. T; D.Ex. W; D.Ex. K ¶27; Rentz Depo. at 43-45 (P.Ex. 6).)

Accordingly, plaintiff has shown objectively that she was subject to unwelcome harassment because of her gender and such harassment was sufficiently pervasive to alter the conditions of her employment.

> **2.    *Defendant UST Is Liable For Uliasz's Conduct And The Environment He Created.***

UST is liable under Title VII for any sexual harassment committed by its supervisor Uliasz. Faragher v. City of Boca Raton, 524 U.S. 775, 118 S.Ct. 2275, (1998); Burford v. McDonald's Corporation, 2004 WL 1392426 (D.Conn. 2004) (P.Ex. 19).

In Burford, the court held the defendant employer liable for plaintiff's supervisor's harassment where plaintiff reasonable availed her self of defendant's corrective measures. For example, plaintiff asserted that she complained about her supervisor's harassing conduct to a number of employees, including the supervisor, and that she called defendant's help line five times before she received a response.

In the instant case, not only is UST liable for Uliasz's conduct but plaintiff has raised a material issue of fact as to UST's ability to apply any affirmative defense. First, the affirmative defense to a claim of hostile environment is only available to UST if plaintiff suffered no tangible employment action. Plaintiff was terminated in connection with her complaints about the alleged harassment. In addition, even if the affirmative defenses were available to UST, plaintiff has clearly demonstrated that her actions in availing herself of any corrective measures were reasonable. Plaintiff complained to Rentz, a compliance officer designated to field complaints of discrimination. (Rentz Depo. at 44-45, 47-48, 50 (P.Ex. 6).) Indeed, Rentz found plaintiff's complaints to "define harassment in the workplace." (Rentz Depo. at 44-45, 47-48, 50-51 (P.Ex. 6).) Plaintiff complained to Viesta who, even after receiving plaintiff's attorney second letter reiterating plaintiff's complaints of harassment, admits that she did nothing to investigate plaintiff's complaints, and took no measures to correct them. (Viesta Depo. at 149 (P.Ex. 4).)

Accordingly, even assuming arguendo that an affirmative defense was available, plaintiff clearly took reasonable steps to employ defendant UST's corrective measures to no avail.

### B. _Discrimination Based On Gender._

Courts have not hesitated to deny a dispositive motion where, as here, the same circumstances suggesting a hostile environment claim also give rise to a claim of sex discrimination. Gregory v. Daly, 243 F.3d 687 (2nd Cir. 2001) (Allegations in female former employee's complaint, that male supervisor, _inter alia_, engaged in a continuous, pattern of conduct that began with insulting and ominous talk and then increasingly took the form of concrete interference with her job functions and finally culminated in her termination, stated claim that her termination occurred under circumstances suggesting sex discrimination as well as a claim for hostile work environment both under Title VII). Sex-based hostility to a woman's continued presence in the workplace, or to particular roles within it, does not necessarily stop at the doctrinal boundary between creation of a hostile environment claim and a sex discrimination claim involving more tangible employment

injuries; E.E.O.C. v. Farmer Bros. Co., 31 F.3d 891, 898 (9th Cir. 1994) ("Because hostility against women underlies decisions to discharge or to refuse to hire women because of their gender, evidence of sex harassment will be relevant to claims of gender based employment discrimination."); Cady v. Cortland, 2000 WL 1456285 (Plaintiff former female employee properly alleged claim for hostile work environment, sex discrimination as well as retaliation) (P.Ex. 20).

The facts in this case support Title VII liability under gender discrimination and hostile environment theories.

### 1.     *Burden Of Proof.*

While claims of gender-based sex discrimination, *quid pro quo* sexual harassment, and hostile work environment sexual harassment all come under the umbrella of Title VII, they are conceptually distinct from one another. See Benoit v. Ocwen Financial Corp., 960 F.Supp. 287, 289-90 (S.D.Fla.1997); Bridges v. Eastman Kodak Co., 822 F.Supp. 1020, 1027 (S.D.N.Y.1993). To establish a prima facie case of sex discrimination, the plaintiff must establish that: (1) she is a woman; (2) she was qualified for the position at issue; (3) she was subject to an adverse employment action[10]; and (4) that action was taken under circumstances giving rise to an inference of discrimination. Shumway v. United Parcel Service, Inc., 118 F.3d at 63, 64 (2nd Cir. 1997); Luciano v. Olsten Corp., 110 F.3d 210, 215 (2d Cir.1997). This last element of a prima facie case may be proven by showing that a man similarly situated was treated differently. Id. A plaintiff may also rely on direct evidence of what the defendant did and said in satisfying her initial burden. See Back v. Hastings On Hudson Union Free School Dist., 365 F.3d 107, 124 (2nd Cir. 2004).

Proof of the *prima facie* case creates a presumption of discrimination that defendant may rebut by producing evidence of a legitimate nondiscriminatory reason for the adverse employment decision. See St. Mary's Honor Center, 509 U.S. at 507, 113 S.Ct. 2742.

---

[10] No affirmative defense is available when harassment culminates in a tangible employment action. Faragher v. City of Boca Raton, 118 S.Ct. 2275 (1998); see also Karibian v. Columbia University, 14 F.3d 733 (1994).

Once the employer produces legitimate, nondiscriminatory reasons for its adverse employment action, the plaintiff must prove, by a preponderance of the evidence that the employer intentionally discriminated against him. <u>Reeves v. Sanderson Plumbing Products,Inc.</u>, 120 S.Ct. 2097 (2000). However, the "fact finder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the *prima facie* case, suffice to show intentional discrimination" <u>Id.</u> at 120 S.Ct. 2097. Of course, "[t]o defeat summary judgment within the *McDonnell Douglas* framework ... the plaintiff is not required to show that the employer's proffered reasons were false or played no role in the employment decision, but only that they were not the only reasons and that the prohibited factor was at least one of the 'motivating' factors." <u>See</u> <u>Holtz v. Rockefeller & Co. Inc.</u>, 258 F.3d 62, 78 (internal quotation marks omitted).

### 2. *Plaintiff's Termination Occurred Under Circumstances Giving Rise To An Inference Of Sex Discrimination.*

Defendants apparently attempt to limit plaintiff's cause of action to a claim of hostile environment by disjoining defendants' sexist conduct from plaintiff's ultimate termination. Specifically, defendants seek to attribute plaintiff's termination solely to her complaints of discrimination and not to defendants' continued sexist behavior. However, this court has found defendants' approach to unlawful sex discrimination to be too narrow. <u>Windhauser v. Bausch & Lomb, Inc.</u>, 302 F.Supp.2d 139 (W.D.N.Y. 2003) (defendant employer's motion for summary judgment denied where plaintiff properly stated a claim for sex discrimination and retaliation based on the elimination of his position); <u>Gregory v. Daly</u>, 243 F.3d 687 (2nd Cir. 2001) (Allegations in female former employee's complaint, that male supervisor, *inter alia*, engaged in a continuous, pattern of conduct that began with insulting and ominous talk and then increasingly took the form of concrete interference with her job functions and finally culminated in her termination, stated claim that her termination occurred under circumstances suggesting sex discrimination as well as a claim

for retaliation.); <u>Cady v. Cortland</u>, 2000 WL 1456285 (Plaintiff former female employee properly alleged claim for hostile work environment, sex discrimination as well as retaliation) (P.Ex. 20).

In the instant case, plaintiff's termination is surrounded by evidence of gender discrimination. Uliasz repeated told plaintiff, among other things, that "women should be barefoot and pregnant," that "women belong in the home" and that women were too "emotional" all referring to his animus toward women in the workplace. <u>See</u> <u>Back v. Hastings On Hudson Union Free School Dist.</u>, 365 F.3d 107, 124 (2nd Cir. 2004) (gender based stereotyped remarks can be evidence that gender played a part in an adverse employment decision satisfying plaintiff's burden of showing prima facie case of sex discrimination). Uliasz even went so far as to call plaintiff a "fat bitch" prior to her termination. (Kanios Depo. at 59-64, 121, 140-141, 246-247, 253-254 (P.Ex. 1); D.Ex. T; D.Ex. W; D.Ex. K ¶27; Rentz Depo. at 43-45 (P.Ex. 6).) Moreover, in relation to plaintiff's claim of retaliation, plaintiff in less than two and a half months after complaining of Uliasz's abuse was terminated for ostensibly performance failures despite receiving a positive review merely weeks before her termination. (D.Ex. V; P.Ex. 21.)

Accordingly, a jury could easily find that plaintiff's gender played a role in her treatment and timing of her termination was based on her gender.

### 3. Inconsistent Application Of Defendants' Alleged Disciplinary Policy Is Sufficient For A Jury To Find That Defendants' Defense Was Pretext For Discrimination.

The Second Circuit in <u>Greenway v. The Buffalo Hilton Hotel</u>, 143 F.3d 47 (2d. Cir. 1998), held that the evidence of defendant employer's inconsistent application of its disciplinary policy was sufficient for the jury to have decided properly that the employer's stated reason for discharge was simply a pretext for discrimination. In <u>Greenway</u>, the plaintiff had been employed with defendant for approximately five years and received positive employment reviews. However, defendant, upon learning of plaintiff's HIV status, immediately proceeded to issue plaintiff warning notices regarding his work performance. The plaintiff, after complaining that he was being discriminated against

because of his disability, was terminated for "continued poor performance." He had received a total of four warnings from his employer upon its learning of his disability up to his date of termination. The evidence offered showed that defendant did not apply a similar disciplinary policy where, for example, one employee who had received 11 written warnings was not fired and another who received 6 warnings was not fired. Moreover, another employee who held the same title as plaintiff was only given a "friendly reminder" after being in a "physical confrontation" with a customer of defendant.

In the instant case, plaintiff, shortly after receiving a positive performance review and bonus, was terminated without ever receiving a warning or notice for her alleged performance failures. However, Lou Mauro, according to defendants a "similarly situated" former UST employee,[11] was not only given several warnings for his performance failures but also given ample opportunities to improve (Viesta Depo. at 161 (P.Ex. 4); Uliasz Depo. at 33-34, 145 (P.Ex. 5).) In fact, not only did UST tolerate Mr. Mauro's abuse of other employees, but he was able to use UST's resources in furtherance of his own personal construction project. (Uliasz Depo. at 33-34, 145 (P.Ex. 5); P.Ex. 17 at D0689 and D0713. Moreover, when asked, Uliasz, who took part in Mr. Mauro's disciplining, could not even equate let alone find more severe plaintiff's alleged performance failures to the gravity of those of Mr. Mauro. (Uliasz Depo. at 145 (P.Ex. 5).)

Accordingly, defendants' reason for terminating plaintiff could easily be found by a fact-finder to be pretextual, and summary judgment must therefore be denied.

---

[11] Plaintiff at the time of her termination was an "Assistant Buyer" in UST's purchasing department. (D.Ex. V; D.Ex. Q.) Mr. Mauro at the time of his termination served as a Buyer in UST's purchasing department. (P.Ex. 17.)

### III. GENUINE ISSUES OF MATERIAL FACT EXIST SUFFICIENT TO DEFEAT DEFENDANTS MOTION FOR SUMMARY JUDGMENT AS TO PLAINTIFF'S RETALIATION CLAIMS UNDER TITLE VII.

Plaintiff has properly stated a claim for retaliation in violation of both Title VII and CFEPA.[12] To establish a prima facie case of retaliation under Title VII, the plaintiff must show that: (1) she was engaged in an activity protected by Title VII; (2) defendant was aware that the plaintiff engaged in the protected activity; (3) the plaintiff suffered a disadvantageous employment action; and (4) a casual relation exists between the protected activity and the employment action. See Reed v. A.W. Lawrence & Co., 95 F.3d 1170, 1178 (2nd Cir. 1996). If plaintiff carries this initial burden, the burden of production shifts to the defendant to offer evidence of a legitimate, non-retaliatory justification for its action. Cosgrove v. Sears, Roebuck & Co., 9 F.3d 1033, 1039 (2d Cir.1993). If the defendant introduces such evidence, the plaintiff is afforded the opportunity to prove that the alleged justification is merely a pretext for retaliation. Rexach v. University of Connecticut Department of Dining Services, 313 F.Supp.2d 100 (D.Conn. 2004) (Kravits, J).

### A. Plaintiff's Proof Establishes A Prima Facie Case For Retaliation.

#### 1. Plaintiff Was Engaged In Protected Activity.

In order for plaintiff to establish the first element, that she was engaged in a protected activity, she need only show that she was acting under a good faith belief that the activity was covered by the statute. Cosgrove v. Sears, Roebuck and Co., supra (citing Summer v United States Postal Service, 899 F.2d 203, 209 (2d. Cir. 1990)). While the protected activity usually takes the form of filing a formal complaint or a lawsuit, making an internal complaint regarding sexual discrimination is also covered by the statute. Id. at 1040.

---

[12] Plaintiff also brings a retaliation claim under the Connecticut Fair Employment Practices Act. We look to federal law for guidance on interpreting state employment discrimination law, and the analysis is the same under both. Craine v. Trinity College, 259 Conn. 625 (2002).

Plaintiff made repeated internal complaints and defendant admits that it registered her protests as complaints of discrimination. (Rentz Depo. at 44-45, 47-48, 50-51 (P.Ex. 6); Kanios Depo. at 82, 117, 120-121 (P.Ex. 1); D.Ex. W; D.Ex. DD.) In addition, in their Memo, defendants "concede for purposes of this Motion that [Plaintiff] arguably participated in protected activity at least as of the date her attorney wrote UST." (Defendants' Memo at 26.) Accordingly, defendants' own assertions establish that plaintiff has satisfied the first element necessary to support her claim of retaliation, and there are no material questions of fact.

### 2. *Defendant Knew Or Should Have Known That Plaintiff Was Engaged In Protected Activity.*

Defendants' own admissions establish that they were aware that plaintiff was in fact complaining of discriminatory conduct. In deed, Rentz's deposition testimony reveals that he viewed plaintiff's assertions to "define harassment in the workplace." (Rentz Depo. at 44-45, 47-48, 50-51 (P.Ex. 6).) Accordingly, there are no genuine issues of fact as to whether defendants knew or should have known that plaintiff was engaged in a protected activity.

### 3. *Defendants' Retaliatory Conduct Affected Plaintiff's Employment.*

The third element of a retaliation claim is satisfied when plaintiff shows that defendant's conduct "affected terms, privileges, duration, or conditions of employment." Dortz v. City of New York, 904 F.Supp. 127, 156, 156 (S.D.N.Y. 1995) (quoting Vergara v. Bensten, 868 F.Supp 581, 591 (S.D.N.Y. 1994)). "While the result is often the employee's discharge, less severe events can also be sufficient." Id. Defendants "concede for purposes of this Motion that [Plaintiff]… can establish **alleged adverse action (i.e. the termination of her employment)** close to the time of her internal complaint." (Defendants' Memo at 26.) Indeed, Howard, upon learning of the contents of plaintiff's attorney's second letter, became "very upset" and that day "discovered" the performance failures relied on to legitimize plaintiff's termination. (Viesta Depo. at 131-133, 142 (P.Ex. 4); D.Ex. P at DO682-DO683; D.Ex. Q.)

Accordingly, there are no material questions of fact as to whether plaintiff's employment was detrimentally affected by defendants' conduct, as revealed by defendants' own admissions.

### 4. *Plaintiff Protected Activity Is Casually Related To Her Adverse Treatment.*

The fourth and final element of a prima facie retaliation claim is satisfied "by showing that the protected activity was *closely* followed by adverse treatment." Dortz, supra at 156-157 (emphasis added). Defendants again concede this issue: "Defendants concede, for purposes of this Motion, that [Plaintiff]…can establish alleged adverse action (i.e., the termination of her employment) *close to the time of her internal complaint*…." (Defendants' Memo. at 26 (emphasis added).) Defendants' only contention, however, is that the individuals involved in the decision to terminate plaintiff were somehow blissfully unaware of plaintiff's complaints of discrimination. Nothing could be further from the truth. In fact, all of the primary decision makers in plaintiff's termination were aware of plaintiff's complaints of discrimination. Thus, the fourth and final element of plaintiff's retaliation claim is satisfied. Cifra v. Gen. Electric Co., 252 F.3d 205, 217 (2d Cir. 2001) (plaintiff's termination 20 days after defendant employer learned she had hired an attorney, via receipt of attorney's letter detailing plaintiff's pursuit of a claim of gender discrimination, provided causal connection needed for proof of retaliation claim); Burford, supra (employer aware of complaint, insofar as plaintiff made them both to management and through defendant employer's regular complaint channels) (P.Ex. 19).

In the surprisingly similar case of Cifra, supra, the Second Circuit found sufficient circumstantial evidence that plaintiff's gender discrimination complaint was causally connected to her termination and that defendant's explanation of poor performance was a pretext for retaliation. In Cifra, plaintiff retained an attorney after her complaints to human resources regarding her male supervisor's harassment went unaddressed. Plaintiff's attorney promptly caused a letter to be delivered to defendant's *human resource department* advising that plaintiff had retained her and requested an opportunity to meet to discuss plaintiff's claims of sex discrimination and fears of

retaliation. Despite plaintiff's attorney's request to the contrary, plaintiff was required to meet with human resources and her male supervisor without her attorney being present. During this meeting, human resources and plaintiff's supervisor tried to convince plaintiff that she did not need an attorney. Less than 20 days from this meeting, plaintiff was terminated for performance issues.

The <u>Cifra</u> court, without addressing whether the contents of plaintiff's attorney's letter, were shared with the alleged harasser, recognized that by the letter, plaintiff had made defendant as well as the harasser aware of her complaints. In addition, the <u>Cifra</u> court held that while plaintiff's argument that she had orally complained to human resources as much as nine months prior to her termination could lend itself to an inference that her complaints did not cause her termination, the court still refused to grant summary judgment on plaintiff's retaliation count. In making its decision, the Court of Appeals looked to the evidence illustrating how defendant's position that it only became aware of plaintiff's Title VII claims upon receipt of plaintiff's attorney's letter "discredited its own causation" argument where plaintiff was terminated 20 days later for alleged performance failures. Additional evidence which the court found persuasive was the harasser's discovery of performance problems merely three days after plaintiff's attorney's letter arrived in light of his finding that plaintiff had satisfactorily performed her duties just six weeks earlier.

In the case at bar, within *two and a half* months of complaining of discrimination, plaintiff was terminated by Howard, Viesta and Uliasz for performance failures. (P.Ex. 9; D.Ex. Q.) This, despite the fact that plaintiff had recently received a positive performance review, approved by Howard and Uliasz, that made no mention of the alleged performance issues of which she was terminated. (D.Ex. V.) Moreover, plaintiff's attorney had written two letters, both explicitly detailing plaintiff's claims of harassment and violations under Title VII. (D.Ex. W; D.Ex. DD.) These letters were made known to Viesta, Howard and Uliasz. (P.Ex. 9.) In fact, Viesta testified that Howard, upon learning of the contents of plaintiff's attorney's second letter, became "very upset." (Viesta Depo. at 131, 132, 133, 146 (P.Ex. 4).) Howard's anger was followed by an immediate report to

26

Viesta of the alleged performance failures he and Uliasz "discovered" during plaintiff's absence.[13] (Viesta Depo. at 131-133, 142 (P.Ex. 4); D.Ex. P at DO682-DO683; D.Ex. Q.) These performance failures were ultimately used to legitimize plaintiff's termination. (Viesta Depo. at 131-133, 142 (P.Ex. 4); D.Ex. P at DO682-DO683; D.Ex. Q.) Plaintiff adamantly denies any of these alleged performance failures. (Kanios Depo. at 187-201 (P.Ex. 1).) Nevertheless, on April 11, 2001, Viesta mailed plaintiff her termination letter, effectively terminating her employment as of April 13, 2001 for these supposed "performance failures" without even discussing the "discovered" issues with plaintiff. (D.Ex. Q.)

Accordingly, there are material issues of fact to be determined by a fact finder in connection with the fourth and final element of the retaliation claim. Plaintiff has produced ample evidence of continued positive performance prior to her complaints, and the close temporal proximity of her complaints with her termination alone satisfies the causal connection requirement. LaFond v. General Physics Services Corp. 50 F.3d 165 (2nd Cir. 1995) (unless the employer has come forward with evidence of a dispositive non-retaliatory reason "as to which there is no genuine issue and which no rational trier of fact could reject, the conflict between the plaintiff's evidence establishing a prima facie case and the employer's evidence of a [non-retaliatory] reason reflects a question of fact to be resolved by the fact finder after trial); see also Back v. Hastings On Hudson Union Free School District, 365 F.3d  107 (2nd Cir. 2004) (derogatory comments stereotyping women followed by adverse action support a conclusion of pretext.)  For these reasons defendant's Motion as to this count should be denied.

---

[13] Note that at this point, plaintiff had only been out on FMLA leave for approximately two days. (D.Ex. P at DO678-DO679; D.Ex. DD; Viesta Depo. at 134-135 (P.Ex. 4).)

## IV.    *GENUINE ISSUES OF MATERIAL FACT EXIST AS TO PLAINTIFF'S CLAIM OF AIDING AND ABETTING.*

While there is no individual liability under Title VII, state statutes[14] may provide a cause of action against an individual for aiding and abetting where the corresponding federal statute does not. Tomka v. Seiler Corp., 66 F.3d 1295, 1317 (2d Cir. 1995) (allowing aiding and abetting liability against the perpetrator when individual held liable was acting with others to harass the plaintiff); see also Perks v. Town of Huntington, 96 F.Supp.2d 222, 228 (E.D.N.Y. 2000) (same); Bogdahn v. Hamilton Standard Space Sys. Int'l. Inc., 46 Conn. Supp. 153, 159 (Conn.Super.Ct.1999) (recognizing as a cognizable claim for aiding and abetting, conduct whereby an employer and other employees' actions "ratified, endorsed and perpetrated" another employee's harassing conduct). While an employee cannot aid and abet his own discriminatory practice, Jones v. Gem Chevrolet, 166 F.Supp.2d 647, 649 n. 1 (D.Conn.2001) (Burns, J), an individual may aid and abet his employer's discrimination. Id. at 650. This individual liability is particularly applicable to supervisors in the use of their authority, even where the employer's liability is derived from the supervisor's wrongful conduct. Wasik v. Stevens Lincoln-Mercury, Inc., 2000 WL 306048 at *6 (P.Ex. 22).

### A.    *Plaintiff's Allegations Support Her Claim Of Aiding And Abetting.*

Defendants seek dismissal of plaintiff's aiding and abetting count by narrowly reading plaintiff's complaint to only encompass the harassment and discrimination perpetrated by Uliasz. However, this limited reading of a discrimination plaintiff's complaint has been flatly rejected by this court. Murphy v. Burgess & Norwalk Economic Opportunity Now, Inc., 1997 WL 529610 (D.Conn. 1997) (Nevas, J) (court disagreed with defendants assertion that the complaint only alleged that one

---

[14] Conn. Gen.Stat. § 46a-60(a)(5) provides that it is a discriminatory practice "for any person, whether an employer or an employee or not, to aid, abet, incite, compel or coerce the doing of any act declared to be a discriminatory employment     practice..." Conn. Gen.Stat. § 46a-60(a)(5).

person participated in the discriminatory employment practices where complaint identifies supervisor and employer) (P.Ex. 23).

In Cullen v. Putnam Savings Bank, Inc., 1997 WL 280502 (D.Conn. 1997) (Nevas, J) (P.Ex. 24), the court denied a motion to dismiss by defendant where the complaint alleged plaintiff's supervisor aided and abetted unlawful discrimination under CFEPA. The Cullen court held that plaintiff properly alleged in his complaint that defendant's employee "engaged in or failed to engage in activities" with his employer which resulted in plaintiff's discrimination. Id. at *5 (P.Ex.24).

Also, in Murphy, supra, the court disagreed with defendants' assertion that the complaint only alleged that one entity participated in the discriminatory employment practices. In denying defendant's motion to dismiss plaintiff's aiding and abetting count under CFEPA, the court recognized plaintiff's assertions that she met with the defendant employer's director of human resources and other supervisors to report that she had been harassed by her superior and that they all failed to take remedial action. In this regard the Murphy court held that plaintiff had alleged that her employer, superior and other supervisors aided and abetted each other and that they aided the discriminatory employment practices themselves. Id. at *5; see also Jones v. Gem Chevrolet, 166 F.Supp.2d 647, 651 (D.Conn.2001) (Burns, J)("…if [defendant employer] is found liable for a discriminatory practice, the jury could find [defendant's employee] liable for aiding and abetting that practice."). In addition, individual liability is particularly applicable to supervisors in the use of their authority, even where the employer's liability is derived from the supervisor's wrongful conduct. Wasik v. Stevens Lincoln-Mercury, Inc., 2000 WL 306048 at *6 (P.Ex. 22).

In the instant case, plaintiff has asserted that defendant Uliasz individually discriminated against plaintiff and also engaged in activities in concert with his employer resulting in the discrimination of plaintiff. Plaintiff's amended complaint reads in relevant part: "As a result of Uliasz's abusive conduct **and UST's failure to appropriately or adequately address plaintiff's complaint consistent with its representations** and its published policy, plaintiff manifested

symptoms of anxiety and depression…plaintiff was required to meet Drs…to discuss her condition…UST encouraged plaintiff to …leave…assuring and representing to her….that she would be allowed to return to work…" (D.Ex. K ¶¶22, 23, 24.) Then "UST received a…letter from plaintiff's attorney …stating that plaintiff was the victim of discrimination….On or about April 12, 2001, plaintiff while on medical leave…received a letter from UST" terminating her employment. (D.Ex. K ¶¶22, 23, 24, 25.) Moreover, plaintiff asserts that her "***termination and unfavorable treatment by her superiors*** were not based on [her] work performance, but rather were ***consistent with her supervisor's sexist views and harassing conduct***…." (D.Ex. K ¶27 (emphasis added).)

Accordingly, as plaintiff has properly pled that both defendants acted in concert with each other resulting in plaintiff's discrimination, summary judgment is inappropriate.

## V. *GENUINE ISSUES OF MATERIAL FACT EXIST AS TO PLAINTIFF'S CLAIM OF NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS.*

In order to sustain a claim of negligent infliction of emotional distress, the Court must determine whether plaintiff has presented evidence (1) that her employer engaged in unreasonable conduct, that is, conduct which was inconsiderate or intended to humiliate or embarrass the employee, and (2) that the conduct was engaged in during the course of the employment termination process. Copeland v. Home and Community Health Services, Inc., 285 F.Supp.2d 144 (D.Conn. 2003) (Hall, J); Perodeau v. City of Hartford, 259 Conn. 729 (2002).

### A. *Plaintiff's Allegations Support Her Claim That Defendants Engaged In Unreasonable Conduct.*

It is up to the Court to determine in the first instance whether defendants' conduct was sufficiently unreasonable to support the claim of negligent infliction of emotional distress. See Appleton v. Board of Educ. of Town of Stonington, 254 Conn. 205 (2000). Plaintiff's allegations of abuse and misconduct during the final weeks of her employment certainly satisfy this element.

In Copeland, supra, the plaintiff employee sued her former employer alleging violations under the Family Medical Leave Act and negligent infliction of emotional distress. In denying

defendant's motion to dismiss plaintiff's negligent infliction of emotion distress claim, the court held that the defendant employer's alleged pressuring of plaintiff amounted to unreasonable conduct. In Copeland, the plaintiff repeatedly advised defendant about both the existence of and the nature of her health problems. Yet defendant, despite its alleged awareness of plaintiff's susceptibility, pressured plaintiff to return to work by being inflexible with plaintiff's work schedule and by threatening to terminate plaintiff during a period spanning almost two months.

In Edwards v. Community Enterprises, Inc., 251 F.Supp.2d 1089 (D.Conn. 2003) (Underhill, J.), defendant employer's motion for summary judgment as to plaintiff's claim of negligent infliction of emotional distress was denied where defendant's conduct during the termination process was deemed unreasonable. In Edwards, defendant employer who terminated plaintiff weeks after its decision to do so acted unreasonably when it encouraged plaintiff to seek medical treatment for her sudden pneumonia only to terminate her while she was ill and on recommended medical leave. Moreover, defendant, upon terminating plaintiff, instructed her to quickly leave the premises and threatened plaintiff that it would have the police remove her should she not comply. See Chen v. Pitney Bowes Corporation, 195 F.Supp.2d 368 (D.Conn. 2002) (Arterton, J.) (court held employer could be held liable for negligent infliction of emotional distress where conduct surrounding plaintiff's leave, his return to work and method of termination could be found unreasonable by a trier of fact); Leach v. F.A. Bartlett Tree Expert Co., 112 F.Supp.2d 230 (D.Conn. 2000) (Goettel, J.) (negligent infliction of emotion distress claims incident to FMLA violations survived motion to dismiss where, *inter alia*, employer threatened employee with termination should employee's absences continue); Cameron v. Saint Francis Hospital and Medical Center, 56 F.Supp.2d 235 (D. Conn. 1999) (Goettel, J.) (denying defendant's motion to dismiss where plaintiff alleged the requisite unreasonable conduct occurred during a ten month termination process when plaintiff had been pre-notified of his termination).

31

In the case at bar, defendants argue that plaintiff's allegations do not amount to unreasonable conduct sufficient to sustain a claim for negligent infliction of emotional distress. On the contrary, plaintiff has presented overwhelming allegations that her employer engaged in unreasonable conduct. UST was well aware of plaintiff's fragile emotional condition. In fact, Viesta admits that plaintiff went to her office on March 19, 2001 "visibly shaking and crying," complaining of "panic attacks" and that she needed to see her doctor. (Viesta Depo. at 120-121 (P.Ex. 4).) Moreover, Viesta admits that plaintiff told her that her "panic attacks" were related to Uliasz's abuse, and Viesta also admits that plaintiff "could not stop thinking" about Uliasz physically "taking his hands" and "mov[ing] her aside." (Viesta Depo. at 120-121 (P.Ex. 4).) Plaintiff was then encouraged to be placed on FMLA leave. (Thorman Depo. at 28, 29 (P.Ex. 12; Hankin Depo. at 74-75 (P.Ex. 14); Trencher Depo. at 17-18 (P.Ex. 13); D.Ex. W.) Even worse, plaintiff's attorney had to respond two days later via letter to UST reprimanding UST for its mishandling of plaintiff's panic attacks, stating "Incredibly, in the middle of a panic attack [Viesta], ***badgered*** [Plaintiff] about what she was going to do when she returned from her leave, telling her that she would have to return to purchasing, because there were no other positions available." (D.Ex. DD.) UST, fully aware that plaintiff was out on FMLA leave related to Uliasz's abusive conduct, terminated[15] plaintiff while out on leave. (D.Ex. Q.)

Accordingly, it is clear that plaintiff's allegations of negligent infliction of emotional distress are sufficient to survive a motion to for summary judgment.

**B.    *The Unreasonable Conduct Occurred During The Course Of The Employment Termination Process.***

Defendants' position that plaintiff has not met the elements of negligent infliction of emotional distress "in connection with the *actual* termination of her employment" in part because she was not in the workplace when the decision was made is wholly unavailing. In fact, this court when

---

[15] Although plaintiff had been actively seeking treatment for her emotional distress at the time she was terminated, she could no longer afford to see her mental health specialists as she was no longer insured. (Kanios Depo. at 315-316 (P.Ex. 1).)

poised with this exact argument summarily rejected it. <u>Nance v. M.D. Health Plan, Inc</u>. 47 F.Supp.2d 276 (D.Conn. 1999). In <u>Nance</u>, defendant employer sought to dismiss plaintiff's negligent infliction of emotional distress claim arguing that because plaintiff was sent home without incident before termination his "actual termination" could not have been unlawful. In denying defendants motion, the court realized that plaintiff's absence when notified of his termination was not dispositive of the issue particularly since prior to his absence and termination defendant had engaged in conduct which may've been unreasonable. <u>Id.</u> at 280.

Similarly, in <u>Edwards v. Community Enterprises, Inc.</u>, 251 F.Supp.2d 1089 (D.Conn. 2003) (Underhill, J.), the court denied defendant employer's motion for summary judgment, finding negligent infliction of emotional distress claim contained the requisite unreasonable conduct in termination process where defendant terminated and evicted plaintiff while plaintiff was out on sick leave. In so ruling, the court held that "The [unreasonable] conduct in question arose from the termination process, and the claim is based on the aggravating circumstances of the termination, not the mere fact that [Plaintiff] was terminated." <u>Id.</u> at 1089. This is because the termination ***process*** comprises more than the sole "act" of terminating an employee. <u>See</u>, <u>e.g.</u>, <u>Kuselias v. Southern New England Telephone Co.</u>, 1996 WL 646759 (Conn.Super. 1996) (suspension period prior to termination included in "termination process") (P.Ex. 25).

Accordingly, it is clear the conduct of which plaintiff complains was part of the termination process which includes the period she was out of the workplace on leave.

## VI.   GENUINE ISSUES OF MATERIAL FACT EXIST AS TO PLAINTIFF'S CLAIM OF NEGLIGENT MISREPRESENTATION.

To establish such a claim a plaintiff must demonstrate that (1) the defendant made a misrepresentation, (2) the defendant knew, or reasonably should have known that the statement was untrue, and (3) the plaintiff's reliance on the misrepresentation was detrimental. <u>Foy v. Pratt & Whitney Group</u>, 127 F.3d at 233 (2nd Cir. 1997).

"[E]ven an innocent misrepresentation of fact may be actionable if the declarant has the means of knowing, ought to know or has the duty of knowing the truth." Williams Ford, Inc. v. Hartford Courant Co., 232 Conn. 559, 575 (1995). The plaintiff need not prove that the representation made by the defendant was promissory, but only that it contained false information. Daley v. Aetna Life & Casualty Co., 249 Conn. 766, 793 (1999). The basic element of a claim for misrepresentation, however, is whether there was a misstatement. Id. Without a misrepresentation, there can be no justifiable reliance. Id.

A.    *Defendant Made A Misrepresentation It Knew Or Should Have Known Representations Were False Or Inaccurate.*

In the instant case, defendants attempt to misguide this Court as to what misrepresentation was made to plaintiff. Count Seven of plaintiff's Complaint claiming negligent misrepresentation clearly states that "Plaintiff relied on false representations in the conduct of her activities and in making her decisions regarding employment, specifically in her decision to take a leave of absence and was damaged thereby." (D.Ex. K ¶¶23, 60.) On March 19, 2001 while at work, plaintiff, visibly shaking and suffering from a panic attack related to Uliasz's abuse, was sent by Viesta to plaintiff's doctor for immediate treatment. (D.Ex. P at DO678; Viesta Depo. at 120-121 (P.Ex. 4); Hankin Notes (P.Ex. 26); Hankin Depo. at 83 (P.Ex. 14).) That same day, due to plaintiff's "suicidal ideation," "serious distress" and her doctor's concern over her remaining in Uliasz's department, it was strongly recommend that plaintiff be placed on Family Medical Leave, a decision in which defendants' EAP department concurred. (Hankin Depo. at 74-76, 83, 86, 91 (P.Ex. 14); Trencher Depo. at 17-18 (P.Ex. 13); Thorman Depo. at 29 (P.Ex. 12); Kanios Depo. at 220-221 (P.Ex. 1); Viesta Depo. at 128-129 (P.Ex. 4); P.Ex. 15.) Thus, on March 20, 2001, plaintiff was in fact placed on FMLA leave. (P.Ex. 16.) More importantly, on March 21, 2001, the second day of plaintiff's leave, Viesta called plaintiff at home and stated "the purpose of the phone call was to inform [plaintiff] about her FMLA leave…and to notify her that she ***has three and a half weeks left of***

34

*FMLA*[16]." (Viesta Depo. at 128-129 (P.Ex. 4); D.Ex. P at DO679.) Then, on or around April 6, 2001, plaintiff was tendered documents specifically stating she was eligible for the federal leave. (P.Ex. 16.)

These representations are now alleged to have been false, as defendants now contend that plaintiff's leave expired prior to her even going on leave. (<u>See</u> Defendant's 56a(1) Statement, No. 84).) If this is correct, Viesta either knew or she should have known her representations were false. Merely having reason to know a representation was false at the time it was made is sufficient to support a claim of negligent misrepresentation. <u>Dacourt Group, Inc. v. Babcock Industries, Inc</u>., 747 F.Supp. 157, 161 (D.Conn. 1990).

### B. **_Plaintiff Relied To Her Detriment._**

Plaintiff clearly relied upon this misrepresentation evidenced by her conduct wherein she took the leave proffered to her and engaged in discussions with defendant UST and her physicians preparing documentation defendant UST requested in connection with her leave. (D.Ex. Y; D.Ex. Z; P.Ex. 27, D.Ex. Q.) <u>See</u> <u>Duty v. Norton-Alcoa Proppants</u>, 293 F.3d 481 (8th Cir. 2002) (not unreasonable for plaintiff to rely on the amount of leave time designated by employer and plaintiff's phone call to defendant following the end of his FMLA leave as designated by defendant's misrepresentation evidenced reliance). In addition, plaintiff made it abundantly clear that she would have been willing and able to return to work had she not been terminated during her leave. (Kanios Depo. at 308, 309, 311 (P.Ex. 1); Viesta Depo. at 128-129 (P.Ex. 4).)

Accordingly, summary judgment is inappropriate as to plaintiff's claim of negligent misrepresentation.

---

[16] Plaintiff, given defendant UST's representation, was therefore on FMLA-qualified leave well after her termination date of April 11, 2001, the day defendant UST dated its termination letter. (D.Ex. Q.)

**VII.    GENUINE ISSUES OF MATERIAL FACT EXIST SUFFICIENT TO DEFEAT DENDANT'S MOTION FOR SUMMARY JUDGMENT AS TO PLAINTIFF'S FMLA CLAIM.**

    **A.    Defendant Is Estopped From Challenging Plaintiff's Eligibility For FMLA Coverage.**

The doctrine of equitable estoppel is properly invoked where the enforcement of the rights of one party would work an injustice upon the other party due to the latter's justifiable reliance upon the former's words or conduct. In re Ionosphere Clubs, Inc., 85 F.3d 992, 999 (2d Cir.1996). Under federal law, a party may be estopped from pursuing a claim or defense where: 1) the party to be estopped makes a misrepresentation of fact to the other party with reason to believe that the other party will rely upon it; 2) and the other party reasonably relies upon it; 3) to her detriment. Heckler v. Community Health Services of Crawford County, Inc., 467 U.S. 51, 59, 104 S.Ct. 2218 (1984).

Defendants claim plaintiff was not protected under the FMLA for she had exhausted her statutorily-guaranteed twelve weeks of leave. However, the Second Circuit holding in Kosakow v. New Rochelle Radiology Associates, P.C., 274 F.3d. 706 (2nd Cir. 2001), estops defendants from asserting that plaintiff exhausted all her FMLA leave. In Kosakow, plaintiff's employer was estopped from maintaining that plaintiff was ineligible for FMLA protection due to its misrepresentation. Plaintiff's former employer told her she was "granted medical leave for the operation, as well as the time for recovery after surgery." Id. at 713. In denying defendant's position, the Second Circuit concluded that the employer's misrepresentation estopped it from maintaining that former employee was ineligible for FMLA protection. See also Woodford v. Community Action of Greene County, Inc., 268 F.3d 51, 57 (2nd Cir. 2001 )("Thus, future employees who rely to their detriment upon assurance of their employer that they qualify for leave under the FMLA may have recourse to the doctrine of equitable estoppel."); see Duty v. Norton-Alcoa Proppants, 293 F.3d 481 (8th Cir. 2002) (employee equitably estopped from asserting that employee used all of his FMLA leave.).

Although rendered in the Eight Circuit, the decision in <u>Duty v. Norton-Alcoa Proppants</u>, 293 F.3d 481 (8th Cir. 2002), is equally persuasive. In <u>Duty</u>, the employer argued that the district court erred by equitably estopping it from asserting an affirmative defense that plaintiff had exhausted his twelve weeks of FMLA prior to his termination thereby barring him from asserting any claims under the FMLA. In denying this defense, the Court of Appeals reasoned that because plaintiff could have relied to his detriment on his employer's letter informing him that his leave qualified under the FMLA, it was estopped from claiming that plaintiff had exhausted his FMLA leave prior to termination. <u>Id.</u> 494 (<u>citing</u> <u>Dormeyer v. Comerica Bank-Illinois</u>, 223 F.3d 579, 582 (7th Cir. 2000) (recognizing a district court's ability to equitably estop employers from asserting an affirmative defense contesting an employee's entitlement to FMLA leave in situations where the employer's words or conduct has misled the employee into relying on the leave)). In the instant case, defendant UST made affirmative representations to plaintiff upon which she relied to her detriment. In addition, defendant's own arguments underscore its "interference" with plaintiff's FMLA rights in violation of §2615. <u>See</u> <u>Kosakow v. New Rochelle Radiology Associates</u>, 274 F.3d 706 (2nd Cir. 2001) (<u>discussing</u> <u>Fry v. First Fidelity Bancorporation</u>, 1996 WL 36910 (E.D.Pa. 1996) (P.Ex. 28), holding that if an employer fails to adequately notify its employees of the impact of its own family medical leave policies on the rights provided by the FMLA, particularly where there is an apparent conflict between the employer's policy and the employee's FMLA rights, such conduct can constitute interference with the employee's FMLA rights if it causes an employee to unwittingly forfeit the protection of the FMLA); <u>Kruse v. Laguardia Hosp.</u>, 1996 WL 1057147, at 5(E.D.N.Y. 1996) (same) (P.Ex. 29); <u>Mion v. Aftermarket Tool & Equip. Group</u>, 990 F.Supp. 535, 539 (W.D.Mich. 1997 (same).

Instructive on this point is the holding in <u>Donnellan v. New York City Transit Authority</u>, 527901 (S.D.N.Y 1999):

"[This] Court agrees with [the] Secretary[17] [of DOL] that failure to give proper notice—including notice that leave taken counts against one's allotment of FMLA leave—may, in appropriate circumstances, function to interfere with or to deny an employee' substantive FMLA rights.  For example, where an employee uses leave which might be counted as vacation time, FMLA leave, or both, an employer's failure to provide notice that the leave counts against the FMLA allotment might interfere with the employee's ability to plan and use future FMLA leave to, for example, schedule elective surgery and recuperate from the surgery."

Id. at *4 (P.Ex. 30).

In Fry v. First Fidelity Bancorporation, 1996 WL 36910 (E.D.Pa. 1996) (P.Ex. 28), plaintiff former employee argued that she was unaware of her employer's method of calculating the family leave period required by the FMLA in that the employer failed to provide adequate notice thereof as required under the FMLA.[18] Specifically, the dispute between plaintiff and her former employer arose from the employer's policy permitting an eligible employee to take an additional four weeks of leave, but counting only the first twelve weeks thereof as the amount of leave required under the FMLA. As a result, defendant contends that plaintiff, who elected to take consecutively the full sixteen weeks offered by the employer, forfeited the FMLA protection after the first twelve weeks. Plaintiff contended that defendant's failure to fully and clearly explain its FMLA policies led her to believe that 16 weeks was protected under the FMLA. In denying defendant's motion for summary judgment, the Fry court concluded that "since adequate notice to employees concerning their FMLA right to reinstatement in light of any additional leave permitted by the employer is necessary to

---

[17] Designation arises as an issue because relevant collective bargaining agreements or employee benefits policies may provide for other, non-FMLA leave that the employee could take instead of, in addition to, or concurrently with FMLA leave. Where the employer provides for paid medical or vacation leave in circumstances that would also qualify for FMLA leave, DOL regulations allow for the employee to elect, or for the employer to require, any of the following: (1) that the FMLA leave be taken before the non-FMLA leave is taken; (2) that the non-FMLA leave be taken before the FMLA leave is taken; or (3) that the non-FMLA leave and the FMLA leave be taken concurrently. (See 29 C.F.R. § 825.207.) DOL regulations place the burden on the employer to determine whether requested leave qualifies as FMLA leave and to designate leave as FMLA-qualifying. (See 29 C.F.R. § 825.208.) *Notably, "[i]n all circumstances, it is the employer's responsibility to designate leave, paid or unpaid, as FMLA-qualifying, based on information provided by the employee" (id. § 825.208(a)(2)), and "[t]he employer must immediately notify the employee that the paid leave is designated, and will be counted as FMLA leave."* (Id. § 825.208(b) (citation omitted) (emphasis added).)

[18] See 29 U.S.C. §2654; 29 C.F.R. § 825.301 (1993) Id. at *2.

enable them to exercise their statutory right to reinstatement by electing to request only twelve weeks of family leave…" Id. at *4.

Accordingly, a plaintiff has stated a valid cause of action where defendant's failure to adequately notify her of its policy amounts to an interference with her FMLA rights[19]. Specifically, plaintiff was wholly unaware and unapprised of defendant's policies[20] nor was she even apprised of how her FMLA leave was being allotted directly interfering with her FMLA rights. (Kanios Depo. at 308-309, 311, 313-314 (P.Ex. 1).) In fact, on or about April 6, 2001, defendant UST informed plaintiff via letter that her "requested leave [will] be counted against your annual FMLA leave entitlement." (D.Ex. Z.) Moreover, defendants make these arguments despite the additional leave permitted by UST which Viesta herself deemed Federal FMLA leave. Therefore, plaintiff was unable to exercise her statutory right to reinstatement not only because she was not given the opportunity to elect and/or request leave under the federal FMLA, but also because defendant UST told her that her additional leave was covered and being applied under the federal FMLA.

### B.    Plaintiff Did Certify That She Was Suffering From A "Serious Health Condition."

The FMLA entitles an eligible employee twelve weeks of leave for a "serious health condition." 29 U.S.C. § 2612(a)(1). On or about April 6, 2001, defendant UST requested plaintiff to provide documentation from her physician acknowledging her serious health condition. (D.Ex. Z.) Such documentation was not only provided, but it was also to be supplemented by plaintiff's physician. (D.Ex. Y; P.Ex. 27; Trencher Depo. at 25-39 (P.Ex. 13); Hankin Notes (P.Ex. 26); Kanios Depo. at 318 (P.Ex. 1).)

---

[19] See 29 U.S.C. §2615(a)(1) and Count Eight of plaintiff's complaint alleging, inter alia, "Interference with Rights."
[20] Defendants' policy ambiguously states: "Under state law, you may be eligible to take more time for FMLA." (D.Ex. AA; D.Ex. Z.)

UST's argument that plaintiff did not certify that she was suffering from a "Serious Health Condition" is merely a red-herring geared at distracting the Court from recognizing that plaintiff was eligible for additional FMLA leave. A close look at the document entitled "Certification of Health Care Provider," which defendant contends is evidence of plaintiff's failure to provide certification of serious illness, reveals that it is signed and dated by one of plaintiff's physicians **after** defendant had already terminated plaintiff yet prior to the exhaustion of her FMLA leave. (D.Ex. Y; D.Ex. Q.) Therefore, UST's assertion that plaintiff lacked certification is a ruse and cannot be countenanced by this Court as a valid reason for denial of plaintiff's FMLA rights. Moreover, the physician responsible for providing medicine to plaintiff for her "depression[21]" had informed UST that she had yet to fill out the  "necessary paperwork" providing certification but that it was forthcoming. (P.Ex. 27; Trencher Depo. at 25-39 (P.Ex. 13; Hankin Notes (P.Ex. 26); Kanios Depo. at 318 (P.Ex. 1).) Even with this notice, UST still terminated plaintiff and attacks her FMLA rights on grounds that she did not provide certification from her health care provider. (P.Ex. 27; D.Ex. Q; Trencher Depo. at 25-39 (P.Ex. 13).) Finally documents customarily utilized by UST entitled "Magellan Clinical Plan for Initial Referral" dated **after** plaintiff's termination clearly show plaintiff was being treated for her serious health condition as she was being prescribed anti-depressant medications. (Trencher Depo. at 25-39 (P.Ex. 13); Hankin Notes (P.Ex. 26); Thorman Depo. at 8, 9, 30, 31 (P.Ex.12).)

According, summary judgment as to plaintiff's claims of interference with her FMLA rights must be denied.

## **CONCLUSION**

For all of the foregoing reasons, plaintiff respectfully requests that defendants' Motion for Summary Judge be denied in its entirety.

---

[21] Depression amounts to a "serious health condition" for purposes of FMLA protection. Kamtaprassad v. Chase Manhattan Corp., 2001 WL 1662071 (S.D.N.Y. 2001) (P.Ex. 31).

By_____
  Scott R. Lucas (ct00517)
  Michel Bayonne (ct24628)
  *Attorneys for Plaintiff*
  MARTIN, LUCAS & CHIOFFI, LLP
  177 Broad Street
  Stamford, CT 06901
  Phone: (203) 973-5200
  Fax: (203) 973-5250
  slucas@mlc-law.com
  mbayonne@mlc-law.com

# ***CERTIFICATE OF SERVICE***

This is to certify that on this 12th day of July, 2004, a copy of the foregoing was mailed, first class, postage prepaid, to:

Steven J. Younes, Esq.
Mary A. Gambardella, Esq.
Epstein Becker & Green, P.C.
One Landmark Square Suite 1800
Stamford, CT 06901-2681
Phone: (203) 348-3737
Fax: (203) 324-9291

_____

Scott R. Lucas