## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **LYNN B. KANIOS,** | : | |
| | : | **CIVIL ACTION NO.:** |
| **Plaintiff,** | : | **303 CV 369 (DJS)** |
| | : | |
| **V.** | : | |
| | : | |
| **UST, INC. and MARK ULIASZ,** | : | |
| | : | **JULY 12, 2004** |
| **Defendants.** | : | |

## <u>PLAINTIFF'S LOCAL RULE 56(a)2 STATEMENT</u>

Pursuant to Local Rule 56(a)2, plaintiff Lynn B. Kanios submits the following statement in support of her Opposition to Defendant's Motion for Summary Judgment:

1.      This action was brought by Plaintiff, Lynn Kanios, a former employee of Defendant UST.  The operative Complaint is the Amended Complaint dated January 14, 2004 (Ex. K to the Memorandum of Law).

***RESPONSE:*** Admitted.

2.      In her Complaint, Kanios alleges: (1) in the First Count against UST, discrimination based on gender in violation of Title VII of the Civil Rights Act of 1964, as amended, 29 U.S.C. § 2000, *et seq*. ("Title VII")[1]; (2) in the Second Count against UST, discrimination based on gender in violation of the Connecticut Fair Employment Practices Act, Conn. Gen. Stat. § 46a-60(a)(1), *et seq*. ("CFEPA"); (3) in the Third Count against UST, retaliation in violation of Title VII; (4) in the Fourth Count against UST, retaliation in violation of the CFEPA; (5) in the Fifth Count against Defendant Uliasz, aiding and abetting in violation of the CFEPA; (6) in the Sixth Count against both Defendants, negligent infliction of emotional distress; (7) in the Seventh Count against UST, negligent misrepresentation; and (8) in the Eighth Count against UST, violation of the federal Family and Medical Leave Act, 29 U.S.C. §2615(a)(1), *et seq*. ("FMLA").

***RESPONSE:***  Denied as stated. The Amended Complaint, dated January 14, 2004, alleges:

(1) in the First Count against UST, sex discrimination pursuant to 29 U.S.C. §2000 (Title VII); (2) in

the Second Count against UST, sex discrimination pursuant to C.G.S. §46a-60(a) (CFEPA); (3) in

the Third Count against UST, retaliation pursuant to 42 U.S.C. §2000e-3 (Title VII); (4) in the Fourth

Count against UST, retaliation pursuant to C.G.S §46a-60(4) (CFEPA); (5) in the Fifth Count against

---

[1] Although Kanios alleges "sexual harassment" in the Complaint, she has clarified that she is alleging only gender-based sexual harassment. (Kanios Depo at 99-104 (P.Ex. 1).)

both defendants UST and Mark Uliasz, aiding and abetting pursuant to C.G.S §46a-60(5) (CFEPA); (6) in the Sixth Count against both defendants UST and Mark Uliasz, negligent infliction of emotional distress; (7) in the Seventh Count against UST, negligent misrepresentation; and (8) in the Eight Count against UST, violation of the federal Family and Medical leave Act, 29 U.S.C. 29 U.S.C. § 2601, *et seq.*, arising out of plaintiff's termination. (D.Ex. K.[2])

3.      UST, headquartered in Greenwich, Connecticut, is in the primary business of manufacturing and distributing smokeless tobacco products.

**_RESPONSE:_** Admitted.

4.      Kanios began her employment with UST on March 6, 1995, as a Support Staff Secretary in the Employee Relations ("Human Resources") Department ("Complaint," ¶ 7, part of Ex. K to the Memo of Law; Kanios Dep. pp. 49-50).  Kanios received an employee handbook and reviewed its contents when she commenced her employment with UST.  (Kanios Dep. p. 51; Ex. L)

**_RESPONSE:_** Denied, except that plaintiff admits she began her employment with UST on March 6, 1995 as a Support Staff Secretary in the Employee Relations Department. (Complaint ¶7 (D.Ex. K).) Plaintiff received an employee handbook and believes that she "went through it." (Kanios Depo. at 51 (P.Ex. 1).)

5.      Kanios performed some secretarial and data coordinator work for the Purchasing Department, filling in for a secretary in that department on maternity leave.  (Kanios Dep. pp. 54, 70, 73)

**_RESPONSE:_** Denied, except that after being given a "merit/promotion" from her initial position in defendant's Human Resources Department, plaintiff then became the Senior Data Coordinator in the Purchasing Department reporting to Tim Howard. (P.Ex. 2.) Prior to her promotion as a Senior Data Coordinator, plaintiff, while the "under employee relations" department, performed some secretarial work in the purchasing department. (Kanios Depo at 54, 70, 72, 73 (P.Ex. 1).)

6.      Kanios describes her interaction at that time with Uliasz, Purchasing Manager, as limited; however, she claimed to have even then experienced problems with his "managerial style,"

---

[2] In these Responses, plaintiff shall refer to defendants' exhibits filed with their Motion for Summary Judgment as "D.Ex. __," and shall refer to the exhibits in her Appendix of Exhibits filed herewith as "P.Ex. ___."

including his "condescending tone." She also claimed that Uliasz made comments about her weight, appearance, the amount of food she consumed during pregnancy, that he vaguely referred to her "mind being home with the kids," and remarked that "women belong in the home." (Kanios Dep. pp. 59-64)

*RESPONSE*: Denied as stated. Plaintiff, prior to her promotion on July 21, 1997, had issues with Uliasz, including but limited to his condescending tones and remarks about her weight and appearance. Uliasz, among other things, also made condescending remarks about plaintiff being pregnant and a woman. (Kanios Depo at 59-64 (P.Ex. 1).)

7.     Although Kanios knew that she could complain to Human Resources about Uliasz, she did not bring any complaint at that time. (Kanios Dep. pp. 67-69, 83-86, 120; Ex. M)

*RESPONSE*: Denied. Prior to her promotion on July 31, 1997, plaintiff complained about harassment and mistreatment to David Turner, a manager in the purchasing department. In addition, plaintiff was instructed by Tim Howard and David Turner, both members of management in the purchasing department, not to complain to Human Resources. In addition, Laurie O'Connor and Priscilla Maguire also told plaintiff not to complain to Human Resources about Uliasz due to the risk of retaliation. (Kanios Depo. at 67-69, 83-86 (P.Ex. 1).)

8.     On or about July 21, 1997, Kanios was promoted into the Purchasing Department as an Associate Buyer by Tim Howard, the department Director. (Ex. K ¶ 8; Kanios Dep. pp. 54-55; Howard Dep. p. 4)

*RESPONSE*: Admitted, except that David Turner, a manager in the purchasing department, first recommended that plaintiff "be considered for promotion to Associate Buyer" when the next opportunity presented itself. (P.Ex. 3.)

9.     Uliasz participated in the decision to have Kanios transferred to him as her supervisor, as well as in the initial promotion to Associate Buyer. (Uliasz Dep. pp. 40, 41, 157; Ex. N) This testimony is also undisputed by Kanios. (Kanios Dep. pp. 58-59 wherein she concedes lack of knowledge on this point)

*RESPONSE*: Denied as stated. Plaintiff, upon being promoted into the purchasing department by Tim Howard after the recommendation of David Turner to do so, by virtue of her new title and defendant's corporate hierarchy, was subordinate to Uliasz and under his immediate supervision. (P.Ex. 2.)

10.     As an Associate Buyer, Kanios' primary responsibilities were to assist the Buyers, Senior Buyers and Managers by placing purchase orders with suppliers, managing inventory by ensuring that certain, designated plants and manufacturing facilities had the ingredients necessary to make the smokeless tobacco products, ensuring sufficient inventory of dry plant materials, developing spreadsheets for polypropylene and casing materials or flavoring fragrances, and placing purchase orders for casing materials, waxes and some of the labels for the dry snuff business.  (Kanios Dep. pp. 55-56, 71; Howard Dep. pp. 12-13, 110, 112, 114; Maguire Dep. pp. 6, 8-9, 27-28, 48, 50-51, 53)

**_RESPONSE_**: Denied as stated. The "main objective" of plaintiff's position as an Associate Buyer was to support the administrative needs of the buying group and to assist in the buying of assigned commodities. (D.Ex. V.)

11.     Priscilla Maguire, a then Buyer, supervised some of Kanios' orders and inventory management.  (Maguire Dep. p. 9)

**_RESPONSE_**: Denied as stated. Plaintiff assisted Priscilla Maguire with her "commodities, which are labels and tobacco ingredients." Under Priscilla Maguire's supervision, she and plaintiff worked well together and "got along very well." (Maguire Dep. P. 9 (P.Ex. 32).)

12.     Kanios was periodically also expected to pitch in, as were the other Associate Buyers, to absorb duties of employees who were on leave.  (Kanios Dep. pp. 69-70; Howard Dep. p. 118; Uliasz Dep. pp. 126-28, 131-32; See also, e.g., Uliasz Dep. pp. 126-128, 138; Howard Dep. p. 118; Kanios Dep. pp. 69-71, 182-84)

**_RESPONSE_**: Admitted.

13.     Kanios initially reported to David Turner.  (Kanios Dep. pp. 57-59)  Shortly thereafter, however, Kanios began to report directly to Defendant Uliasz, but her responsibilities did not change. (Id.)

**_RESPONSE_**: Denied as stated. After being given a "merit/promotion" from her initial position in defendant's Human Resources department, plaintiff then became the Senior Data Coordinator in the purchasing department reporting to Tim Howard. (P.Ex. 2.) Prior to her promotion as a Senior Data Coordinator, plaintiff, while "under [the] employee relations" department, performed some secretarial work in the purchasing department. (Kanios Depo at 54, 72, 73 (P.Ex. 1).) Plaintiff, upon being promoted into the purchasing department by Tim Howard after the recommendation of David Turner to do so, by virtue of her new title and defendant's corporate

hierarchy, was subordinate to Uliasz and under his immediate supervision. (P.Ex. 2; Kanios Depo at 54, 72, 73 (P.Ex. 1).)

14.    At all times, Uliasz reported to Tim Howard.  (Howard Dep. pp. 5, 9)

**_RESPONSE_**: Denied, except plaintiff lacks knowledge sufficient to form a belief as to whether "at all times" Uliasz reported to Tim Howard. Uliasz also reported to David Turner and John McGrath. (Howard Depo. at 5, 9 (P.Ex. 10).)

15.    In or about late January 2001, Kanios told a colleague, Christine Walsh, that she was upset by comments made to her by Uliasz.  (Kanios Dep. pp. 80, 116-17; Ex. K ¶ 16)

**_RESPONSE_**: Admitted.

16.    Walsh worked directly for Robert Rentz, Director of Customer Development and a UST Compliance Officer;[3] she told Rentz about her "friend" who was having problems with her supervisor. (Rentz Dep. pp. 42; Kanios Dep. pp. 145-46)

**_RESPONSE_**: Denied as stated. Rentz, as a compliance representative,[4] "put one and one together pretty quickly" when recognizing that Christine Walsh, his subordinate, had brought to his attention complaints on behalf of plaintiff. (Rentz Depo. at 43 (P.Ex. 6).)

17.    Kanios then spoke directly with Rentz after Rentz contacted her.  (Kanios Depo. at 82, 117, 120 (P.Ex. 1); Rentz Depo. at 43-44 (P.Ex. 6).)

**_RESPONSE_**: Admitted.

18.    Kanios alleged to Rentz: (a) that Uliasz made offensive comments about her size; (b) that he often commented about the amount of food she was consuming, possibly having called her a "fat bitch" (although Rentz was admittedly unclear in his recollection on this remark); and (c) that, in general, he made repeated, condescending comments about her intelligence and performance.  (Kanios Dep. p. 120-21; Rentz Dep. pp. 43-44, 60; Viesta Dep. pp. 63-65 and Ex. P, DO667)

---

[3] Compliance officers are identified individuals within UST charged with the responsibility of acting as additional receivers of employee complaints of violations of the Company's Code of Conduct.  Once received, these officers forward complaints received to the appropriate department, such as Human Resources, for investigation. (Rentz Dep. pp. 16-18).

[4] Compliance Representatives, among other things, assist the Compliance Committee in its oversight and implementation of UST's compliance program, including compliance with the Code of Corporate Responsibility and Code Policy Statements. Compliance representatives also serve as an individual to whom employees and other agents can report violations by others within the organization without fear or retribution, and to take action on such reports as directed by the Compliance Committee. (P.Ex. 7.)

**_RESPONSE_**: Denied as stated. Plaintiff complained to Rentz, *inter alia*, that Uliasz: (1) was humiliating her in public; (2) making comments about her size, (3) making comments in the cafeteria in front of other employees about the food that plaintiff was consuming; (4) making embarrassing comments; (5) using profanity when describing plaintiff; (6) called her a "fat bitch"; and (7) pushed her. Moreover, plaintiff complained to Rentz that she wanted to leave the department because of Uliasz, that Uliasz' harassment was on-going and that she feared retaliation if she reported her complaints to human resources. (Rentz Depo. at 43-45 (P.Ex. 6); Kanios Depo. at 121 (P.Ex. 1).)

19.     Kanios also told Rentz Uliasz "pushed" her.  (Kanios Dep. p. 121)

**_RESPONSE_**: Admitted, except that Kanios also complained to Rentz that she feared retaliation and that Uliasz' harassment was on-going.  (Id.)

20.     No mention of any gender-based comments was made by Kanios to Rentz.  (Id.)

**_RESPONSE_**: Denied. Plaintiff made numerous complaints of sex harassment. (Id.)

21.     Rentz advised Kanios that the matter had to be reported, and himself followed up with the Legal Department.  (Rentz Dep. pp. 44, 47-48)

**_RESPONSE_**: Admitted, except that Rentz also reported plaintiff's complaints to Human Resources. (Rentz Depo. at 44-45, 47-48, 50 (P.Ex. 6).)

22.     This conversation with Rentz was the first on record in which Kanios ever complained about conduct by Uliasz to UST management.  (Kanios Dep. pp. 76-77, 83, 111, 286-87; Howard Dep. pp. 23-24)

**_RESPONSE_**: Denied. Prior to her promotion on July 31, 1997, plaintiff complained about harassment and mistreatment to David Turner, a manager in the purchasing department. In addition, plaintiff was instructed by Tim Howard and David Turner, both members of management in the purchasing department, not to complain to Human Resources. (Kanios Depo. at 67-69, 77-78, 83-86 (P.Ex. 1).)

23.     Kanios claimed during deposition she previously complained to David Turner and to Tim Howard, yet she did not include this allegation either in her Complaint, or in her CHRO Charge. Further, she could not remember the particulars of these purported conversations.  (Kanios Dep. pp. 68, 77-78 ; Ex. K; Ex. R, CHRO charge)

**_RESPONSE:_** Denied as stated. Prior to her promotion on July 31, 1997, plaintiff complained about harassment and mistreatment to David Turner, a manager in the purchasing department. In addition, plaintiff was instructed by Tim Howard and David Turner, both members of management in the purchasing department, not to complain to Human Resources. (Kanios Depo. pp. 67-69, 77-78, 83-86 (P.Ex. 1).) Moreover, Plaintiff's Complaint specifically states that "On numerous occasions throughout her employment plaintiff complained to Tim Howard, UST's Purchasing Director and the head of plaintiff's department, regarding Uliasz' harassment." (Complaint ¶15 (D.Ex. K).)

24.     Kanios claimed she did not go to Human Resources earlier out of fear of retaliation, but she could not name any single instance which she observed to support this fear.  (Kanios Dep. pp. 83, 84-87, 118)

**_RESPONSE:_** Denied. Plaintiff was instructed by Tim Howard and David Turner, both members of management in the purchasing department, not to complain to Human Resources. In addition, Laurie O'Connor and Priscilla Maguire also told plaintiff not to complain to Human Resources about Uliasz due to the risk of retaliation. (Kanios Depo. pp. 67-69, 83-86 (P.Ex. 1).) In addition, Priscilla Maguire, during a meeting within the purchasing department, complained that the department was managed by fear and that "people might be intimidated…if they brought up something." (Maguire Depo. at 10-11 (D.Ex. 32).)

25.     She acknowledged that others had complained about the department, with other males having complained specifically about Uliasz's managerial style, yet she could not point to any retaliation against them.  (Kanios Dep. pp. 84-86, 157-59)

**_RESPONSE:_** Denied. Plaintiff was instructed by Tim Howard and David Turner, both members of management in the purchasing department, not to complain to Human Resources. In addition, Laurie O'Connor and Priscilla Maguire also told plaintiff not to complain to Human Resources about Uliasz due to the risk of retaliation. (Kanios Depo. at 67-69, 83-86 (P.Ex. 1).) Plaintiff intimates that an employee whose position was "replaced" may have complained and may have been retaliated against. (Kanios Depo. at 157-159 (P.Ex. 1).) Moreover, Priscilla Maguire, a

female buyer, during a meeting within the purchasing department in which plaintiff was present, complained that the department was managed by fear and that "people might be intimidated…if they brought up something." (Maguire Depo. at 10-11 (P.Ex. 32); Kanios Depo. at 157-159 (P.Ex. 1).)

26.    Rentz then followed up with Nella Viesta, Director of Employee Relations, to advise her that Kanios would be coming in to see her.  (Kanios Dep. p. 122; Rentz Dep. Pp. 50-51; Viesta Dep. p. 8)

*RESPONSE:* Denied as stated. Rentz, in a meeting with Nella Viesta, defendant's Director

of Human Resources and member of the compliance committee, along with "a lawyer from UST,"

discussed all of plaintiff's complaints. (Rentz Depo. at 50-51 (P.Ex. 6).)

27.    By that time, however, Viesta had already been made aware by the Legal Department that Kanios complained about Uliasz.  (Viesta Dep. pp. 62-63 and Ex. P DO667)  An investigation thereafter ensued.  (See *infra*)

*RESPONSE:* Denied. No investigation was made into plaintiff's complaints of harassment.

(P.Ex. 9; Viesta Depo. at 36-37, 44-45 (P.Ex. 4).)

28.    On February 7, 2001, Viesta met with Kanios.  She complained to Viesta about Uliasz's managerial style, condescending tone, as well as his "comments" about her food consumption.  (Kanios Dep. pp. 148-49, 151-52)

*RESPONSE:* Denied as stated. On or about February 7, 2001, Viesta met with Plaintiff.

Plaintiff complained to Viesta about Uliasz' sex discrimination. (Kanios Depo. at 148-152 (P.Ex. 1).)

29.    During her deposition, Kanios elaborated that Uliasz made derogatory comments about her appearance, weight, eating habits and intelligence.  By way of example: (a) when she returned from maternity leave, Uliasz told her he "needed to teach [her] Math 101 again," and that "her thoughts are still at home"; (b) he kept a small jar of pennies on a desk in the department which he labeled her "education fund"; (c) incident to her two pregnancies, Uliasz had commented repeatedly that she was "really packing it [weight] on…was eating for two…was strapping on a feed bag…."; "when you are done eating, make sure you wipe your chin off"; and (d) he would ask her if she "wanted a hefty bag," referring again to her food consumption.  (Kanios Dep. pp. 97-104, 148-49, 150-52)

*RESPONSE:* Admitted, except that plaintiff, *inter alia*, also elaborated that Uliasz: (1)

discriminated against her because of her sex; (2) made comments about plaintiff "being barefoot and

pregnant" referring to his animus towards women in the workplace and his sex based harassment of

plaintiff; (3) made comments about plaintiff being a woman needing to be at home with her kids

8

again referring to his animus towards women in the workplace and his sex based harassment of plaintiff; and (4) comments that plaintiff because she was a woman was too emotional.  These comments toward plaintiff were made repeatedly. (Kanios Depo. at 148-152 (P.Ex. 1).)

30.     When asked at her deposition if all comments were about "weight and eating habits," Kanios said "No, there was…he would make comments about my appearance, he would make comments that he had to deal with…he would talk condescending to me and it would be inferior comments and he would—you know, comments he wouldn't make to a man.  A lot of it is hard to say. A lot of it was in his—he had a lot of mannerisms.  It's very hard to describe…"  When asked yet again what comments were not related to weight or food consumption, she answered:  "He's made comments about my hair, he's made comments about my glasses, he's made comments about my shoes.  He's made comments about—you know, living still in the 80's with the clothes I had on."  She also claimed he made negative comments about her attractiveness.  (Kanios Dep. pp. 97-104, 247, Viesta Dep. pp. 41-44)

*RESPONSE:* Admitted, except that plaintiff, *inter alia*, also elaborated that Ulisaz: (1) discriminated against her because of her sex; (2) made comments about plaintiff "being barefoot and pregnant" referring to his animus towards women in the workplace and his sex based harassment of plaintiff; (3) made comments about plaintiff being a woman needing to be at home with her kids again referring to his animus towards women in the workplace and his sexual harassment of plaintiff; (4) made comments that plaintiff because she was a woman was too emotional; and (5) made comments referring to plaintiff as being unattractive again sexually harassing plaintiff. These comments toward plaintiff were made  incessantly. (Kanios Depo. at 102-103, 148-152 (P.Ex. 1).)

31.     Kanios further asserted that Uliasz commented about her being "barefoot and pregnant," being a woman home with children, and about being emotional because she was a woman.  (Kanios Dep. pp. 89-93, 97-104, 150-152)

*RESPONSE:* Admitted.

32.     Viesta denies any record of Kanios alleging gender-derogatory remarks. (Viesta Dep. pp. 37-38, 41-44, 55-56, 67-69, 72, 75-80 and Ex. P DO668-669)

*RESPONSE:* Denied as stated. Viesta, in her notes reflecting her meeting with plaintiff regarding plaintiff's complaints of sex discrimination, recorded, *inter alia*, that plaintiff complained that Uliasz made inappropriate comments about her weight, intelligence, and appearance. It was also recorded that some of these comments were made while plaintiff was pregnant. Moreover, these

9

notes reflect that plaintiff was physically moved as if "she didn't matter," with Uliaz stating "out my way." (D.Ex. P at D0668-669; Viesta Depo. at 79 (P.Ex.4).)

33.    Kanios also told Viesta that Uliasz put his hands on her to get by her, expressing frustration, during a conversation in his office--"like she didn't matter."  (Kanios Dep. pp. 108-10, 169-170, 172; Viesta Dep. pp. 42-43, 72-73)

**_RESPONSE_**: Admitted, except that plaintiff was physically moved as if "she didn't matter," with Uliaz stating "out my way." (D.Ex. P at D0668-669.)

34.    Viesta denied that Kanios alleged Ulisaz pushed or shoved her, but rather, visibly demonstrated and verbally described that he had placed his hands up to get by her—without touching, pushing or shoving.  (Viesta Dep. pp. 42-43, 72-73)

**_RESPONSE_**: Denied as stated. Viesta's notes reflect that plaintiff was physically "moved over" as if "she didn't matter," with Uliaz stating "out my way." (D.Ex. P at D0668-669; Viesta Depo. at 79 (P.Ex. 4).)

35.    Kanios' allegations of comments which refer to "women" are absent from both Kanios' Complaint in this action and her CHRO Charge, including the letter attached to her Charge authored by her then attorney, William Blake.  (Ex. K; Ex. R)

**_RESPONSE_**: Denied. Complaints of sex discrimination are found within the complaint. (Complaint ¶¶12, 13, 14, 15 (D.Ex. K); D.Ex. R ¶¶8, 9.)

36.    Further, Kanios produced purported contemporaneous handwritten notes of what she described as pertinent events; not one comment reflected in those notes refers to such statements.  (Ex. T, Kanios Notes)

**_RESPONSE_**: Denied. Plaintiff's notes reflect a barrage of instances in which Uliaz, among other things, made comments about plaintiff's attractiveness, references to her size and appearance, and references drawing similarities between her and an animal. Some of these comments were made while plaintiff was pregnant. Plaintiff's notes also reflect Uliasz's animosity toward her pregnancy and women in the workforce, i.e. "are you going to use the pregnancy excuse." (D.Ex. T.)

37.    When asked at her deposition whether she had raised any claims of gender based discrimination or harassment to Viesta, Kanios responded ambiguously that she "believed" she told Viesta about comments "along those lines"; about the remark that Kanios was "barefoot and pregnant," about Kanios being emotional because she was a woman, and about her mind being home with the children. (Kanios Dep. pp. 148-52; see also Kanios Dep. pp. 97-104, 273-75, 277, 280, 281-88; Ex. T)

*RESPONSE:* Denied as stated. Viesta, in her notes reflecting her meeting with plaintiff regarding plaintiff's complaints of sex discrimination, recorded, *inter alia*, that plaintiff complained that Uliasz made inappropriate comments about her weight, intelligence, and appearance.  It was also recorded that some of these comments were made while plaintiff was pregnant. Moreover, these notes reflect that plaintiff was physically moved as if "she didn't matter," with Uliaz stating "out my way." (D.Ex. P at D0668-669; Viesta Depo. at 79 (P.Ex. 4); Kanios Depo. at 148-152 (P.Ex. 1).)

38.     Kanios was assured she would not have to confront Uliasz unless she was comfortable. (Kanios Dep. pp. 125-27; Ex. K ¶ 17)

*RESPONSE:* Admitted.

39.     Viesta promptly met with Uliasz on February 8, 2001, and informed him of Kanios' complaints which concerned his condescending management style and comments he made about the amount of food Kanios consumed.  (Uliasz Dep. pp. 90, 93-94, 171-73; Viesta Dep. pp. 83-88; Ex. P DO670, D0682-683)

*RESPONSE:* Denied as stated. In late January 2001, plaintiff met with and complained to Rentz regarding Uliasz's harassment which he deemed to "define harassment in the workplace." At this meeting, one of plaintiff's complaints to Rentz was that Uliasz had called her a "fat bitch." Soon after this meeting, Rentz met with Viesta and UST's legal department. At this meeting, Rentz informed the legal department and Viesta of all of plaintiff's complaints. On or about February 8, 2001, Viesta met with Uliasz and informed him of plaintiff's complaints. (Rentz Depo. at 43-45, 50-51 (P.Ex. 6); D.Ex. P at DO667, DO670.)

40.     Uliasz expressed surprise to Viesta that Kanios had not addressed this issue with him directly, yet conceded that, at times, he may have exhibited his frustration with Kanios' performance in a manner which could be too direct.  (Uliasz Dep. pp. 172-73; Viesta Dep. p. 85)

*RESPONSE:* Denied as stated. Uliasz was made aware that employees within the purchasing department did not voice their complaints in fear of retaliation. (Maguire Depo. at 10-11 (P.Ex. 32); Kanios Depo. at 67-69, 77-78, 83-86 (P.Ex. 1).) In addition, Uliasz told Viesta that he was

condescending toward plaintiff and that he insulted plaintiff's intelligence. (Viesta Depo. at 84-85 (P.Ex. 4).)

41.     Uliasz agreed to try to be more sensitive to any condescending demeanor, and to better manage Kanios' performance by giving her specifics and coaching.  (Viesta Dep. pp. 87- 88; Ex. P D0670; Uliasz Dep. pp. 101-02)

**_RESPONSE_**: Denied, except that plaintiff prior to meeting with Viesta and learning of plaintiff's complaints had already given plaintiff a positive review. Uliasz stated that he would stop being condescending. (D.Ex. V; Uliasz Depo. at 98 (P.Ex. 5).)

42.     Uliasz further admitted that he made the "Math 101" comment once (Uliasz Dep. pp. 84), and that he may have joked in the cafeteria about Kanios' food consumption.  (Uliasz Dep. p. 88)

**_RESPONSE_**:  Denied. Uliasz admitted to making the "Math 101" comment and that he commented on the amount of food plaintiff was eating. (Uliasz Depo. at 84, 88 (P.Ex. 5); Maguire Depo. at 35 (P.Ex. 32); Kanios Depo. at 102-103, 148-152 (P.Ex. 1).)

43.     However, during his deposition, Uliasz added that such teasing remarks were made in the department between and among males and females alike. (Uliasz Dep. pp. 158-159, 181)

**_RESPONSE_**: Denied. Uliasz targeted plaintiff with his sexually harassing comments. (Kanios Depo. at 149 (P.Ex. 1).)

44.     Kanios conceded Uliasz could have been simply making a distinction between men and women and how sensitive women are to teasing remarks, as opposed to how men handle teasing. (Kanios Dep. p. 151)

**_RESPONSE_**: Denied as stated. Plaintiff stated that Uliasz found her to be emotional because she was a woman. (Kanios Depo. at 151 (P.Ex. 1).)

45.     Viesta denies that Kanios made any claims of gender-based derogatory comments by Uliasz, and indeed, Viesta's deposition testimony and contemporaneous investigatory notes reflect allegations by Kanios consistent with the Complaint and the CHRO Charge; i.e., that the comments were about the amount of food being consumed, weight, appearance, and intelligence. (Viesta Dep. pp. 172-175 and Ex. P)

**_RESPONSE_**: Denied as stated. Viesta's notes reflect that plaintiff complained that Uliasz made sexually harassing comments regarding plaintiff's appearance and attacked plaintiff's intelligence because she was a female. (D.Ex. P.)

12

46.     Kanios could not proffer evidence as to how Uliasz treated males, or anyone else, in the office.  Nor could she provide any evidence regarding Uliasz's pattern of hiring and firing of males and females, except to concede he promoted Maguire. (Kanios Dep. pp. 95, 113-14, 153-55 )

_**RESPONSE:**_  Denied. Plaintiff states that Uliasz discriminated against her and that he targeted her with his harassing comments. (Kanios Depo. at 149 (P.Ex. 1).) In addition, a so-called similarly situated male employee was treated far better than plaintiff. (Uliasz Depo. at 33-35 (P.Ex. 5).)

47.     After hearing about Kanios' complaint, Uliasz met with Kanios, as pre-planned, to discuss her annual performance review. (Kanios Dep. pp. 124-25, 139-40; Uliasz Dep. pp. 68-71, 169-170)

_**RESPONSE:**_  Denied as stated. Plaintiff's positive annual review of 2001 was already completed when Uliasz was told about plaintiff's complaints and before he met with plaintiff. (D.Ex. V; D.Ex. P.)

48.     Contrary to the Complaint, Kanios admitted during deposition that Uliasz specifically referred to his conversation with Viesta during her review meeting.  (Kanios Dep. pp. 124-25)

_**RESPONSE:**_  Denied as stated. Plaintiff's positive annual review of 2001 was already completed when Uliasz was told about plaintiff's complaints and before he met with plaintiff. (D.Ex. V; D.Ex. P.)

49.     Uliasz still gave Kanios a positive overall performance review and commensurate raise. (Ex. V)   Historically, Kanios's reviews reflected a "meets" or "exceeds" expectations rating by Uliasz. (Kanios Dep. pp. 73-89)

_**RESPONSE:**_  Denied. Plaintiff's positive annual review of 2001 was already completed when Uliasz was told about plaintiff's complaints and before he met with plaintiff. (D.Ex. V; D.Ex. P.) Plaintiff always received positive performance reviews and received a positive performance review from David Turner. (D.Ex. V; D.Ex. P.)

50.     A bonus followed two weeks later.  (Ex. V; Ex. U D0398; Viesta Dep. pp. 165-166; Kanios Dep. pp. 124-125, 160)

*RESPONSE:* Admitted, except that plaintiff's positive annual review was already completed when Uliasz was told about plaintiff's complaints. (D.Ex. V; D.Ex. P.) In addition, throughout her employment, plaintiff each year always received an increase in pay in some form. (P.Ex. 2.)

51.     Howard and Uliasz could have taken the opportunity to change Kanios' performance review upon learning of her complaint about Uliasz, and before presenting it to Kanios. However, neither took such action. Again, two weeks later, Kanios received a bonus on top of the raise granted with the positive review. (Viesta Dep. pp. 168-169; Howard Dep. pp. 145-47)

*RESPONSE:* Denied. Plaintiff's positive annual review of 2001 was already completed when Uliasz was told about plaintiff's complaints and before he met with plaintiff. (D.Ex. V; D.Ex. P.) In addition, throughout her employment plaintiff each year always received an increase in pay in some form. (P.Ex. 2.)

52.     Viesta also advised Howard that Kanios had complained about Uliasz's condescending and abrasive management style. (Viesta Dep. pp. 88-90; Howard Dep. pp. 30-35, 37, 63-66)

*RESPONSE:* Denied as stated. In late January 2001, plaintiff met with and complained to Rentz regarding Uliasz' harassment which he deemed to "define harassment in the workplace." At this meeting, one of plaintiff's complaints to Rentz was that Uliasz had called her a "fat bitch." Soon after this meeting, Rentz met with Viesta and UST's legal department. At this meeting, Rentz informed the legal department and Viesta of all of plaintiff's complaints. On or about February 8, 2001, Viesta met with Uliasz and informed him of plaintiff's complaints. (Rentz Depo. at 43-45, 50-51 (P.Ex. 6); D.Ex. P at DO667, DO670.) Soon after, Viesta met with Howard to discuss plaintiff's complaints. (Viesta Depo. at 88-89 (P.Ex. 4); Howard Depo. at 30-37 (P.Ex. 10).) A short time later, Viesta informed Howard that plaintiff had retained an attorney regarding her complaints of sex harassment. (Viesta Depo. at 131-132 (P.Ex. 4).)

53.     Howard agreed to a meeting with and to monitor Uliasz. (Howard Dep. p. 35-40; Viesta Dep. pp. 89-90, 94, 176)

*RESPONSE:* Admitted.

54.    Howard then approached Kanios directly, who reiterated her claims to Howard. (Kanios Dep. pp. 130-31; Howard Dep. pp. 44-47, 50-52, 78-79; Viesta Dep. p. 94; Ex. EE DO384-388) Howard met with Uliasz.  (Howard Dep. pp. 39-40, 64-67; Uliasz Dep. p. 99-101; Ex. EE DO385-388)

*RESPONSE:* Denied. Prior to her promotion on July 31, 1997, plaintiff complained about harassment and mistreatment to David Turner and Tim Howard, both managers in the purchasing department. In addition, plaintiff was instructed by Tim Howard and David Turner not to complain to Human Resources. (Kanios Depo. at 67-69, 77-78, 83-86 (P.Ex. 1).) Plaintiff made it overtly clear that she did not want to take part in any meeting with Uliasz and yet was duped into such a meeting by Howard. (Kanios Depo. at 130-131 (P.Ex. 1).)

55.    Howard testified Kanios never alleged to him that Uliasz had called her "fat," "ugly," or that she believed she was treated differently because of gender. (Howard Dep. pp. 144- 145)

*RESPONSE:* Denied. Prior to her promotion on July 31, 1997 and beyond, plaintiff repeatedly complained about harassment and mistreatment to David Turner and Tim Howard, both managers in the purchasing department. In addition, plaintiff was instructed by Tim Howard and David Turner not to complain to Human Resources. (Kanios Depo. at 67-69, 77-78, 83-86 (P.Ex. 1).)

56.    Kanios ambiguously claimed she told Howard of Uliasz's comments by making it "obvious" they were made because she is a woman.  (Kanios Dep. p. 146-48)  No factual details were provided.

*RESPONSE:* Denied. Prior to her promotion on July 31, 1997 and beyond, plaintiff repeatedly complained about harassment and mistreatment to David Turner and Tim Howard, both managers in the purchasing department. In addition, plaintiff was instructed by Tim Howard and David Turner not to complain to Human Resources. (Kanios Depo. at 67-69, 77-78, 83-86 (P.Ex. 1).)

57.    On February 16, 2001, Howard, in an attempt to facilitate a resolution, attempted to have a meeting with Kanios and Uliasz, but Kanios expressed discomfort at meeting with them alone. (Kanios Dep. 130-31; Viesta Dep. pp. 98-100; Ex. P DO672)

*RESPONSE:* Denied as stated. Plaintiff made it overtly clear that she did not want to take part in any meeting with Uliasz and yet later was duped into such a meeting by Howard. (Kanios Depo. at 130-131 (P.Ex. 1); D.Ex. W.)

58.     On that same day, Kanios went to the Vice President of UST's Employee Assistance Program ("EAP"), Karen Thorman.  (Thorman Dep. pp. 12-17; Kanios Dep. p. 132)

*RESPONSE:* Admitted.

59.     Observing that Kanios was emotionally upset about attending a meeting her managers had scheduled, Thorman referred Kanios to Dr. Jane Hankin, a psychologist on UST's EAP referral list. Thorman further recommended that Kanios go back to Viesta and talk to her about her discomfort, and herself contacted Viesta to advise that Kanios wanted Viesta present at the meeting. (Thorman Dep. pp. 12-17, 26; Viesta Dep. pp. 94-97; Ex. P DO671)

*RESPONSE:* Denied as stated. Plaintiff was assured she would not have to meet with Uliasz.

(Kanios Depo. at 126-127 (P.Ex. 1).) In addition, plaintiff made it overtly clear that she did not want

to take part in any meeting with Uliasz and yet was later duped into such a meeting by Howard.

(Kanios Depo. at 130-131 (P.Ex.1); D.Ex. W.) As a result of Howard's attempts to force a meeting,

plaintiff's condition worsened and she was sent home from work by Thorman. (D.Ex. P at D0671.)

Thorman referred plaintiff to Dr. Jane Hankin, a psychologist on UST's EAP referral list. (Thorman

Depo. at 12-17, 26 (P.Ex. 12).)

60.     However, on February 20, before hearing from Viesta, Howard attempted to resolve the situation by having a meeting with Kanios and Uliasz, to find out how to "make it better".  (Kanios Dep. pp. 132-36; Howard Dep. pp. 81-83, 89-92; Ex. EE DO389; Viesta Dep. pp. 94-97, 102, 104-05; Ex. P DO671-674; Uliasz Dep. pp. 102, 105-06)

*RESPONSE:* Denied. Howard was made aware by Viesta that plaintiff did not want to meet

with him or Uliasz. At this meeting, plaintiff was extremely uncomfortable and did not speak. (D.Ex.

P at DO671-DO672; Viesta Depo. at 102-103 (P.Ex. 4); D.Ex. W.)

61.     After the February 20th meeting with Uliasz and Howard, Kanios contacted an attorney, who wrote a letter to Senior Vice President, Richard Kohlberger.  (Kanios Dep. pp. 134-35)

*RESPONSE:* Admitted.

62.     This letter referenced only comments relating to Kanios' weight, appearance, and intelligence, yet asserted that such comments were the result of gender-bias, that they created a "hostile environment", and constituted "sexual harassment."  (Ex. W)

**_RESPONSE_**: Denied. On February 21, 2001, Kohlberger received a letter from plaintiff's attorney specifically claiming sexual harassment. This letter, *inter alia*, stated Uliasz made derogatory comments about plaintiff's appearance and that Uliasz pushed her. (D.Ex. W.)

63.     In the interim, on February 22, Viesta had a conversation with Kanios, during which Kanios informed her of the meeting with Howard and Uliasz two days earlier, and her discomfort with meeting them alone. Kanios told Viesta she thought they were trying to "make it a performance issue", and therefore, Viesta suggested another meeting with her present for the following Monday. Kanios agreed. (Viesta Dep. pp. 103-07; Ex. P DO672-674)

**_RESPONSE_**: Denied as stated. Viesta was well aware that plaintiff did not wish to meet with Uliasz and Howard. (Complaint ¶17 (D.Ex. K); D.Ex. P at DO671.) Nevertheless, Viesta put no stop to it. (Viesta Depo. at 98-100, 102-103 (P.Ex. 4).) In addition, plaintiff complained to Viesta that Howard and Uliasz were trying to undermine her complaints of discrimination by creating performance issues. (D.Ex. P at DO674.) A subsequent meeting involving plaintiff, Viesta, Howard and Uliasz was scheduled despite plaintiff's attorney's demand to be present. (D.Ex. W.)

64.     After this conversation, but prior to the scheduled Monday meeting, Kohlberger passed the attorney letter along to Viesta. Viesta contacted Kanios on February 23 to discuss the letter, and asked why Kanios had contacted an attorney. (Kanios Dep. p. 136; Viesta Dep. pp. 104-106, 108-09, 112; Ex. P D0675-676)

**_RESPONSE_**: Denied as stated. Viesta testified that she first saw the letter from plaintiff's attorney on February 23, 2001. (Viesta Depo. at 106 (P.Ex. 4).) Viesta then met with plaintiff to discuss her attorney's letter that stated that plaintiff was a victim of sexual harassment. (Kanios Depo. at 136-137 (P.Ex. 1).)

65.     Viesta claims Kanios told her that her "real estate attorney" had been premature in sending the letter, and she wanted to explore transfer opportunities, but agreed to proceed with the Monday meeting with Howard and Uliasz to continue to aim for resolution. (Viesta Dep. pp. 109-12; Ex. P DO675).

**_RESPONSE_**: Denied as stated. Viesta testified that plaintiff was concerned about being "forced out" and that "her management [was] trying to make a performance issues" out of her complaints. (Viesta Depo. at 109 (P.Ex. 4).) Plaintiff stated that she wanted someone to represent her in the upcoming meeting with Howard and Uliasz. (Kanios Depo. at 136 (P.Ex. 1).)

66.     Kanios denies disavowing the letter, but agrees that she told Viesta she would meet again without her attorney present, responding to Viesta's expression that she wanted things to work about with Uliasz.  (Kanios Dep. pp. 137-38; Ex. P DO675-676)

**<u>RESPONSE</u>:** Denied as stated. Plaintiff never stated that the complaints brought in her attorney's letter were premature nor did she recant in any way any of the complaints brought in her attorney's letter. (Kanios Depo. at 137 (P.Ex. 1).) Plaintiff's attorney, despite his request to be in attendance, was not present at the meeting involving plaintiff, Viesta, Howard and Uliasz. (Kanios Depo. at 141 (P.Ex. 1); D.Ex. DD.)

67.     On February 27, 2001, this meeting was conducted.  Kanios' allegations were reviewed, and the parties agreed that Uliasz would meet with Kanios once each week to discuss the status on projects to improve communications and to avoid problems when he might be frustrated with her performance.  It was also decided that Howard would be observing, monitoring and coaching Uliasz and attending his regular staff meetings as much as he could.  They reiterated that Kanios could come to Uliasz or Howard at any time with any continuing concerns. (Kanios Dep. pp. 138-144; Viesta Dep. pp. 113-16; Ex. P D0675-676; Howard Dep. pp. 90-93, 98-99; Ex. EE DO390)

**<u>RESPONSE</u>:** Denied. On February 7, 2001, approximately 20 days prior to the February 27, 2001 meeting, plaintiff received a positive performance review that never mentioned Uliasz's alleged frustration with plaintiff's performance, let alone be a basis for her termination, until she complained of sexual harassment via her attorney letter. (Viesta Depo. at 111-113 (P.Ex. 4).) In addition, plaintiff called her attorney and informed him that she disagreed with the outcome of the meeting. (Kanios Depo. at 144-145 (P.Ex. 1).)

68.     Viesta testified that she decided what investigative steps to take based specifically on Kanios' allegations.  Thus, had Kanios suggested gender-based harassment, Viesta possibly would have conducted other interviews of women in the department.  (Viesta Dep. pp. 174-175)

**<u>RESPONSE</u>:** Denied. In late January 2001, plaintiff met with and complained to Rentz regarding Uliasz's harassment which he deemed to "define harassment in the workplace." At this meeting, one of plaintiff's complaints to Rentz was that Uliasz had called her a "fat bitch." Soon after this meeting, Rentz met with Viesta and UST's legal department. At this meeting, Rentz informed the legal department and Viesta of all of plaintiff's complaints. (Rentz at 43-45, 50-51 (P.Ex. 6); D.Ex. P at DO667, DO670.) Viesta, in her notes reflecting her meeting with plaintiff regarding

18

plaintiff's complaints of sex discrimination, recorded, *inter alia*, that plaintiff complained that Uliasz made inappropriate comments about her weight, intelligence, and appearance. It was also recorded that some of these comments were made while plaintiff was pregnant. Moreover, these notes reflect that plaintiff was physically moved as if "she didn't matter," with Uliaz stating "out of my way." (D.Ex. P at D0668-669; Viesta Depo. at 79 (P.Ex. 4); Kanios Depo. at 148-152 (P.Ex. 1).) Kohlberger testified that if true, these complaints, especially about appearance, could amount to a violation of UST's Code of Corporate Responsibility which may deal "with violations of law." (Kohlberger Depo. at 29-33 (P.Ex. 8).)

69.     Viesta then told Howard and Uliasz that "a letter" had been received from an attorney representing Kanios, but she did not divulge to Uliasz, and could not recall divulging to Howard, the specific content thereof or that discrimination and sexual harassment were being alleged.  Howard and Uliasz specifically recalled not being told of these details (Howard Dep. pp. 101-104, 133 150-151, 154; Uliasz Dep. pp. 173-175)

**_RESPONSE:_** Denied as stated. Viesta alerted Howard and Uliasz that plaintiff had retained an attorney in connection with her complaints and that a letter from such attorney had been received by UST. This information was relayed to Howard and Uliasz prior to her termination and prior to the alleged discovery of the performance issues forming the basis for her termination. (Viesta Depo at 131-132 (P.Ex. 4); Howard Depo. at 101-102, 133 (P.Ex. 10); D.Ex. P at DO679-DO680.)

70.     The testimony of Howard and Uliasz, which establish that Howard and Uliasz were never made privy to any of the contents of the attorney letters, cannot be contraverted with evidence by Kanios.

**_RESPONSE:_** Denied. Viesta alerted Howard and Uliasz that plaintiff had retained an attorney in connection with her complaints and that a letter from such attorney had been received by UST. This information was relayed to Howard and Uliasz prior to her termination and prior to the alleged discovery of the performance issues forming the basis for her termination. Moreover, Viesta testified that she might have relayed the context of the letter to Howard. (Viesta Depo at 131-132 (P.Ex. 4); Howard 101-102, 133 (P.Ex. 10); D.Ex. P at DO679-DO680.)

71.     Viesta prepared a "purpose" memo dated February 26, 2001, confirming the topics of discussion at the February 27 meeting, noting specifically Viesta's continuing perception that Kanios' complaint was that Uliasz was condescending, and that he had made offensive remarks related to her eating habits and intelligence.   The memo also mentioned Uliasz's frustrations with Kanios' performance as a potential reason for his attitude. (Viesta Dep. pp. 113-117, 178; Ex. P D0677; Kanios Dep. pp. 138-45)

**_RESPONSE:_** Denied. Viesta testified that she first saw the letter from plaintiff's attorney on February 23, 2001. (Viesta Depo. at 106 (P.Ex. 4).) This letter complains, _inter alia_, that plaintiff was being sexually harassed. (D.Ex. W.) In addition, Viesta admits that on February 7, 2001, approximately 20 days prior to the February 27, 2001 meeting, plaintiff received a positive performance review that never mentioned Uliasz's alleged frustration with plaintiff's performance, let alone be a basis for her termination, until she complained of sexual harassment via her attorney letter. (Viesta Depo. at 111-113 (P.Ex. 4).)

72.     Kanios admitted in deposition that some of these performance issues had, in fact, been addressed by Uliasz before her complaint.  (Kanios Dep. pp. 162-74; <u>see also</u> Viesta Dep. p. 178-79, where she confirms that Kanios never alleged performance concerns of Uliasz unjustified)

**_RESPONSE:_** Denied. On February 7, 2001, approximately 20 days prior to the February 27, 2001 meeting, plaintiff received a positive performance review that never mentioned Uliasz's alleged frustration with plaintiff's performance, let alone be a basis for her termination, until she complained of sexual harassment via her attorney letter. (Viesta Depo. at 111-113 (P.Ex. 4).)

73.     Viesta also prepared a March 6, 2001, "recap" memo specifically noting the solutions discussed to improve communications between Kanios and Uliasz going forward.  (Ex. X)

**_RESPONSE:_** Denied. On February 7, 2001, approximately 20 days prior to the February 27, 2001 meeting, plaintiff received a positive performance review that never mentioned Uliasz's alleged frustration with plaintiff's performance, let alone be a basis for her termination, until she complained of sexual harassment via her attorney letter. (Viesta Depo. at 111-113 (P.Ex. 4).) In addition, plaintiff called her attorney and informed him that she disagreed with the outcome of the meeting. (Kanios Depo. at 144-145 (P.Ex. 1).)

74.    Significantly, the recap memo contained an invitation to the recipients, including Kanios, to alter or add to its content if the recipient thought it necessary---Kanios neither changed nor added anything to this memo, despite the lack of any reference to gender-based remarks, or discrimination or harassment on the basis of gender or any other protected category.  (Kanios Dep. pp. 144-45; Ex. X; Viesta Dep. pp. 180-81)

_**RESPONSE**_: Denied. Plaintiff called her attorney and informed him that she disagreed with the outcome of the meeting. (Kanios Depo. at 144-145 (P.Ex. 1).) In addition, Viesta testified that she first saw the letter from plaintiff's attorney on February 23, 2001, four days prior to the meeting that gave rise to the inaccurate "recap" memo. (Viesta Depo. at 106 (P.Ex. 4).) Viesta then met with plaintiff to discuss her attorney's letter that stated that plaintiff was a victim of sexual harassment. (Kanios Depo. at 136-137 (P.Ex. 1).)

75.    Kanios claimed that even after March 6**,** Uliasz made additional comments about her eating.  (Kanios Dep. pp. 140-41)

_**RESPONSE**_: Denied as stated. Uliasz continued to harass plaintiff even after her complaints to Human Resources. (Kanios Depo. at 140-141 (P.Ex. 1).)

76.    However, subsequent to this last meeting, Viesta periodically checked with Kanios about the status of her situation and Kanios replied that the situation was "okay."  (Viesta Dep. pp. 118-119)

_**RESPONSE**_: Denied. From March 6, 2001 to the time of plaintiff's family medical leave, Uliasz's harassment of plaintiff continued unabated. (Kanios Depo. at 140-141, 185-186 (P.Ex. 1); D.Ex. P.)

77.    Viesta, Howard and Uliasz therefore believed the matter had progressed to Kanios' satisfaction.  (Viesta Dep. p. 119; Howard Dep. pp. 90-93; Uliasz Dep. pp. 114-15, 119)

_**RESPONSE**_: Denied. From March 6, 2001 to the time of plaintiff's family medical leave, Uliasz's harassment of plaintiff continued unabated. (Kanios Depo. at 140-141, 185-186 (P.Ex. 1); D.Ex. P; Viesta Depo. at 120-121 (P.Ex. 4).)

78.    On March 19, 2001, Kanios went to Viesta and to Thorman upset, without providing the reasons why she was upset. (Kanios Dep. p. 211; Viesta Dep. pp. 120-21)

*RESPONSE:* Denied. Plaintiff made it known that her emotional distress which manifested itself in panic attacks was directly related to Uliasz's harassment. (Kanios Depo. at 338 (P.Ex. 1); D.Ex. P; Viesta Depo. at 120-121 (P.Ex. 4).)

79.    Kanios mentioned she had a scheduled doctor's appointment and Thorman recommended she keep that appointment.  (Thorman Dep. p. 26)  Kanios told Viesta she was having panic attacks and was going to see her doctor. (Viesta Dep. pp. 120-121, 177, 180; Ex. P D0678.)

*RESPONSE:* Admitted, except that Viesta and Thorman agreed that given plaintiff's condition, she should go see her doctor. (Viesta Depo. at 120-121 (P.Ex. 4); Trencher Depo. at 17-18 (P.Ex. 13).)

80.    Thorman was then contacted directly by Kanios' psychologist who expressed concern over Kanios' return to the department.  (Hankin Dep. pp. 91-92)

*RESPONSE:* Denied as stated. Due to plaintiff's suicidal ideation caused by Uliasz's harassment, plaintiff was placed on family medical leave. (Hankin Depo. at 74-75 (P.Ex. 14); Trencher Depo. at 17-18 (P.Ex. 13); Hankin Notes (P.Ex. 26).)

81.    At the psychologist's request, Thorman agreed to approve Kanios for a two week leave of absence, commencing immediately on March 20, 2001.  (Thorman Dep. pp. 28, 29, 36; Hankin Dep. pp. 91-92; Trencher Dep. pp. 19-20, 35-36; Kanios Dep. pp. 220-21, 310- 311)

*RESPONSE:* Denied. Plaintiff was placed on family medical leave by UST. (Viesta Depo. at 128-129 (P.Ex. 4); Trencher Depo. at 17-18 (P.Ex. 13); Hankin Depo. at 74-76, 83, 86, 91 (P.Ex. 14); Thorman Depo. at 29 (P.Ex. 12); Kanios Depo. at 220-221 (P.Ex. 1).)

82.    Kanios followed up with Viesta on March 20, 2001, and informed her of the two-week medical leave.  (Viesta Dep. pp. 123-24)

*RESPONSE:* Denied. Plaintiff was told that she qualified for approximately one month of FMLA leave. (Viesta Depo. at 128-129 (P.Ex. 4).)

83.    On March 22, 2001, Viesta forwarded to Kanios the UST leave of absence forms, including the physician certification forms, for completion by her and by her treating psychologists so as to qualify for any remaining leave to which Kanios was entitled. (Kanios Dep. pp. 312-14; Ex. Y; Ex. Z; Ex. AA)

*RESPONSE:* Denied as stated. Plaintiff was placed on family medical leave by UST. (Viesta Depo. at 128-129 (P.Ex. 4); Trencher Depo. at 17-18 (P.Ex. 13).) In addition, plaintiff was told that she qualified for approximately one month of FMLA leave. (Viesta Depo. at 128-129 (P.Ex. 4).) Moreover, one day prior to plaintiff's termination, her family medical leave documents were being processed. (D.Ex. Y.)

84.     Like the FMLA policy set forth in the employee handbook, these forms, which Kanios acknowledged receiving and completing, specifically provided that the federal leave entitlement was calculated by looking back at the prior 12 month period. In this regard, it is critical to note that in 2000, and specifically between May 1 through July 12, Kanios had already taken 10.3 weeks of FMLA qualified leave incident to her pregnancy. She then took an additional 2 weeks of medical leave from July 24, 2000, through August 7, 2000; thus, Kanios had taken more than 12 weeks of medical leave during the 12 months between March 20, 2000, and March 20, 2001. (Kanios Dep. pp. 302-03, 306; Ex. Z; Ex. AA; Ex. BB; Ex. CC)

*RESPONSE:* Denied as stated. Plaintiff was placed on family medical leave by UST. (Viesta Depo. at 128-129 (P.Ex. 4); Trencher Depo. at 17-18 (P.Ex. 13).) In addition, plaintiff was told that she qualified for approximately one month of FMLA leave. (Viesta Depo. at 128-129 (P.Ex. 4).) Moreover, one day prior to plaintiff's termination, her family medical leave documents were being processed. (D.Ex. Y.)

85.     The forms confirmed that her federally guaranteed FMLA rights had already been exhausted by that point, and that she may have additional eligibility for leave only under the Connecticut state FMLA.[5] (Ex. Z; Ex. AA; Ex. BB; Kanios Dep. pp. 314-15)

*RESPONSE:* Denied as stated. Plaintiff was placed on family medical leave by UST. (Viesta Depo. at 128-129 (P.Ex. 4); Trencher Depo. at 17-18 (P.Ex. 13).) In addition, plaintiff was told that she qualified for approximately one month of FMLA leave. (Viesta Depo. at 128-129 (P.Ex. 4).) Moreover, one day prior to plaintiff's termination, her family medical leave documents were being processed. (D.Ex. Y.)

86.     On March 21, 2001, immediately following the commencement of Kanios' leave, another letter had been received by Kohlberger from Attorney Blake. (Ex. DD)

*RESPONSE:* Admitted.

---

[5] These forms were sent again to Kanios on April 6, 2001. (D.Ex. Q.)

87.     Kohlberger forwarded this letter to Viesta as well, but the contents of this letter were, like the first, not made known to Uliasz or Howard.  (Howard Dep. pp. 101-104, 133, 150-151, 154; Ex. P D0682-683; Viesta Dep. p. 131-39; Uliasz Dep. 174)

**_RESPONSE_:** Denied as stated. Viesta alerted Howard and Uliasz that plaintiff had retained

an attorney in connection with her complaints and that a letter from such attorney had been received

by UST. This information was relayed to Howard and Uliasz prior to her termination and prior to the

alleged discovery of the performance issues forming the basis for her termination. Moreover, Viesta

testified that she might have relayed the context of the letter to Howard. (Viesta Depo at 131-132

(P.Ex. 4); Howard Depo. at 101-102, 133 (P.Ex. 10); D.Ex. P at DO679-DO680.)

88.     Viesta told Howard a second letter had been received.  During this same conversation, Howard advised Viesta that after Kanios' leave of absence commenced, the plants began calling him and Maguire directly, complaining about the reducing inventory; the failure to receive critical supplies; and unprocessed orders for items for which Kanios was responsible.  (Howard Dep. pp. 107-22, 136-39; Uliasz Dep. pp. 5-6, 135-37, 159-160; Maguire Dep. pp. 20-21; Viesta Dep. pp. 131-36, 142, 149-57; Ex. S).

**_RESPONSE_:** Denied as stated. Viesta alerted Howard and Uliasz that plaintiff had retained

an attorney in connection with her complaints and that a letter from such attorney had been received

by UST. This information was relayed to Howard and Uliasz prior to her termination and prior to the

alleged discovery of the performance issues forming the basis for her termination. Moreover, Viesta

testified that she might have relayed the context of the letter to Howard. (Viesta Depo at 131-132

(P.Ex. 4); Howard Depo. at 101-102, 133 (P.Ex. 10); D.Ex. P at DO679-DO680.) In addition, a so-

called similarly situated male employee who was supposedly terminated for the same performance

deficiencies as plaintiff was not terminated for "unprocessed orders." (Uliasz Depo. at 33-35 (P.Ex.

5).) Finally, plaintiff was not responsible for the so-called "unprocessed orders" or any failures

discovered by Howard or Uliasz during her family medical leave. (Kanios Depo. at 187-201 (P.Ex.

1).)

89.     Maguire testified as to her direct knowledge that orders for supplies and ingredients had not been timely placed by Kanios, despite that she and Kanios had reviewed the inventory together prior to her leave and decided what items within Kanios' responsibility needed to be ordered for the manufacturing plants.  Maguire confirmed that representatives from the plants had called her directly,

informing her that orders for critical ingredients and supplies were either not received or not placed at all.  Maguire herself was frustrated since, based on Kanios' prior assurances and discussions, Kanios should have understood the tasks to be completed.  It was Maguire who then informed both Uliasz and Howard about a number of problems related to the orders for plant materials/ingredients.  (Maguire Dep. pp. 26-29, 44-55, 61-62)

*RESPONSE:* Denied as stated. Plaintiff assisted Priscilla Maguire with her "commodities, which are labels and tobacco ingredients." Under Priscilla Maguire's supervision, she and plaintiff worked well together and "got a long very well." (Maguire Depo. at 9 (P.Ex. 32).) Finally, plaintiff was not responsible for the so-called "unprocessed orders" or any failures discovered by Howard or Uliasz during her family medical leave. (Kanios Depo. at 187-201 (P.Ex. 1).)

90.     A series of e-mail communications and internal memoranda outlining the problems were presented to Maguire during her deposition; she confirmed that she knew personally and directly that Kanios had failed to order items as reflected in these communications.  (Id.; Ex. S)

*RESPONSE:* Denied as stated. Plaintiff assisted Priscilla Maguire with her "commodities, which are labels and tobacco ingredients." Under Priscilla Maguire's supervision, she and plaintiff worked well together and "got a long very well." (Maguire Depo. at 9 (P.Ex. 32).) Finally, plaintiff was not responsible for the so-called "unprocessed orders" or any failures discovered by Howard or Uliasz during her family medical leave. (Kanios Depo. at 187-201 (P.Ex. 1).)

91.     Maguire, a female and friend of Kanios, someone completely removed from the investigation and complaint process, and not a decision-maker with respect to Kanios' employment, presented testimony unrefuted by Kanios that these failures constituted serious derelictions of duty by Kanios which could have potentially shut down plants and/or cost UST millions of dollars.  (Maguire Dep. pp. 49-52; Ex. O, Maguire Affidavit to CHRO)

*RESPONSE:* Denied as stated. Plaintiff assisted Priscilla Maguire with her "commodities, which are labels and tobacco ingredients." Under Priscilla Maguire's supervision, she and plaintiff worked well together and "got a long very well." (Maguire Depo. at 9 (P.Ex. 32).) Finally, plaintiff was not responsible for the so-called "unprocessed orders" or any failures discovered by Howard or Uliasz during her family medical leave. (Kanios Depo. at 187-201 (P.Ex. 1).) Moreover, plaintiff testified that Maguire "apologized" for having to lie on behalf of UST, but that she did it in fear of termination. (Kanios Depo. at 227 (P.Ex. 1).)

92.     Kanios offered no specific facts regarding the reason for the e-mails; did not allege the e-mails were concocted, altered, or fabricated; and proclaimed a lack of any knowledge of these issues. However, she admitted the seriousness of the consequences in not correctly and timely placing orders. (Kanios Dep. 56, 181-210)

_**RESPONSE**_: Denied. Plaintiff clearly stated that she was not responsible for the performance failures discovered after her attorney letter was sent to UST and discovered one day after her family medical leave began.  (Kanios 187-201)

93.     After this initial conversation wherein Howard advised Viesta of these discoveries, serious additional problems were unearthed.  As Howard testified and his contemporaneous handwritten notes confirm, once he was advised of the problems with the plants, both through Maguire and through calls placed directly to him, he asked the employees covering Kanios' desk to see what else might be lingering.  This inquiry revealed that the problems were prevalent, yet Kanios had told Howard prior to her leave as well things were "under control."[6]  (Howard Dep. pp. 106-22, 132-39; Ex. S)

_**RESPONSE**_: Denied. Plaintiff clearly stated that she was not responsible for the performance failures discovered after her attorney letter was sent to UST and discovered one day after her family medical leave began. (Kanios Depo. at 187-201 (P.Ex. 1).)

94.     By this time, it was clear that Kanios' deficiencies were egregious in UST's opinion, especially in view of her repeated assurances to management.  (Uliasz Dep. pp. 135-38)

_**RESPONSE**_: Denied. Plaintiff clearly stated that she was not responsible for the performance failures discovered after her attorney letter was sent to UST and discovered one day after her family medical leave began. (Kanios Depo. at 187-201 (P.Ex. 1).) In addition, a so-called similarly situated male employee who was supposedly terminated for the same performance deficiencies as plaintiff was not terminated for "unprocessed orders." (Uliasz Depo. at 33-35 (P.Ex. 5).)

95.     While Kanios claims that Howard and Uliasz were driven by their desire to retaliate against her for lodging her complaint, she proffers no reason whatsoever for Maguire's undisputed and unequivocal testimony with respect to her performance deficiencies or to disprove the testimony by Howard regarding calls he received directly from the plants.  (Kanios Dep. pp. 181-210)

---

[6] Howard initially told Viesta he wanted to place Kanios on probation, but after problems continued to be discovered, he agreed termination was warranted. (Viesta Depo. at 155-157 (P.Ex. 4.))

*__RESPONSE__: Denied as stated. Plaintiff assisted Priscilla Maguire with her "commodities, which are labels and tobacco ingredients." Under Priscilla Maguire's supervision, she and plaintiff worked well together and "got a long very well." (Maguire Depo. at 9 (P.Ex. 32).) Finally, plaintiff was not responsible for the so-called "unprocessed orders" or any failures discovered by Howard or Uliasz during her family medical leave. (Kanios Depo. at 187-201 (P.Ex. 1).) Moreover, plaintiff testified that Maguire "apologized" for having to lie on behalf of UST, but that she did it in fear of termination. (Kanios Depo. at 227 (P.Ex. 1).)*

96.     Kanios' employment was ultimately terminated effective April 13 by way of letter to her. (Ex. Q, Termination Letter)

*__RESPONSE__: Admitted, except that plaintiff's termination letter is dated April 11, 2001 and plaintiff received a call from the NAPM informing her that they were notified of her termination prior to April 13, 2001. (Kanios Depo. at 251-252 (P.Ex. 1).)*

97.     Kanios confirmed at her deposition that she was medically unable to return to work at the time she received the letter terminating her employment. (Kanios Dep. pp. 306-307, 310)

*__RESPONSE__: Denied. Plaintiff was able to return to work at the time she was terminated. (Kanios Depo. at 308-309 (P.Ex. 1).)*

98.     Kanios stopped seeing her treating psychologist as soon as she received the termination letter, and has not sought continuing treatment with any medical professional since then. (Kanios Dep. pp. 217-19, 315-317)

*__RESPONSE__: Denied. Plaintiff, upon termination, was no longer insured and could no longer afford medical attention. (Kanios Depo. at 315-316 (P.Ex. 1).)*

99.     On or about August 21, 2001, Kanios filed an administrative charge with the Connecticut Commission on Human Rights and Opportunities and the Equal Employment Opportunity Commission.   As previously established, in support of her Charge, Kanios submitted an affidavit, under oath, in which she set forth only allegations that Uliasz had made comments relating to her weight, appearance, and intelligence. The affidavit contains no reference whatsoever to comments by Uliasz that were sexual or gender-based; there were no allegations mentioning disparate treatment of "women," or of Kanios as a "woman"; or even any comments about pregnancy. (Ex. R, Kanios Affidavit to CHRO)

*__RESPONSE__: Denied. (D.Ex. R.)*

27

100.    Similarly, Kanios' Complaint and Amended Complaint in this action contain only allegations that Uliasz made comments regarding her "weight, appearance, eating habits and intelligence," and are likewise conspicuously devoid of any mention of comments regarding gender or pregnancy. (Ex. K ¶¶ 12, 13).

**RESPONSE:** Denied. (D.Ex. K.)

101.    Based on these undisputed facts and the applicable judicial precedent the following becomes apparent:

(a) In support of her discrimination/harassment claims, Kanios failed to proffer sufficient evidence that Uliasz's conduct, even if true, was based on her gender.  Kanios is attempting to transform comments about weight, the amount of food she consumed, and her level of intelligence into actionable behavior, merely by projecting that she did not observe male co-workers being treated in the same fashion.  As to any other comments where gender is even arguably referenced (e.g., "women belong at home"), the sporadic dispersing of gender-based comments does not salvage her cause of action, particularly when she cannot establish how any purported gender bias harbored by Uliasz affected her in terms of compensation or status.  Indeed, she admitted her performance never changed; she was promoted with input by Uliasz; given positive performance reviews; given commensurate raises; and paid bonuses, with one positive review, raise and bonus being given <u>after</u> her internal complaint. (Kanios Dep. pp. 89-95, 124-29, 150-52, 160, 169-70; Maguire Dep. pp. 26, 35-37, 42-44, 58-61; Ex. V; Ex. U);

(b)  In any event, liability cannot be imputed to UST as no Kanios does not allege adverse action attributable to gender based harassment or discrimination (Kanios Dep. p. 254); UST took preventive measures to prevent such harassment (Kanios Dep. 51, 67, 69; Ex. L; Ex. M); and Kanios failed to reasonably take advantage of those measures by waiting to file a complaint, failing to file a subsequent complaint even though his conduct allegedly continued, and by not following up with the remedial measures taken.  (Kanios Dep. pp. 68, 77, 111, 122, 130-36, 138, 140-45; <u>see</u>, <u>e.g</u>, Viesta Dep. pp. 88-90, 92-94, 98-102, 114; Howard Dep. pp. 30, 34-35, 39-40, 44-46, 50-51, 55, 78, 81-83, 86, 89, 94, 98-99; Ex. P);

(c) As to her retaliation claims, even if Kanios' allegations are taken as true, she did not engage in "protected activity" <u>known to Howard or Uliasz</u>, the primary decision-makers with respect to the termination of her employment, when that decision was made, and therefore, Kanios cannot sustain a claim of retaliation under either Title VII or the CFEPA  (Howard Dep. pp. 30-35, 101-04, 133, 144-45, 150-51, 154; Uliasz Dep. pp. 90, 93-94, 171-75).  Moreover, she cannot prove a causal connection between the claimed protected activity and the termination decision, nor can she proffer sufficient evidence of pretext for Defendants' articulated reasons for the subject decision---its discovery of serious neglect of her job duties. (Howard Dep. pp. 107-22; Uliasz Dep. pp. 5-6, 135-37, 159-60; Viesta Dep. pp. 131-36, 142, 149-57; Ex. S; Maguire Dep. pp. 20-21, 26-29, 44-55, 61-62; Kanios Dep. p. 210: "Q.: Do you have any evidence, meaning facts or documents…that the reason given you for termination is inaccurate?  That it was really some other reasoning they terminated you? A.: No, I don't—no.");

(d) Uliasz cannot be held to have "aided and abetted" a discriminatory practice as a matter of law; Uliasz is the accused "discriminator," and therefore, cannot be an "aider or abetter" under well established law;

28

(e) Kanios cannot sustain a claim of negligent infliction of emotional distress, as the required showing that defendant should have realized its conduct during the termination process involved an unreasonable risk of causing severe distress, which might result in illness or bodily harm;

(f) Kanios cannot establish that any representation made to her by anyone at UST was false when made, or which anyone should have known was false when made, in connection with her taking a leave of absence; and

(g) Kanios cannot maintain a claim under the FMLA because: (i) by the time she commenced her last leave of absence, her rights had already been exhausted; (ii) in any event, the remainder of her leave entitlement was exhausted by the time of her termination; or (iii) in the alternative, she did not fulfill the requirement of continued certification of a serious illness, nor was she even able to return to her employment at the time of the undisputed expiration of her leave entitlement.

*__RESPONSE__*: Denied. (D.Ex. K; Rentz Depo. at 43, 45 (P.Ex. 6); Kanios Depo. at 187-201 (P.Ex. 1); D.Ex. W; D.Ex. DD; Plaintiff's Opposition to Defendants' Motion for Summary Judgment.)

102. Accordingly, summary judgment is warranted as to the Amended Complaint in its entirety.

*__RESPONSE__*: Denied.

## *__DISPUTED ISSUES OF MATERIAL FACT__*

1. Prior to her complaints of harassment, plaintiff for over five years continuously received promotions, positive performance reviews and bonuses. (P.Ex. 3; D.Ex. V; P.Ex. 2; Viesta Depo. at 14-21 (P.Ex. 4).)

2. Incident to plaintiff's two pregnancies, Uliasz continuously commented on plaintiff's appearance. (D.Ex. K.)

3. Uliasz engaged in unremitting harassment of plaintiff including but not limited to calling her a "fat bitch." (Kanios Depo. at 59-64, 121, 140-141, 246-247, 253-254 (P.Ex. 1); D.Ex. T; D.Ex. W; D.Ex. K ¶27; Rentz Depo. at 43-45 (P.Ex. 6).)

4. Uliasz subjected plaintiff to unwelcome physical contact. (Kanios Depo. at 59-64, 97-98, 102-103, 109, 140-141, 246-247, 253-254 (P.Ex. 1).)

5.      Rentz informed Viesta of plaintiff's complaints of discrimination. (Rentz Depo. at 44-45, 47-48, 50-51 (P.Ex. 6); Viesta Depo. at 36-37, 44-45 (P.Ex. 4).)

6.      No action was taken to provide, prevent and or promptly correct Uliasz's discriminatory behavior. (Viesta Depo. at 36-37, 44-45 (P.Ex. 4).)

7.      Uliasz, as supervisor of plaintiff, abused the power of his position to further the harassment of plaintiff, leaving UST liable despite any claim that it did not have knowledge of Uliasz' unlawful conduct. (Viesta Depo. at 36-37, 44-45 (P.Ex. 4).)

8.      No affirmative defense is available to UST because Uliasz's harassment culminated in a tangible negative employment action. (D.Ex. Q; Kanios Depo. at 59-64, 97-98, 102-103, 109, 140-141, 246-247, 253-254 (P.Ex. 1); D.Ex. T; D.Ex. W; D.Ex. K ¶27.)

9.      Viesta, Howard and Uliasz, as the primary decision makers in plaintiff's employment, were fully aware of plaintiff's complaints of discrimination. (Viesta Depo. at 36-37, 44-45 (P.Ex. 4); P.Ex. 9.)

10.     Plaintiff, prior to her complaints of discrimination, received no indication that her performance was poor. (Viesta Depo. at 115-116 (P.Ex. 4).)

11.     Plaintiff's gender played a role in defendants' decision to terminate her. (D.Ex. Q; Kanios Depo. at 59-64, 97-98, 102-103, 109, 140-141, 246-247, 253-254 (P.Ex. 1); D.Ex. T; D.Ex. W; D.Ex. K ¶27.)

12.     Plaintiff's complaints played a role in defendants' decision to terminate her. (D.Ex. Q; Kanios Depo. at 59-64, 97-98, 102-103, 109, 140-141, 246-247, 253-254 (P.Ex. 1); D.Ex. T; D.Ex. W; D.Ex. K ¶27.)

13.     Plaintiff complained to Viesta that Uliasz was subjecting her to continuous sexual harassment. (Kanios Depo. 97-98, 103-104, 108-110, 148-152, 169-170, 247 (P.Ex. 1); D.Ex. P at DO668-669; Viesta Depo. pp 62-63, 72-73, 79 (P.Ex. 4).)

14.    As of February 7, 2001, prior to learning of plaintiff's complaints against him, Uliasz created a positive performance review which had been shared with Howard. (Howard Depo. at 26-29; D.Ex. V; P.Ex. 2.)

15.    On February 8, 2001, Viesta met with Uliasz and informed him of plaintiff's complaints. (Rentz Depo. at 43-45, 50-51 (P.Ex. 6); D.Ex. P at DO667, DO670; Viesta Depo. at 83-84 (P.Ex. 4).)

16.    Uliasz admits to being "condescending" toward plaintiff. (D.Ex. P at DO670; Viesta Depo. at 83-84 (P.Ex. 4).)

17.    After learning of plaintiff's complaints, Uliasz did not change plaintiff's positive review because at this time  the review had already been discussed with Howard and they both had authorized her salary increase. (Howard Depo. at 26-29 (P.Ex. 10); P.Ex. 2; Kanios Depo. at 127-128 (P.Ex. 1).)

18.    Viesta informed Howard of plaintiff's complaints. (Viesta Depo. at 88-89 (P.Ex. 4); Howard Depo. at 30-37 (P.Ex. 10).)

19.    On February 16, 2001, Howard having been instructed by Human Resources to "put this to bed," referring to plaintiff's complaints, met with plaintiff and attempted to set up a meeting between Uliasz, plaintiff and himself. (Kanios Depo. at 130-131 (P.Ex. 1); D.Ex. W; D.Ex. P at DO671-DO672; Viesta Depo. at 98, 102-103 (P.Ex. 4); P.Ex. 11; Howard Depo. at 46-48 (P.Ex. 10).)

20.    Within a few minutes of the meeting on February 16, 2001 between Howard and plaintiff, plaintiff became visibly "upset" and ended the meeting crying, making it clear to Howard that she "was not emotionally ready" and did not want to meet with Uliasz. (Howard Depo. at 46-48 (P.Ex. 10); Kanios Depo. at 130-131 (P.Ex. 1).)

21.    Plaintiff went to the Vice President of UST's Employee Assistance Program ("EAP"), Karen Thorman, and complained to her and Mary Ann Morelli, defendant UST's manager of the Employee Assistance Program, that Uliasz had made sexist and derogatory remarks about her

31

weight and appearance. (P.Ex. 11; Thorman Depo. at 12-17 (P.Ex. 12); Kanios Depo. at 132 (P.Ex. 1).)

22.    Thorman, on February 16, 2001, sent plaintiff home from work due to her visible emotional distress. (Viesta Depo. at 94-96 (P.Ex. 4); D.Ex. P at D0671.)

23.    Plaintiff was assured by EAP that she did not have to confront Uliasz alone. (Kanios Depo. at 126 (P.Ex. 1).)

24.    On February 20, 2001, Howard and Uliasz, both aware that plaintiff did not want to meet, duped plaintiff into meeting. (D.Ex. P at DO671-DO672; Viesta Depo. at 98-99, 102-103 (P.Ex. 4); D.Ex. W.)

25.    After the meeting on February 20, 2001, plaintiff complained to Viesta that Howard and Uliasz had created a "two against one" atmosphere and were trying to undermine her complaints of discrimination by creating false performance issues. (D.Ex. P at DO674; Viesta Depo. at 104-105 (P.Ex. 4).)

26.    After meeting with Uliasz and Howard on February 20, 2001, plaintiff contacted an attorney who wrote a letter to the Senior Vice President of UST, Richard Kolhberger. (Kanios Depo. at 134-135 (P.Ex. 1); D.Ex. W.)

27.    On February 21, 2001, Kohlberger received the letter from plaintiff's attorney specifically claiming, among other things, sexual harassment. (D.Ex. W.)

28.    Kohlberger, although the person responsible for overseeing all complaints of discrimination, decided not to take any action himself and passed plaintiff's attorney's letter to Viesta. (P.Ex. 9; D.Ex. P at DO675-676; Viesta Depo. at 106 (P.Ex. 4); Kohlberger Depo. at 13-16, 37-43 (P.Ex. 8).)

29.    Plaintiff's attorney makes it clear in his letter that he is to be present if UST meets with plaintiff to discuss her complaints regarding Uliasz. (D.Ex. W.)

30.     Despite plaintiff's attorney's request, a subsequent meeting involving only plaintiff, Viesta, Howard and Uliasz was scheduled. (D.Ex. W; D.Ex. P at DO677; D.Ex. X.)

31.     On February 27, 2001, this meeting was conducted and a written synopsis of this meeting reflects a discussion not about plaintiff's complaints of discrimination, but instead of her theretofore undisclosed "performance issues." (D.Ex. X; D.Ex. V; D.Ex. P at DO674.)

32.     Plaintiff then called her attorney and informed him of what had occurred, specifically stating that she disagreed with the outcome of this meeting. (Kanios Depo. at 144-145 (P.Ex. 1).)

33.     Despite plaintiff's numerous complaints reported to various members of UST's management, Uliasz's harassment continued unabated. (D.Ex. W; D.Ex. DD; Kanios Depo. at 59-64, 121 140-141, 246-247, 253-254 (P.Ex. 1); D.Ex. T; D.Ex. W; D.Ex. K ¶27; Rentz Depo. at 43-45 (P.Ex. 6); Kohlberger Depo. at 37-43 (P.Ex. 8).)

34.     Plaintiff had been receiving treatment for the emotional distress she suffered at the hands of Uliasz. (Kanios Depo. at 338 (P.Ex. 1); D.Ex. P at DO678; Viesta Depo. at 120-121 (P.Ex. 4).)

35.     On March 19, 2001, plaintiff, visibly shaking and suffering from a panic attack related to Uliasz's abuse, was sent by Viesta to plaintiff's doctor for immediate treatment. (D.Ex. P at DO678; Viesta Depo. at 120-121 (P.Ex. 4); Hankin Depo. at 83 (P.Ex. 14).)

36.     Due to plaintiff's "suicidal ideation," "serious distress" and her doctor's concern over plaintiff remaining in Uliasz's department, plaintiff was placed on Family Medical Leave on March 20, 2001. (Hankin Depo. at 74-76, 83, 86, 91 (P.Ex. 14); Trencher Depo. at 17-18 (P.Ex. 13); Thorman Depo. at 29 (P.Ex. 12); Kanios Depo. at 220-221 (P.Ex. 1); Viesta Depo. at 128-129 (P.Ex. 4); P.Ex. T.)

37.    Viesta informed plaintiff that she had "three and a half weeks left of FMLA."[7] (Viesta Depo. at 128-129 (P.Ex. 4); D.Ex. P at DO679.)

38.    Plaintiff was tendered documents specifically stating she was eligible for the federal leave. (D.Ex. Z.)

39.    On March 21, 2001, immediately following the commencement of plaintiff's Family Medical Leave, plaintiff's attorney sent a second letter to Kohlberger again reiterating plaintiff's claims of sexual harassment and addressing UST's deliberate attempts to stifle plaintiff's rights. (D.Ex. DD; Kohlberger Depo. at 37-43; D.Ex. P at DO679, DO682-DO683.)

40.    Upon receipt of plaintiff's attorney's second letter, Kohlberger did no investigation of his own and passed the letter to Viesta. (Kohlberger Depo. at 37-43 (P.Ex. 8).)

41.    Viesta, upon receipt of this letter on March 21, 2001, again did no investigation of her own. (D.Ex. P at DO683; P.Ex. 9; Viesta Depo. at 131, 146 (P.Ex. 4).)

42.    On March 22, 2001, the day after receipt of plaintiff's attorney's second letter, Viesta alerted Howard and Uliasz that plaintiff had retained an attorney to represent her in opposition to UST. (D.Ex. P at DO683; P.Ex. 9; Viesta Depo. at 131, 132, 146 (P.Ex. 4).)

43.    The same day Howard learned of plaintiff's attorney's second letter, he informed Viesta of the alleged performance failures he and Uliasz "discovered" during plaintiff's absence. (Viesta Depo. at 131-133, 142 (P.Ex. 4); D.Ex. P at DO682-DO683; D.Ex. Q.)

44.    Plaintiff was not responsible for any of these alleged performance failures. (Kanios Depo. at 187-201 (P.Ex. 1).)

45.    Plaintiff was terminated while on FMLA leave, after her attorney's second letter, ostensibly for performance reasons never even discussed with nor mentioned to her. (Viesta Depo. at 115-116 (P.Ex. 4); D.Ex. P at DO682-DO683; D.Ex. Q.)

---

[7] Note also that one day prior to the date of plaintiff's termination letter, her family medical leave documents were being processed. (D.Ex. Z.)

46.    Plaintiff's complaints of harassment were ignored and converted into performance issues which ultimately lead to her termination. (P.Ex. 2; Kanios Depo. at 49-50, 56-59, 72-73, 140-141, 246-247, 253-254 (P.Ex. 1); P.Ex. 7; D.Ex. W; D.Ex. DD; D.Ex. P; D.Ex. Q; Maguire Depo. at 9 (P.Ex. 32); Viesta Depo. at 149 (P.Ex. 4); P.Ex. 9.)

47.    Mr. Mauro, a former employee defendants claim was "similarly situated" to plaintiff, was given several warnings of his performance failures as well as ample opportunities to improve, and only after numerous warnings, personal confrontations and discussions was he actually terminated. (Uliasz Depo. at 33-34, 145; P.Ex. 17 at D0689 and D0713; Viesta Depo. at 161 (P.Ex. 4).)

48.    The only other female employee with UST who claimed sex discrimination was terminated for performance reasons within three months of doing so. (P.Ex. 18; Viesta Depo. at 11-12, 159-160 (P.Ex. 4).)

49.    Defendants' unlawful conduct interfered with plaintiff's FMLA rights. (Viesta Depo. at 115-116 (P.Ex. 4); D.Ex. P at DO682-DO683; D.Ex. Q.)

50.    The actions of Uliasz were taken against plaintiff in an attempt to aid and abet UST's discrimination practices. (D.Ex. K. ¶52; Uliasz Depo. at 33-34, 145 (P.Ex. 5); P.Ex. 17 at D0689 and D0713; Viesta Depo. at 161 (P.Ex. 4); P.Ex. 2; Kanios Depo. at 49-50, 56-59, 72-73, 140-141, 246-247, 253-254 (P.Ex. 1); P.Ex. 7; D.Ex. W; D.Ex. DD; D.Ex. P; D.Ex. Q; Maguire Depo. at 9 (P.Ex. 32); Viesta Depo. at 149 (P.Ex. 4); P.Ex. 9.)

51.    As a result of defendants unlawful conduct, plaintiff suffered and continues to suffer emotional distress. (D.Ex. K ¶57; Hankin Depo. at 74-76, 83, 86, 91 (P.Ex. 14); Trencher Depo. at 17-18 (P.Ex. 13); Thorman Depo. at 29 (P.Ex. 12); Kanios Depo. at 220-221 (P.Ex. 1); Viesta Depo. at 128-129 (P.Ex. 4); P.Ex. 15.)

52.    Plaintiff relied on false representations in the conduct of her activities and in making her decisions regarding employment, specifically in her decision to take a leave of absence, and was

damaged thereby. (D.Ex. K. ¶60; Viesta Depo. at 115-116; (P.Ex. 4); D.Ex. P at DO682-DO683;

D.Ex. Q.)

By_____
  Scott R. Lucas (ct00517)
  Michel Bayonne (ct24628)
  *Attorneys for Plaintiff*
  MARTIN, LUCAS & CHIOFFI, LLP
  177 Broad Street
  Stamford, CT 06901
  Phone: (203) 973-5200
  Fax: (203) 973-5250
  slucas@mlc-law.com
  mbayonne@mlc-law.com

## ***CERTIFICATE OF SERVICE***

This is to certify that on this 12th day of July, 2004, a copy of the foregoing was mailed, first

class, postage prepaid, to:


Steven J. Younes, Esq.
Mary A. Gambardella, Esq.
Epstein Becker & Green, P.C.
One Landmark Square Suite 1800
Stamford, CT 06901-2681
Phone: (203) 348-3737
Fax: (203) 324-9291


_____

Scott R. Lucas